**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DR. SHANNON "SJ" JOSLIN,[1] | |
| *Plaintiff*, | |
| vs. | Case No. 1:26-cv-576 |
| U.S. DEPARTMENT OF THE INTERIOR,<br>    1849 C Street NW<br>    Washington, DC 20240, | **COMPLAINT** |
| NATIONAL PARK SERVICE,<br>    1849 C Street NW<br>    Washington, DC 20240, | |
| U.S. DEPARTMENT OF JUSTICE,<br>    950 Pennsylvania Avenue NW<br>    Washington, DC 20530, | |
| U.S. ATTORNEY'S OFFICE FOR THE<br>EASTERN DISTRICT OF CALIFORNIA,<br>    501 I Street, Suite 10-100<br>    Sacramento, CA 95814, | |
| DOUG BURGUM, in his official capacity as<br>Secretary of the Interior,<br>    1849 C Street NW<br>    Washington, DC 20240, | |
| JESSICA BOWRON, in her official capacity<br>as the Acting Director of the National Park<br>Service,<br>    1849 C Street NW<br>    Washington, DC 20240, | |

---

[1] Pursuant to Local Civil Rule 5.1(c)(1), Plaintiff's address is being filed under seal with the Court in a separate Notice.

PAM BONDI, in her official capacity as Attorney General of the United States, *and*
      950 Pennsylvania Avenue NW
      Washington, DC 20530,

ERIC GRANT, in his official capacity as the Court-Appointed U.S. Attorney for the Eastern District of California,
      501 I Street, Suite 10-100
      Sacramento, CA 95814,

          *Defendants*.

## INTRODUCTION

1.      For decades, climbers at Yosemite National Park have expressed messages—political and non-political—from the iconic rock formation El Capitan ("El Cap"). Yosemite's history is rooted in activism, and that tradition continues today. In August, however, the National Park Service (NPS), together with the Department of Justice (DOJ), broke with this tradition by targeting Plaintiff Shannon "SJ" Joslin for their speech. Dr. Joslin—a nonbinary park ranger and biologist—together with a group of climber friends, unfurled a trans pride flag on El Cap for less than three hours. For this transgression, Dr. Joslin was summarily fired and then, in a significant escalation, criminally investigated. This vindictive campaign violated Dr. Joslin's First Amendment and Privacy Act rights and continues to chill their expressive conduct and speech.

2.      The Trump Administration's hostility toward trans rights is well-documented. On the first day of his second term, Trump signed a major executive order stripping away protections for trans people, and since then, the Administration has waged an all-out attack on trans rights. Among myriad other agency actions, the Department of Defense barred trans soldiers from serving in the military, and the Department of Health and Human Services made it more difficult for trans

2

patients to get appropriate medical care. The administration's actions have sent a clear message: that trans people are not protected by this Administration.

3. Around the same time, the Trump Administration began extensively purging departments and agencies across the federal workforce, including the National Park Service. The initial wave included over 1,000 probationary employees, including critical park staff and rangers. To date, almost one-fourth of all full-time NPS employees have been laid off.

4. Dr. Joslin's group, on a day off, displayed a trans pride flag to send a different message: that being trans is natural. After a short time, the group pulled down the flag on their own accord.

5. The next day, the Yosemite Superintendent announced a new ban on certain sized flags in over 94% of the park—a ban that would have encompassed both the trans flag's size and location. This restriction was added to the Superintendent's Compendium, which contains various rules for use of the park, many of which are backed up by criminal penalties. The timing signaled the beginning of the government's retributive conduct: the Compendium update purported to be dated May 20, 2025 (the day the trans pride flag was flown), but it was neither electronically signed nor made public until May 21, 2025.

6. The government's campaign escalated, and soon thereafter, NPS fired Dr. Joslin. The termination notice cited only a regulation prohibiting demonstrations outside of designated protest areas—a charge that, on information and belief, had never been applied to or enforced for conduct like Dr. Joslin's. As a result, according to NPS, Dr. Joslin "failed to demonstrate acceptable conduct" during their probationary NPS employment.

7. But that was not the end. In communications directly to Dr. Joslin and in statements to the press, the agency confirmed that they were treating the incident as a criminal matter, and

that Dr. Joslin was under active investigation.  Dr. Joslin has not been indicted, but neither have they been informed that any investigation has concluded.  This sends a clear message: Hanging a trans flag in the park results in firing and criminal investigation.  Future expression in support of trans rights would lead to even more severe punishment.

8.      Defendants' campaign against Dr. Joslin is illegal and unconstitutional.  First, Dr. Joslin's termination and criminal investigation were clearly motivated by the government's disagreement with Dr. Joslin's off-duty speech in support of the trans community, of which Dr. Joslin is a part.  Even assuming that Dr. Joslin's actions in displaying the transgender flag violated any existing NPS rules,[2] enforcement of facially valid rules in a way that discriminates based on viewpoint violates the First Amendment.  Moreover, NPS's collection and maintenance of Dr. Joslin's protected speech as part of Dr. Joslin's personnel record, and NPS's use of this information as the basis for Dr. Joslin's termination, violated the Privacy Act.  As a result, Dr. Joslin is entitled to both compensatory and equitable relief.

9.      Unlike tenured employees, Dr. Joslin, as a probationary employee, has no right to appeal their termination to the Merit Systems Protection Board (MSPB).  5 U.S.C. § 7513(d).  They merely can file a complaint with the Office of Special Counsel (OSC), which includes several potential discretionary actions by OSC that would deprive Dr. Joslin of any possibility of administrative remedies by MSPB or meaningful judicial review by an Article III court.

10.      Doctor Joslin filed a complaint with OSC on December 8, 2025 alleging their termination for off-duty expressive activity, hanging the trans flag, is a prohibited personnel practice in violation of both the First Amendment of Constitution and the Privacy Act, 5 U.S.C.

---

[2] It is not clear that the display of the trans flag was a "demonstration," which is a defined term of art in the relevant regulation.  *See* 36 C.F.R. § 2.51 (2024).  The Court need not determine whether the regulation was actually violated to hold that it was selectively enforced.

§ 552a. However, as stated above, filing an OSC complaint does not provide Dr. Joslin with a guaranteed path to appeal their termination to either MSPB or an Article III court.

**PARTIES**

11. Plaintiff Shannon "SJ" Joslin is an individual who primarily resides in El Portal, California. From March 2021 until their termination on August 12, 2025, Dr. Joslin was employed as a wildlife biologist for the Department of the Interior, National Park Service, at Yosemite National Park. Dr. Joslin has a Ph.D. in genetics and prefers they/them pronouns.

12. Defendant U.S. Department of the Interior (DOI) is an agency within the meaning of the Privacy Act. It is an executive department of the United States government. *See* 43 U.S.C. § 1451.

13. Defendant National Park Service is an agency within the meaning of the Privacy Act. It is an executive branch agency and a component of DOI. *See* 54 U.S.C. § 100301.

14. Defendant U.S. Department of Justice is an executive department of the United States government. *See* 28 U.S.C. § 501.

15. Defendant U.S. Attorney's Office for the Eastern District of California is a subagency of the Department of Justice. *See* 28 U.S.C. § 541.

16. Defendant Doug Burgum is the Secretary of DOI, the highest-level official in the Department. He is sued in his official capacity.

17. Defendant Jessica Bowron is the Acting Director of NPS. She is sued in her official capacity.

18. Defendant Pam Bondi is the U.S. Attorney General, the highest-level official in DOJ. She is sued in her official capacity.

19.     Defendant Eric Grant is the court-appointed U.S. Attorney for the Eastern District of California.  He is sued in his official capacity.

## JURISDICTION AND VENUE

20.     Jurisdiction in this Court is proper under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, specifically the First Amendment and the Privacy Act, 5 U.S.C. § 552a.  The Privacy Act also grants this Court jurisdiction under 5 U.S.C. § 552a(g)(1).

21.     Venue is proper in this District under 5 U.S.C. § 552(g)(5), which allows Privacy Act claims to be brought in the U.S. District Court for the District of Columbia.  Venue is also proper in this District under 28 U.S.C. § 1391(e)(1)(A) because the Defendants are officers or employees of the United States acting in their official capacity or under color of legal authority, and at least one of them resides in this District.

22.     Sovereign immunity is waived by 5 U.S.C. § 702 and 5 U.S.C. § 552a(g).

## BACKGROUND

### I.     Yosemite's Long Tradition of Activism

23.     Both activism and guardianship of what is now Yosemite have been fundamental to the development and protection of the park since the mid-1800s.  Long before the United States formally recognized the concept of a national park, advocates sought formal protection of the land now part of Yosemite, demanding official oversight and safekeeping of the area.[3]  The groundswell of advocacy for park protection worked; President Lincoln signed watershed legislation that marked the first time the federal government protected public land.[4]

---

[3] https://perma.cc/RY7Y-78NW; https://perma.cc/N4YS-R8KS.
[4] https://perma.cc/RY7Y-78NW.

24.     Still, because there was no unified body of park administration, Yosemite lacked a formal staffing infrastructure.  In lieu of dedicated park employees, the military patrolled the park on horseback, including the all-Black regiment known as the Buffalo Soldiers.[5]  Once Congress established NPS in 1916, the federal government repeatedly embraced the necessity of dedicated park staff.  Federal labor programs enabled Yosemite rangers to continue working amidst the nationwide economic turmoil of the Great Depression,[6] and after World War II, President Eisenhower reiterated the importance of the national park workforce, passing a bill that modernized employee housing and increased staffing at Yosemite.[7]

25.     As park visitation rose rapidly, so did rock climbing in the park.  With its large wall climbs, Yosemite quickly became an incubator for climbing practices, and it remains an epicenter of rock-climbing culture today.[8]

26.     Alongside the influx in free-spirited climbers, the park became an increasingly popular refuge for California's hippie subculture in the late 1960s and 1970s, securing Yosemite's role as an epicenter of broader cultural revolutions.[9]  The park offered a respite from the nation's cultural turmoil over war, materialism, and societal norms, providing instead a space to connect to nature and freedom and reimagine daily life.  These broader societal tensions nevertheless erupted in Yosemite in July 1970, leading to a violent confrontation between campers and rangers at Stoneman Meadow that increased the scope of park regulation for decades to come.[10]

---

[5] https://perma.cc/RY7Y-78NW.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*

27.    The park has continued to be a hub of demonstration more recently.  For example, Yosemite hosted Pride events multiple years in a row, including a 2023 celebration involving over 1,000 park employees.[11]

28.    Another well-documented example of this tradition is the flying of flags at various places across Yosemite,  including on the face of El Capitan, known as El Cap.  El Cap is "one of Yosemite's most iconic landmarks," "known as the mecca of modern rock climbing[.]"[12]  This tradition continues there today, with flags having been flown on El Cap as recent as fall of 2025. Social media and photographers have documented flags ranging from an annual Father's Day greeting[13] and a birthday wish to a prominent El Cap photographer,[14] to flags protesting climate change[15] and the Israel-Palestine conflict.[16]  At least one other recent flag—an inverted American flag[17]—involved a simultaneous demonstration outside the park welcome center.[18]  As one NPS employee explained, this form of speech is often used to "bring[] attention to what's happening in the parks, which are every American's properties[.]"[19]

29.    On information and belief, no one involved in prior actions—including other federal employees—experienced any consequences as a result of their demonstration.

---

[11] https://perma.cc/K8UX-3TVU; https://perma.cc/986N-QCKW; https://perma.cc/NMD3-5RKE.
[12] https://perma.cc/P95H-QY6E.
[13] *See, e.g.*, https://perma.cc/BTX6-NEMA (commentary on annual flying); https://perma.cc/N4T8-2LU4; https://perma.cc/HW5M-97YT.
[14] https://perma.cc/N5XB-SNSA; https://perma.cc/B8XH-2CXT.
[15] https://perma.cc/VX4Q-WC6A.
[16] https://www.sfgate.com/california-parks/article/yosemite-el-capitan-stop-the-genocide-banner-19521220.php.
[17] https://perma.cc/R945-LFHT; https://perma.cc/47HE-VY88.
[18] https://perma.cc/5DKK-5YXT.
[19] https://www.fastcompany.com/91283708/yosemite-national-park-upside-down-flag-nps-rangers-protest-job-cuts-doge.

**II.     The Trump Administration's Attacks on Park Rangers and Trans Rights**

30.     Beginning shortly after President Trump's inauguration, his administration, including Elon Musk, who, until recently, spearheaded the Department of Governmental Efficiency (DOGE) cost-cutting initiatives,[20] has been gutting agencies as part of an effort to shrink the federal bureaucracy and budget.  In March of last year, President Trump ordered all federal agencies to compile plans for a second wave of mass layoffs, which the White House reviewed alongside Musk's DOGE.[21]

31.     DOI, and specifically NPS, was not spared.  As early as mid-February of last year—less than two months after President Trump took office—the administration had cut thousands of newly hired NPS employees.[22]  To date, up to 24% of permanent park staff has been laid off, and NPS brought on only about half of the 8,000 promised seasonal staff.[23]  As a result of these cuts, national parks were forced to trim their hours, cancel tours and other events, and close visitor centers.  For example, Florissant Fossil Beds National Monument announced that it would be closed at least two days a week for the foreseeable future,[24] and reporting reveals the visible impact of the loss of park staff, including unclean bathrooms and fewer employees to guide or educate visitors.[25]

---

[20] https://www.politico.com/news/2025/05/28/musk-doge-depart-government-00373963.

[21] https://www.reuters.com/world/us/backlash-hhs-delays-plan-slash-10000-jobs-politico-reports-2025-03-31/.

[22] https://perma.cc/S6QA-FZHW.

[23]      https://www.myyosemitepark.com/park/conservation/what-yosemite-locals-want-you-to-know/.

[24]      https://www.fastcompany.com/91283708/yosemite-national-park-upside-down-flag-nps-rangers-protest-job-cuts-doge.

[25]    https://www.nytimes.com/2026/01/19/us/politics/yosemite-national-park-california-staffing-cuts.html;  https://perma.cc/7TLJ-9NVB;  https://perma.cc/PD9J-SV39;  https://perma.cc/N4FG-K495.

32.     The administration's reductions in force across NPS prompted protests, including a February 22, 2025 protest for federal workers' rights outside the Yosemite Welcome Center.

33.     The Trump administration has also taken a hostile approach to the LGBTQ+ community, specifically targeting protections for transgender people.  President Trump's first executive orders of his second term included attacks on transgender people's identity,[26] military service,[27] access to health care,[28] access to education,[29] and access to sports.[30]  The results of these orders have been devastating to the LGBTQ+ community.  For example, the Department of State now issues passports based only on a person's sex assigned at birth;[31] the Department of Health and Human Services replaced former Assistant Secretary of Health Admiral Rachel Levine's legal name with her deadname in the permanent institutional display, where her picture hangs as the first openly transgender government official confirmed by the Senate;[32] and federal employees have been fired or denied retirement benefits due to their support for or membership in the LGBTQ+ community.[33]

34.     The Human Rights Campaign, a prominent LGBTQ organization, published a brief documenting how the Trump Administration's first 100 days constituted a "[s]ystematic [a]ttack

---

[26] Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025), https://www.federalregister.gov/d/2025-02090.
[27] Exec. Order 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025), https://www.federalregister.gov/d/2025-02178.
[28] Exec. Order 14187, 90 Fed. Reg. 8771 (Feb. 23, 2025), https://www.federalregister.gov/d/2025-02194.
[29] Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025), https://www.federalregister.gov/d/2025-02090; https://perma.cc/559H-CJKV.
[30] Exec. Order 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025), https://www.federalregister.gov/d/2025-02513.
[31] https://perma.cc/N5WN-DM4Q.
[32] https://perma.cc/PJP9-XB9J.
[33] https://perma.cc/DH6K-5USW; https://www.reuters.com/legal/government/us-air-force-denies-early-retirement-group-transgender-service-members-2025-08-07/.

on LGBTQ+ [h]ealth," highlighting a broad swath of censorship of trans-inclusive information, including the attempt to "pause if not outright cancel" research funding focusing on critical health issues facing the LGBTQ+ community; the removal of "questions [in government documents] that allowed data on LGBTQ+ people to be collected and studied"; and demands that agencies modify federal policy documents to "erase all instances of language that had previously been changed to now be inclusive of LGBTQ+ communities[.]"[34] By early February 2025, the Trump administration had removed more than 350 pages, policies, and resources containing LGBTQ+ information, including "guides for schools implementing inclusive anti-harassment policies; articles about supporting LGBTQI+ veterans; executive actions taken by President Joe Biden, such as the 'Federal Evidence Agenda on LGBTQI+ Equity'; and the Equal Employment Opportunity Commission's LGBTQI+ resource webpage."[35] And Attorney General Pam Bondi has referred to "radical gender ideology" as an "animating principle" behind "rampant criminal conduct rising to the level of domestic terrorism," and directed the FBI to "establish a cash reward system" for arresting leaders of said "domestic terrorist organizations[.]"[36]

35. DOI and NPS are no exception to this marked change in government policy since the inauguration. For example, one of the websites censored by the new administration is the NPS website documenting the history and significance of the Stonewall Uprising, a watershed moment in the fight for LGBTQ+ rights that led to the dedication of the Stonewall National Monument, which is managed by NPS. The website was scrubbed of any mention of transgender or queer

---

[34] Human Rights Campaign, *First 100 Days: The Trump Administration's Systematic Attack on LGBTQ+ Health*, https://perma.cc/2U2W-TBAU.

[35] https://www.americanprogress.org/article/hundreds-of-lgbtqi-resources-censored-by-the-trump-administration/.

[36] Off. of the Att'y Gen. of the U.S., Implementing National Security Presidential Memorandum-7: Countering Domestic Terrorism and Organized Political Violence (Dec. 4, 2025), attorney-general-bondi-memorandum-re-nspm-7-ag-guidance-12-4-2025.pdf.

people—including removing the "T" from the acronym "LGBTQ."[37]   Federal officials also removed the pride flag from the monument site, which local officials have since replaced.[38]

36.    Nor is this hostility completely new.  Yosemite officials restricted the activities allowed at the park's 2024 Pride parade despite having allowed all the requested events the previous three years, verbally rationalizing that if NPS granted that group's request, the park would have to grant the same request from white supremacists.  Shortly after, Yosemite conducted a First Amendment training to ensure staff are adequately informed of constitutional rights within national parks.  On information and belief, this training was made available as a result of the improper Pride parade restrictions, as Yosemite officials should have granted the Pride organizers' permit request in full.

## III.    Dr. Joslin's Employment with NPS

37.    Plaintiff Shannon "SJ" Joslin is a resident of El Portal, California.  Dr. Joslin holds both a bachelor's degree and Ph.D. in genetics from University of California, Davis.  They are a lifelong climber who has been active in the Yosemite community in a variety of roles over the last two decades.

38.    Dr. Joslin was first hired as a wildlife biologist in Yosemite National Park in March 2021.  Dr. Joslin started in a two-year role due to employment complexities introduced by the COVID-19 pandemic.  This position ended in March 2023, and Dr. Joslin continued their same work in a contract capacity until their supervisor rehired them into a career seasonal position—one of the most permanent positions for NPS wildlife employees—in September 2023.  Dr. Joslin's supervisor created this more stable position for them, as Dr. Joslin indicated they would like to

---

[37] https://perma.cc/48HH-8MZY.
[38] https://www.politico.com/news/2026/02/10/stonewall-pride-flag-trump-nyc-00774020.

work and live in the park forever. Because Dr. Joslin was hired pursuant to COVID hiring authority for their initial period of employment, they began a two-year probationary period when they were hired into the career seasonal position in September 2023. Although their first official NPS position involved the same job responsibilities as the career seasonal position, those two years did not count towards their tenure with the federal government.

39. During Dr. Joslin's roughly 4.5 years with NPS, Dr. Joslin managed Yosemite's bat program, as well as the terrestrial wildlife data for all research projects at Yosemite. Dr. Joslin received universally positive performance reviews and was never subject to disciplinary action prior to the flag display.

## IV.    The May 20 Flag Display

40. In the wake of the dramatic cuts to the ranger service, which also coincided with the early 2025 uptick in attacks on transgender and LGBTQ people, Dr. Joslin attended a protest in support of federal workers' rights.

41. This protest, and the history of expressive conduct at El Cap, inspired Dr. Joslin to make a statement in support of trans people, and they first conceived of rigging a flag on the iconic granite monolith.

42. Dr. Joslin approached a group of fellow climbers, including two fellow NPS employees, and began planning the display. The group contacted environmentalist and drag queen Pattie Gonia, who also lent support leading up to and after the event. The organizers decided to fly a large trans pride flag in order to prove a point: "that trans is natural,"[39] and "to make sure that trans people know they're welcome outdoors."[40]

---

[39] https://www.instagram.com/reel/DJ8rtECC_9E/?hl=en.
[40] https://www.climbing.com/news/yosemite-biologist-fired-for-trans-pride-flag-display/.

43.     Over the same period, various subsets of the organizers attended weekend trips to the site to stake out the technical logistics of fixing a sizable flag to the rock face.  All of Dr. Joslin's involvement in the planning was done on their own time.

44.     Before the flag display, Dr. Joslin and their colleagues consulted with coworkers who attended the NPS-facilitated First Amendment training to discuss personal risks associated with their plan given their employment with NPS.  Based on this training, their colleagues assured them that so long as they were not on duty when participating, they would have their full First Amendment rights, which they factored into the scheduling of the display.

45.     In the week leading up to the display, the organizers encouraged members of the LGBTQ community passing through Yosemite to write messages in support of trans people directly onto the flag they intended to display on El Cap.

46.     On Sunday, May 18—one of Dr. Joslin's days off—a few of the organizers, including Dr. Joslin, climbed El Cap to rig the rope in preparation for the flag, setting it up in a manner that avoided harm to either wildlife or other visitors.  After Dr. Joslin finished work on Monday, May 19, they joined the whole group of trans, queer, and allied climbers on the rock to finish prepping the flag for the next day's flying, and slept under where they would rig the flag overnight, which they had a permit to do.

47.     The organizers unfurled the flag the next morning—Tuesday, May 20, one of Dr. Joslin's days off—around 9:00 a.m., about one-third of the way up El Cap's cliff face, at the base of a naturally formed heart feature.

48.     The flag covered approximately .000069% of El Cap's total surface area; it would take approximately 14,500 more flags of similar size to cover all of El Cap's face.[41]

---

[41] *See* https://perma.cc/52AP-9XN2.



49. The flag flew for approximately two hours, during which the flag did not block any climbers or climbing routes.

50. Around 11:00 a.m., one of the flag seams ripped, and the team "bunched up" the flag on the side of the wall such that it was no longer visible. After they began pulling down the flag, Dr. Joslin received a call from a climbing ranger who congratulated the organizers on a successful mission, and asked them to take the flag down. Dr. Joslin explained that they were already in the process of doing so, so the ranger thanked them and told them to have a great day.

51. The flag was fully removed by approximately 11:30 a.m. or 12:00 p.m., less than three hours after its initial unfurling.

52. On the same day that flag was displayed, the group issued a press release. Dr. Joslin was quoted in the press release but was not identified as a Yosemite employee. On information

15

and belief, Defendants collected this press release and used it as part of their determination to take adverse action against Dr. Joslin.

53.     At all times during the preparation for and placement and display of the trans pride flag, Dr. Joslin was off duty.  Dr. Joslin never identified themself as a Yosemite employee, nor did their colleagues participating in the climb.  Dr. Joslin never suggested, and indeed made all available efforts to disclaim, that the display reflected any position held by the park or was in any way related to their NPS employment.  Dr. Joslin hung the flag on their day off in order to make clear that the statement was made not as a ranger, but as a human being.

54.     Dr. Joslin and the other organizers received an outpouring of support for their display from colleagues, members of the Yosemite climbing community, and members of the LGBTQ+ community, in addition to the public writ large.

## V.     The Aftermath of the May 20 Demonstration

### *Compendium Update*

55.     The day after Dr. Joslin's demonstration, the Yosemite Superintendent announced a new ban on flags.  The ban was added as an update to the Yosemite Superintendent's Compendium, which sets out permit requirements, closures, restrictions, and other guidelines within Yosemite, pursuant to the superintendent's regulatory authority.  *See* 36 C.F.R. § 1.5 (1986); *see* 54 U.S.C. § 100751(a).  Specifically, the newly-instituted flag ban states that no person or group may "hang or otherwise affix to any natural or cultural feature, or display so as to cover any natural or cultural feature, any banner, flag, or sign larger than 15 square feet (e.g., 5 feet x 3

feet)."[42]  The ban applies within wilderness areas or potential wilderness areas inside the national park—areas that comprise over 94% of Yosemite's total acreage, including El Cap.[43]

56.     The Superintendent justified the policy change as "necessary to preserve the values of wilderness character in accordance with the Wilderness Act, provide for an unimpaired visitor experience, protect natural and cultural resources in designated Wilderness and Potential Wilderness Addition portions of the park," as well as "to maintain public safety, as it prohibits draping items that could endanger and interfere with permitted or allowable unpermitted climbing activity."[44]   However, such a restriction never previously existed in the history of Yosemite National Park, and, on information and belief, many such flags had been displayed in the past.

57.     While the Compendium update purports to be dated May 20, 2025 (the day of the trans pride flag demonstration), it was electronically signed by the park's acting superintendent and ultimately published on May 21, 2025.[45]

58.     Reporting on the flag ban implementation called attention to the temporal connection between the trans pride flag and the ban on flags over a certain size, suggesting that the new policy was a direct reaction to Dr. Joslin's action displaying the trans flag. As one article explained, "[a]s expected, the timing of the update caused considerable commotion among park visitors."[46]   On information and belief, and based on the timing of the announcement, the park's stated justification was pretext for censoring disfavored speech like Dr. Joslin's flag demonstration.

---

[42] https://thehill.com/homenews/state-watch/5347980-yosemite-rulebook-trans-pride-flag/.
[43] https://perma.cc/86G2-TFXF.
[44] *Supra* n.42.
[45] *Id.*
[46] https://perma.cc/37EA-DZMP.

59.     Violations of any NPS regulation, including those in the Compendium, purport to carry the same penalty: a fine as provided by law of up to $5,000 for individuals or $10,000 for organizations (18 U.S.C. § 3571), or by imprisonment not exceeding six months (18 U.S.C. § 3559), or both, in addition to covering all court costs associated with any court proceedings. *See* 36 C.F.R. § 1.3 (2024); 54 U.S.C. § 100751(c) (both citing 18 U.S.C. § 1865).

### *Disciplinary Action*

60.     In a sharp departure from the tone of the communications from NPS the day of the event, NPS informed Dr. Joslin a few days later that they were under investigation.

61.     As part of that investigation, NPS summoned Dr. Joslin for an in-person interview. Dr. Joslin asked whether they were under criminal investigation and the interviewer responded affirmatively.  Dr. Joslin declined to discuss further without representation and they were excused from the interview.

62.     During a later, purely administrative interview, an NPS representative explained that Dr. Joslin's investigation was the result of their participation in what NPS claimed was a demonstration that constituted a violation of the park rules, namely, the May 20 flying of a large trans pride flag on El Cap.

63.     The next day, Dr. Joslin's boss got a call from the acting deputy superintendent requesting that Dr. Joslin come in for an additional meeting.  At that meeting, the acting deputy superintendent shook Dr. Joslin's hand, introduced herself, and handed Dr. Joslin a "Notice of Termination During Trial Period."

64.     This termination notice, dated July 30, 2025, and attached as Exhibit A, alleged that Dr. Joslin "failed to demonstrate acceptable conduct" when they "participated in a small group demonstration in an area outside the designated protest and demonstration area without a permit

18

as required by 36 CFR 2.51 and thus circumvented rules applicable to all park visitors." As a result, the letter concluded, Dr. Joslin's "continued employment . . . at [Yosemite] is being terminated" with a "terminative effective date [of] August 12, 2025." The termination notice did not contain any additional justification for the disciplinary action. Dr. Joslin also received a termination-related SF-50, which officially documents an employee's separation from the government and can have lasting effects on an individual's ability to secure other jobs in the future. This SF-50 reiterated the "unacceptable conduct" justification for terminating Dr. Joslin's probationary employment.

65.     Since then, Defendants' public statements have made clear their intent to investigate Dr. Joslin to the fullest extent possible under the applicable regulation, leaving Dr. Joslin concerned about pending administrative, disciplinary, civil, and criminal proceedings, including a fine, imprisonment, or both.[47] Dr. Joslin also fears further collateral consequences.

### Repercussions of Termination

66.     As a result of their unlawful termination, Dr. Joslin has faced—and continues to face—medical, financial, personal, and professional harm. Dr. Joslin has suffered lost wages and other job benefits since their termination over five months ago. Dr. Joslin also experienced an interruption in their health insurance coverage in the face of multiple significant diagnoses (Lyme disease and thyroid condition) that require ongoing medical care, and have been exacerbated by

---

[47] https://perma.cc/86P4-8JLP ("The agencies 'are pursuing administrative action against several Yosemite National Park employees and possible criminal charges against several park visitors who are alleged to have violated federal laws and regulations related to demonstrations," National Park Service spokesperson Rachel Pawlitz said.'"); https://perma.cc/FK6P-2MMX ("[A]s most demonstrations require a permit, the U.S. Attorney's Office for the Eastern District of California 'is evaluating possible criminal charges based on a National Park Service investigation.'"); https://www.newsweek.com/yosemite-trans-flag-park-ranger-fired-el-capitan-2116414; https://kmph.com/news/local/yosemite-biologist-fired-for-hanging-trans-flag-on-el-capitan.

the stress of their abrupt termination.  In the same vein, Dr. Joslin's unexpected termination, based on protected activity, has also caused them mental anguish for which they have incurred increased healthcare costs for mental health treatment.

67.     Dr. Joslin is also dealing with an unexpected and challenging job search.  Dr. Joslin wants their job back, and wants to continue to serve as a biologist and park ranger with NPS.  In their words, the only position for their skills in their current location is with NPS.  As a result, Dr. Joslin has incurred and will continue to incur expenses associated with both career search tools and relocation—all while wishing they could return to their NPS job and remain in their community.

68.     Dr. Joslin further faces the ongoing chilling of their speech, as Dr. Joslin would continue to express their viewpoints through expressive conduct in Yosemite if they did not fear the penalties—civil, criminal, and otherwise—associated with the selective enforcement of the flag ban.  In particular, Dr. Joslin fears that if they demonstrated in support of LGBTQ+ rights again, that they would again be subject to investigations and enforcement.

69.     More broadly, Dr. Joslin fears that the Trump administration will continue to weaponize and make examples of probationary employees in order "to tell all of the other federal employees that they have to be silent and comply or they will be eliminated."[48]  As Dr. Joslin explained, "[i]t isn't just about one ranger.  It's about whether everyone has the right to speak freely in the United States."[49]

70.     Dr. Joslin filed a complaint with the OSC on December 5, 2025, alleging that Defendants' unconstitutional conduct constituted a "Prohibited Personnel Practice."  *See* 5 U.S.C.

---

[48]         https://www.aol.com/yosemite-national-park-employee-fired-215947358.html; https://perma.cc/86P4-8JLP.

[49] https://perma.cc/52AP-9XN2.

§ 2302(a)(1), (b)(12); 5 U.S.C. § 1214(a)(1)(A).  Under the Civil Service Reform Act (CSRA), the OSC must respond within 240 days, 5 U.S.C. § 1214(b)(2)(A)—here, Monday, August 3, 2026. But the OSC investigator assigned to Dr. Joslin's case informed counsel that the office is "experiencing delays in processing [OSC complaints] as [they] try to catch up from the government shut down and the large volume of complaints that have filed."

## CLAIMS
### COUNT I: VIOLATION OF THE FIRST AMENDMENT
### (TERMINATION, AS TO DEFENDANTS DOI, NPS, BURGUM, & BOWRON)

71.     Dr. Joslin incorporates the above paragraphs as if fully set forth herein.

72.     The First Amendment protects Dr. Joslin's right to free speech, including the right to express different viewpoints without retaliation, punishment, or deterrence based on those viewpoints and beliefs.

73.     Defendants' actions in terminating Dr. Joslin's employment violate the First Amendment by selectively targeting for retaliation specific forms of expression based on content and viewpoint, and by seeking to punish Dr. Joslin for engaging in speech disfavored by the government.

74.     Defendants' actions have the purpose and effect of direct and indirect censorship and both content-based and viewpoint-based discrimination against Plaintiff.

75.     Defendants' actions have already and will continue to chill Dr. Joslin's freedom of speech and expression.

76.     This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

**COUNT II: VIOLATION OF THE FIRST AMENDMENT**
**(CRIMINAL INVESTIGATION, AS TO ALL DEFENDANTS)**

77.    Dr. Joslin incorporates the above paragraphs as if fully set forth herein.

78.    The First Amendment protects Dr. Joslin's right to free speech, including the right to express viewpoints disfavored by the government without retaliation, punishment, or deterrence based on those viewpoints and beliefs.

79.    Defendants' actions pursuing criminal punishment violate the First Amendment because they constitute coercion, persuasion, and/or intimidation that is intended to and has the effect of inhibiting the free exchange of ideas and the expression of viewpoints disfavored by the government.

80.    Defendants' actions further violate the First Amendment by selectively targeting for retaliation specific forms of expression on content and viewpoint, and by seeking to punish Dr. Joslin for engaging in speech disfavored by the government.

81.    Defendants' actions further violate the First Amendment because they constitute threats of legal sanction and other means of coercion to achieve the suppression of disfavored speech.

82.    Defendants' actions have the purpose and effect of direct and indirect censorship and both content-based and viewpoint-based discrimination against Dr. Joslin.

83.    Defendants' actions have already and will continue to chill Dr. Joslin's freedom of speech and expression.

84.    This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

**COUNT III: VIOLATION OF THE PRIVACY ACT – 5 U.S.C. § 552a(e)(7)**
**(AS TO DEFENDANTS NPS & DOI)**

85.    Dr. Joslin incorporates the above paragraphs as if fully set forth herein.

86.    5 U.S.C. § 552a(e)(7) provides that "[e]ach agency that maintains a system of records shall . . . maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity[.]"

87.    5 U.S.C. § 552(a)(4) defines a "record" as "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph[.]"

88.    5 U.S.C. § 552a(g)(1)(D) provides that "[w]henever any agency . . . fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection."

89.    NPS and DOI are "agencies" as defined by 5 U.S.C. § 552a(1).

90.    On information and belief, Defendants used records "describing how [Dr. Joslin] exercise[d] rights guaranteed by the First Amendment," where no such exception in 5 U.S.C. § 552a(e)(7) applies, for the purpose of taking adverse action against Dr. Joslin for their off-duty protected speech.  Defendants then took adverse action against Dr. Joslin based on those records by terminating Dr. Joslin effective August 12, 2025.

23

91.     As a result, Dr. Joslin was subject to an adverse effect: they were terminated when they otherwise would not have been and suffered harms, including actual damages.

92.     All Defendants acted intentionally or willfully within the meaning of the Privacy Act.

93.     Administrative exhaustion is not required for damages claims under the Privacy Act.  And Dr. Joslin has no alternative recourse for these Privacy Act violations.

### COUNT IV: VIOLATION OF THE PRIVACY ACT – 5 U.S.C. § 552a(g)(1)(C) (AS TO DEFENDANTS NPS & DOI)

94.     Dr. Joslin incorporates the above paragraphs as if fully set forth herein.

95.     5 U.S.C. § 552a(g)(1)(C) provides that "[w]henever an agency . . . fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual . . . the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection."

96.     On information and belief, Defendants used records describing how Dr. Joslin exercised rights guaranteed by the First Amendment while off duty, which made those records irrelevant under the Privacy Act.  The use of these irrelevant records caused NPS and DOI to make an adverse determination against Dr. Joslin, specifically by terminating Dr. Joslin effective August 12, 2025.

97.     As a result, Dr. Joslin has suffered harm, including actual damages.

98.     All Defendants are "agencies" as defined by 5 U.S.C. § 552a(1).

99.     All Defendants acted intentionally or willfully within the meaning of the Privacy Act.

100.    Administrative exhaustion is not required for damages claims under the Privacy Act.  And Dr. Joslin has no alternative recourse for these Privacy Act violations.

## COUNT V: DECLARATORY JUDGMENT ACT
### (AS TO ALL DEFENDANTS)

101.    Dr. Joslin incorporates the above paragraphs as if fully set forth herein.

102.    Dr. Joslin is entitled to declaratory relief under 28 U.S.C. § 2201 and 28 U.S.C. § 2202.  There is an actual controversy within this Court's jurisdiction, and a declaration of rights necessary to remedy continuing harm resulting from (1) Defendants' retaliatory criminal investigation into and wrongful termination of Dr. Joslin's employment with NPS in violation of the First Amendment; and (2) Defendants' collection and use of data on Dr. Joslin's (and other federal employees') protected First Amendment activity, including as the basis for their wrongful termination.

## PRAYER FOR RELIEF

For these reasons, Dr. Joslin requests that the Court award the following relief:

a.  Grant injunctive relief, pursuant to 42 U.S.C. § 3613(c)(1), ordering Defendants to reinstate Dr. Joslin to their position, title, and job description held with NPS as of August 11, 2025, and enjoining Defendants from criminally enforcing park regulations against Dr. Joslin for speech supportive of trans rights;

b.  Award Dr. Joslin actual damages under 5 U.S.C. § 552a(g)(4)(A), the exact amount of which is to be determined at trial but is not less than $1,000;

c.  Grant a declaratory judgment under 28 U.S.C. § 2201 and 28 U.S.C. § 2202 that

Defendants' collection and use of information about Dr. Joslin's protected First

Amendment activity was unlawful;

d.  Award Dr. Joslin reasonable costs and attorney's fees as provided in 5 U.S.C.

§ 552a(g)(4)(B) and/or 28 U.S.C. § 2412;

e.  Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

f.  Grant such other relief as the Court may deem just and proper.

Dated:  February 23, 2026                         Respectfully submitted,

                                                  /s/ Clayton L. Bailey
                                                  Clayton L. Bailey (DC Bar No. 1644867)
                                                  Margaret (Emmy) Wydman (DC Bar No.
                                                  90007646)
                                                  **Civil Service Law Center LLP**
                                                  1455 Pennsylvania Ave NW, Suite 400
                                                  Washington, DC 20004
                                                  (202) 571-7836
                                                  cbailey@civilservicellp.com
                                                  ewydman@civilservicellp.com

                                                  Paula Dinerstein (DC Bar No. 333971)
                                                  Joanna Citron Day* (DC Bar No. 477833)
                                                  **Public Employees for Environmental
                                                  Responsibility**
                                                  962 Wayne Ave, Suite 610
                                                  Silver Spring, MD 20910
                                                  (202) 464-2293
                                                  pdinerstein@peer.org
                                                  jday@peer.org

                                                  *application for admission pending per
                                                  LCvR 5.1(c)(2)