Clayton L. Bailey (DC Bar No. 1644867) (admitted *pro hac vice*)
Margaret (Emmy) Wydman (DC Bar No. 9007646) (admitted *pro hac vice*)
**Civil Service Law Center LLP**
1455 Pennsylvania Ave NW, Suite 400
Washington, DC 20004
(202) 571-7836

Paula Dinerstein (DC Bar No. 333971) (admitted *pro hac vice*)
**Public Employees for Environmental Responsibility**
962 Wayne Ave, Suite 610
Silver Spring, MD 20910
(202) 464-2293
pdinerstein@peer.org

*Counsel for Plaintiff Shannon "SJ" Joslin*

[Additional counsel listed on signature page]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

DR. SHANNON "SJ" JOSLIN,

     *Plaintiff,*

     vs.

U.S. DEPARTMENT OF THE INTERIOR, *et al.*,

     *Defendants.*

Case No. 1:26-cv-2029-JLT-EPG

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

PAGE

INTRODUCTION ..................................................................................................................1

I.    Factual Background........................................................................................................2

      A.    History of Demonstrations at Yosemite ................................................................2

      B.    First Amendment Regulations at Yosemite ...........................................................3

      C.    The Trump Administration's Hostility to Trans Rights and Speech.........................4

      D.    NPS's Selective Punishment of Dr. Joslin ............................................................4

II.   Procedural Background ..................................................................................................6

III.  Dr. Joslin is likely to succeed on the merits. ...................................................................8

      A.    Dr. Joslin's selective punishment was unconstitutional. ...........................................8

            1.    Dr. Joslin was similarly situated to others who were not punished. .............9

            2.    The government's actions violated Dr. Joslin's First Amendment
                  rights.......................................................................................................11

            3.    Dr. Joslin, even as a federal employee, is entitled to First
                  Amendment protections. ..........................................................................12

      B.    This Court has jurisdiction to reinstate Dr. Joslin. ................................................14

      C.    This Court has jurisdiction to enjoin criminal enforcement against Dr.
            Joslin......................................................................................................................17

IV.   The remaining factors also support Dr. Joslin's request for preliminary relief. .................20

      A.    Dr. Joslin will suffer irreparable harm absent immediate relief.............................20

      B.    The balance of equities strongly favors Dr. Joslin. ..............................................20

CONCLUSION ....................................................................................................................21

**TABLE OF AUTHORITIES**

**CASES**                                                                                                    **PAGE**

*AFGE Loc. 1 v. Stone,*
  502 F.3d 1027 (9th Cir. 2007)...................................................................................... 14, 16

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) .......................................................................................... 7, 20

*Am. Beverage Ass'n v. City & Cnty. of San Francisco,*
  916 F.3d 749 (9th Cir. 2019)............................................................................................. 7, 20

*Baird v. Bonta,*
  81 F.4th 1036 (9th Cir. 2023)........................................................................................... 20, 21

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
  591 U.S. 610 (2020) .............................................................................................................. 10

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics,*
  29 F.4th 468 (9th Cir. 2022).................................................................................................. 20

*Chamber of Com. of the United States of Am. v. Bonta,*
  62 F.4th 473 (9th Cir. 2023)................................................................................................... 7

*Church of Scientology of California v. Comm'r,*
  823 F.2d 1310 (9th Cir. 1987)................................................................................................. 8

*Cmty. House, Inc. v. City of Boise,*
  490 F.3d 1041 (9th Cir. 2007)............................................................................................... 21

*Coleman v. Ridge,*
  2008 WL 108895 (N.D. Cal. Jan. 8, 2008) .......................................................................... 15

*Connick v. Myers,*
  461 U.S. 138 (1983) ......................................................................................................... 11, 12

*Cox v. Louisiana,*
  379 U.S. 536 (1965) ............................................................................................................... 8

*D'Angelo v. Winter,*
  403 F. App'x 181 (9th Cir. 2010)........................................................................................... 14

*Davis v. Billington,*
  51 F. Supp. 3d 97 (D.D.C. 2014) .......................................................................................... 16

*Doe v. Harris,*
  772 F.3d 563 (9th Cir. 2014).................................................................................................. 20

**CASES (continued)**                                                        **PAGE**

*Dombrowski v. Pfister*,
380 U.S. 479 (1965) ............................................................................................. 20

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ................................................................................................ 16

*Esparraguera v. Dep't of the Army*,
981 F.3d 1328 (Fed. Cir. 2020) .......................................................................... 16

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ............................................................................................ 17

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) (en banc) ..................................................... 7, 20, 21

*Fenico v. City of Philadelphia*,
70 F.4th 151 (3d Cir. 2023) ................................................................................ 14

*Flores v. Bennett*,
635 F. Supp. 3d 1020 (E.D. Cal. 2022) ............................................................... 12

*Foti v. City of Menlo Park*,
146 F.3d 629 (9th Cir. 1998) ............................................................................ 2, 8

*Frazier v. Merit Sys. Prot. Bd.*,
672 F.2d 150 (D.C. Cir. 1982) ............................................................................ 16

*Frederick Douglass Found., Inc. v. D.C.*,
82 F.4th 1122 (D.C. Cir. 2023) ................................................................. 9, 10, 19

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ...................................................................................... 17, 19

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ...................................................................................... 12, 13

*Garcia v. Cnty. of Alameda*,
150 F.4th 1224 (9th Cir. 2025) ..................................................................... 17, 18

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ................................................................................ 7

*Geo Grp., Inc. v. Inslee*,
151 F.4th 1107 (9th Cir. 2025) ........................................................................... 18

*Giebel v. Sylvester*,
244 F.3d 1182 (9th Cir. 2001) ............................................................................ 11

**CASES (continued)**       **PAGE**

*Gilbrook v. City of Westminster*,
   177 F.3d 839 (9th Cir. 1999) ........................................................................ 12, 13

*Hoye v. City of Oakland*,
   653 F.3d 835 (9th Cir. 2011) ...................................................................... 8, 9, 10

*Hubbard v. U.S. EPA Adm'r*,
   809 F.2d 1 (D.C. Cir. 1986) ................................................................................. 17

*Isaacson v. Mayes*,
   84 F.4th 1089 (9th Cir. 2023) ............................................................................. 19

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*,
   585 U.S. 878 (2018) ...................................................................................... 11, 13

*Johnson v. Multnomah Cnty., Or.*,
   48 F.3d 420 (9th Cir. 1995) ................................................................................. 13

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) ........................................................................................ 9, 12

*Lacey v. Maricopa Cnty.*,
   693 F.3d 896 (9th Cir. 2012) .............................................................................. 10

*LSO, Ltd. v. Stroh*,
   205 F.3d 1146 (9th Cir. 2000) ............................................................................ 18

*McCullen v. Coakley*,
   573 U.S. 464 (2014) .............................................................................................. 8

*Meese v. Keene*,
   481 U.S. 465 (1987) ............................................................................................ 18

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ................................................................................ 7

*Milliken v. Bradley*,
   433 U.S. 267 (1977) ............................................................................................ 19

*Nken v. Holder*,
   556 U.S. 418 (2009) .............................................................................................. 7

*Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*,
   112 F.4th 373 (6th Cir. 2024) ............................................................................. 14

*NRA v. Vullo*,
   602 U.S. 175 (2024) .............................................................................................. 8

**CASES (continued)**              **PAGE**

*Olivier v. City of Brandon, Miss.*,
607 U.S. ___, 2026 WL 783725 (U.S. Mar. 20, 2026) ......................................................... 19

*Peace Ranch, LLC v. Bonta*,
93 F.4th 482 (9th Cir. 2024) ................................................................................................. 19

*Rankin v. McPherson*,
483 U.S. 378 (1987) ............................................................................................................. 13

*Riley's Am. Heritage Farms v. Elsasser*,
32 F.4th 707 (9th Cir. 2022) ................................................................................................. 13

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995) .......................................................................................................... 8, 11

*Roth v. Veteran's Admin. of Gov't of U.S.*,
856 F.2d 1401 (9th Cir. 1988) ............................................................................................. 13

*Schlesinger v. Reservists Comm. to Stop the War*,
418 U.S. 208 (1974) ............................................................................................................. 18

*Snyder v. Phelps*,
562 U.S. 443 (2011) ............................................................................................................. 11

*Sprint Commc'ns, Inc. v. Jacobs*,
571 U.S. 69 (2013) ............................................................................................................... 18

*Stand With US Ctr. for Legal Just. v. Mass. Inst. of Tech.*,
158 F.4th 1 (1st Cir. 2025) ................................................................................................... 11

*Steffel v. Thompson*,
415 U.S. 452 (1974) ............................................................................................................. 18

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........................................................................................................ 17, 18

*Swann v. Charlotte-Mecklenburg Bd. of Ed.*,
402 U.S. 1 (1971) ................................................................................................................. 19

*United States v. Fausto*,
484 U.S. 439 (1988) ............................................................................................................. 16

*United States v. Nat'l Treasury Emps. Union*,
513 U.S. 454 (1995) ............................................................................................................. 12

*Waln v. Dysart Sch. Dist.*,
54 F.4th 1152 (9th Cir. 2022)...................................................................................... 8, 9, 11, 12

PLAINTIFF'S PRELIM. INJ. MEMO.         - v -

**CASES (continued)** PAGE

*Wayte v. U.S.*,
470 U.S 598 (1985) ................................................................................................. 9

*Webster v. Doe*,
486 U.S. 592 (1988) ................................................................................................ 14

*Wilborn v. Napolitano*,
2012 WL 354494 (S.D. Cal. Feb. 2, 2012) ........................................................... 15

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ...................................................................................................... 7

*Woodhull Freedom Found. v. United States*,
948 F.3d 363 (D.C. Cir. 2020) ............................................................................... 18

**STATUTES** PAGE

5 U.S.C. § 1214(a)(1)(A) ................................................................................................ 15

5 U.S.C. § 1214(a)(1)(D) ................................................................................................ 15

5 U.S.C. § 1214(b)(1) ..................................................................................................... 17

5 U.S.C. § 1214(b)(2)(B) ................................................................................................ 15

5 U.S.C. § 1214(b)(2)(C) ................................................................................................ 15

5 U.S.C. § 1214(b)(3)(B) ................................................................................................ 15

5 U.S.C. § 1214(c)(1) ................................................................................................ 16, 17

5 U.S.C. § 2302 .............................................................................................................. 15

5 U.S.C § 7511(a)(1)(A) ................................................................................................. 15

5 U.S.C. § 7513(d) .......................................................................................................... 15

5 U.S.C. § 7703 .............................................................................................................. 15

18 U.S.C. § 1865(a) .......................................................................................................... 3

18 U.S.C. § 3559 ............................................................................................................... 3

18 U.S.C. § 3571 ............................................................................................................... 3

54 U.S.C. § 100751(a) ...................................................................................................... 3

54 U.S.C. § 100751(c) ....................................................................................................... 3

**REGULATIONS**                                                                          **PAGE**

5 C.F.R. § 1201.3(a)(3) (2026) ........................................................................... 15

36 C.F.R. § 1.3 ....................................................................................................... 3

36 C.F.R. § 1.5 ....................................................................................................... 3

36 C.F.R. § 2.51 ................................................................................... 3, 5, 19, 21

36 C.F.R. § 2.51(a) ................................................................................................ 3

36 C.F.R. § 2.51(c) ................................................................................................ 3

75 Fed. Reg. 64148, 64153 ................................................................................... 3

83 Fed. Reg. 2065, 2068 ....................................................................................... 3

**INTRODUCTION**

For decades, climbers of all political stripes have shared messages from El Capitan (El Cap), the iconic rock formation in the heart of Yosemite National Park (Yosemite). Support for political causes, expressions of personal identity, and simple messages to friends and family have taken turns dotting the rock face. The National Park Service (NPS) never punished anyone for hanging flags of all sizes—that is, until Dr. Shannon "SJ" Joslin, together with a group of climbers, hung a trans pride flag. This time, NPS fired Dr. Joslin and began civilly and criminally investigating them, in concert with the Department of Justice (DOJ). That selective punishment was viewpoint discrimination in violation of the First Amendment. Dr. Joslin therefore moves for a preliminary injunction reversing the agency's decision to terminate and enjoining criminal enforcement against Dr. Joslin for this or similar future conduct.[1]

The rights of trans people have long been a subject of intense public attention and concern. Following an established tradition of bringing flags up El Cap, Dr. Joslin—a wildlife biologist for Yosemite who studies bat genetics—climbed the cliff with some friends and colleagues to spread a trans pride flag in support of their community to ensure they felt welcome in the national parks. After less than three hours, Dr. Joslin and the team took down the flag. The display took place while Dr. Joslin was off-duty, with no connection between the display and Dr. Joslin's NPS work.

Apparently for the first and only time, NPS and DOJ aggressively responded to a flag on El Cap. First, NPS summarily fired Dr. Joslin, who was a probationary employee at that time. Then, the government began a *criminal* investigation into the flag display. Other consequences have followed. NPS's sole justification was that Dr. Joslin had "participated in a small group demonstration in an area outside the designated protest and demonstration area without a permit." But that was pretext. In truth, the government's selective enforcement of its regulation against Dr. Joslin's display (assuming Dr. Joslin even violated the regulation) was motivated by its content: support for trans rights, which the Trump Administration, including NPS, has relentlessly attacked.

---

[1] Dr. Joslin moves only as to the amended complaint's constitutional claims (Counts I & II). *See* First Am. Compl., filed contemporaneously; *see infra* n.5.

These actions against Dr. Joslin violate the First Amendment. Although the government may be able to enforce some speech restrictions at Yosemite, "discriminatory enforcement of a speech restriction amounts to viewpoint discrimination in violation of the First Amendment." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (citation omitted). That is the case here.

The Defendants' likely counterarguments are unavailing. The administrative channeling arguments that the government often advances in cases brought by federal employees do not apply to constitutional cases where, as here, there is no path to judicial review available through Civil Service Reform Act (CSRA) channels that offers meaningful relief. On criminal enforcement, Dr. Joslin can readily establish standing, and injunctions are proper in First Amendment cases like this one. On both fronts, the loss of First Amendment rights for even a short time constitutes irreparable harm. And the balance of the equities clearly favors Dr. Joslin.

**BACKGROUND**

**I.      Factual Background**

  **A.      History of Demonstrations at Yosemite**

Yosemite has long been a hub for activism. Wydman Decl.,[2] Exs. 1, 2, 3, 4; Joslin Decl.[3] 2. Displays on El Cap, one of Yosemite's most iconic landmarks (Wydman Decl., Ex. 5), are core to that history. Activity around El Cap is so common that media has sprung up just to cover it: for over two decades, "Yosemite Icon" Tom Evans maintained a seasonal climbing blog, the "El Cap Report," that tracked the daily happenings of the famous rock formation. Wydman Decl., Exs. 6, 7. The El Cap Report documented scores of messages displayed from flags or banners, from support for Yosemite Medical Clinic (Wydman Decl., Ex. 8) to a birthday wish to Evans himself (Wydman Decl., Exs. 9, 10).

More recently, this natural billboard has been the site of political protest on a range of issues, including climate change (Wydman Decl., Ex. 11) and the Israel-Palestine conflict (Wydman Decl., Ex. 12). Just three months before Dr. Joslin displayed the trans pride flag, another group of

[2] Declaration of Margaret (Emmy) Wydman, attached hereto as Exhibit 2.

[3] Declaration of Shannon "SJ" Joslin, attached hereto as Exhibit 4.

PLAINTIFF'S PRELIM. INJ. MEMO.     - 2 -

employees displayed an upside-down American flag to protest staffing cuts at national parks. Wydman Decl., Ex. 13.  The climbers sought to "bring[] attention to what's happening in the parks, which are every American's properties[.]"  Wydman Decl., Exs. 14, 29, 30.  As far as Dr. Joslin is aware, none of these instances were punished in any way.  Joslin Decl. 2.

### B.       First Amendment Regulations at Yosemite

Officials at Yosemite relied on 36 C.F.R. § 2.51 to punish Dr. Joslin.  Joslin Decl., Ex. C, at 1.  That regulation limits "demonstrations," defined as "conduct that involve[s] the communication or expression of views or grievances . . . which is reasonably likely to attract a crowd or onlookers." 36 C.F.R. § 2.51(a).  Under the rule, subject to various permitting rules, demonstrations are allowed in "designated available park areas," 36 C.F.R. § 2.51(c), which do not include El Cap.  Wydman Decl., Ex. 15, at 42.  The current version of the regulation has been in place since 2018, *see* 83 Fed. Reg. 2065, 2068, and a regulation that similarly limited demonstrations to specified areas has been in place since at least 2010, *see* 75 Fed. Reg. 64148, 64153.

The day after Dr. Joslin's display, Yosemite revised its "Superintendent's Compendium," which sets forth the policies governing "the proper management, protection, government and public use" of the park.  Wydman Decl., Ex. 15, at 1, Ex. 16.  The Compendium is a compilation of the federal laws and regulations "governing the use and enjoyment of all the areas of the National Park System."  *See* Wydman Decl., Ex. 15, at 1; 36 C.F.R. § 1.5; *see* 54 U.S.C. § 100751(a).  This revised compendium, for the first time, included an explicit permit requirement for "any banner, flag, or sign larger than fifteen square feet."  Wydman Decl., Ex. 15, at 23–24.  The new rule applies "in designated Wilderness and Potential Wilderness Addition portions of the park," which comprise over 94% of the park, including El Cap.  *Id.*; Wydman Decl., Ex. 17.  Oddly, the new rule was backdated, apparently to try to capture Dr. Joslin's conduct.  Wydman Decl., Exs. 15, 16.

Violations of any NPS regulation, including those in the Compendium, purport to carry the same penalty: a fine as provided by law of up to $5,000 for individuals or $10,000 for organizations (18 U.S.C. § 3571), or by imprisonment not exceeding six months (18 U.S.C. § 3559), or both.  *See* 36 C.F.R. § 1.3; 54 U.S.C. § 100751(c) (both citing 18 U.S.C. § 1865(a)).

## C.     The Trump Administration's Hostility to Trans Rights and Speech

Since the beginning of President Trump's second term, the federal government writ large has demonstrated sustained hostility toward the LGBTQ+ community, with a particular animus toward trans people.  President Trump's first executive orders of his second term included attacks on trans people's identity, military service, access to health care, access to education, access to bathrooms, and access to sports.  The results of these orders have been devastating to the LGBTQ+ community.  For example, the Department of State now issues passports based only on a person's sex assigned at birth; the Department of Health and Human Services replaced former Assistant Secretary of Health Admiral Rachel Levine's legal name with her deadname in the permanent institutional display, where her picture hangs as the first openly trans government official confirmed by the Senate; and federal employees have been fired or denied retirement benefits due to their support of or membership in the LGBTQ+ community.[4]

NPS has followed suit.  In the months leading up to Dr. Joslin's punishment, NPS scrubbed its webpage documenting the history and significance of the Stonewall Uprising, a watershed moment in the fight for LGBTQ+ rights.  The Stonewall National Monument, the first U.S. landmark dedicated to LGBTQ+ rights and history, is managed by NPS.  Specifically, the website erased any mention of trans people, including removing the "T" from the acronym "LGBTQ."  Wydman Decl., Ex. 18.  Federal officials also removed the pride flag from the monument site, which local officials have since replaced.  Wydman Decl., Ex. 19.

## D.     NPS's Selective Punishment of Dr. Joslin

On May 20, 2025, Plaintiff Shannon "SJ" Joslin, who is nonbinary, joined a group of trans, queer, and allied climbers to scale El Cap and unfurl a trans pride flag.  Joslin Decl. 4–5.  The group voluntarily took the flag down after less than three hours, during which the flag did not block any climbers or climbing routes.  It was hung on ropes affixed to the rockface with the same temporary climbing equipment used by thousands of climbers on that wall, and did no damage.  The group's

_____

[4] The Human Rights Campaign released a brief following President Trump's first 100 days in office documenting the many ways in which the Administration has targeted LGBTQ+ speech.  Wydman Decl., Ex. 32.

intention was to communicate the flag display to the public through photographs on social media. *Id.* Dr. Joslin explained that the group "[r]ais[ed] this flag in the heart of El Cap" as "a celebration of [their] community standing in solidarity with each other and all targeted groups," to show that "[t]rans existence is not up for debate" and that "[b]eing trans is a natural, beautiful part of human and biological diversity." Joslin Decl. 7; Wydman Decl., Ex. 20. All of Dr. Joslin's expressive activity took place during off-duty hours, and Dr. Joslin never identified themself as a Yosemite employee, nor did their colleagues participating in the climb. Dr. Joslin never suggested that the demonstration reflected any position held by the park; rather, Dr. Joslin made all available efforts to disclaim that it was at all affiliated with their NPS employment. Wydman Decl., Exs. 21, 22; Joslin Decl. 8–9.

About a week later, Defendants notified Dr. Joslin that they were under investigation for their participation in the May 20 display and, after a series of interviews, Dr. Joslin received a termination notice. Joslin Decl. 10–11. The notice stated that Dr. Joslin "failed to demonstrate acceptable conduct" when they "participated in a small group demonstration in an area outside the designated protest and demonstration area without a permit as required by 36 C.F.R. § 2.51 and thus circumvented rules applicable to all park visitors." [5] Joslin Decl. 11, Ex. C. As a result, the letter concluded, Dr. Joslin's "continued employment . . . at [Yosemite] is being terminated" with a "terminative effective date [of] August 12, 2025." *Id.*; *see also* Joslin Decl., Ex. D. Because Dr. Joslin was fired approximately four weeks before the end of their two-year probationary period, Dr. Joslin did not have access to the Merit Systems Protection Board (MSPB) or to the Federal Circuit appeal that follows an MSPB proceeding. Joslin Decl. 10.

Defendants also began criminally investigating Dr. Joslin. NPS told Dr. Joslin during an early in-person interview that they had initiated an active criminal investigation. Joslin Decl. 9. NPS also told numerous media outlets that the agency, together with DOJ, was pursuing criminal penalties against the climbers. Wydman Decl., Exs. 23 ("The agencies 'are pursuing administrative

---

[5] It is not clear that the display of the trans flag was a "demonstration," which is a defined term of art in the relevant regulation. *See* 36 C.F.R. § 2.51. The Court need not determine whether the regulation was actually violated to hold that it was selectively enforced.

action against several Yosemite National Park employees and possible criminal charges against several park visitors who are alleged to have violated federal laws and regulations related to demonstrations,' National Park Service spokesperson Rachel Pawlitz said."), 24 ("[A]s most demonstrations require a permit, the U.S. Attorney's Office for the Eastern District of California 'is evaluating possible criminal charges based on a National Park Service investigation.'"), 25, 26. Between the park's new ban on flags and the agency's heavy-handed punishment of Dr. Joslin, media attention on NPS's response dwarfed coverage of the original display. *See* Wydman Decl., Exs. 24, 25, 29, 33, 34, 35, 36, 37.

Further, in early 2026, Dr. Joslin applied to serve as a member of Yosemite's search and rescue (SAR) team for the summer season. Joslin Decl. 10–11. This is a volunteer position intended to "augment the . . . operational staff" that "respond[s] to emergencies that occur[] in the park" given the "the complexity and frequency of these emergencies" during busy season. Wydman Decl., Ex. 41. Dr. Joslin was encouraged to apply because of their extensive climbing, medical, and safety-related certifications. Joslin Decl. 2, 10–11. But Dr. Joslin was rejected without an interview on the grounds that "[a]ll . . . positions . . . ha[d] been filled," despite Dr. Joslin's colleague informing them that no offers had been made at the time of that email. Joslin Decl. 10–11; Joslin Decl., Ex. E.

As a result of these actions, Dr. Joslin lost a dream job, along with significant wages and benefits, including health insurance, a critical resource because the stress of the situation has exacerbated multiple preexisting medical conditions. Aside from tangible losses, Dr. Joslin has suffered a significant constitutional injury: freedom of expression in Dr. Joslin's favorite place, Yosemite, out of fear of continued targeting and escalating criminal enforcement. This selective targeting of Dr. Joslin has reverberated throughout the community, representing what Dr. Joslin explains as a warning to "all of the other federal employees that they have to be silent and comply or they will be eliminated." Wydman Decl., Exs. 23, 27.

## II. Procedural Background

Dr. Joslin initially filed their complaint, and a motion for preliminary injunction, in the U.S. District Court for the District of Columbia, asserting claims under the First Amendment and Privacy Act. D.D.C. Compl., ECF No. 1; D.D.C. Mot. for Prelim. Inj., ECF No. 3. After expedited briefing

on Defendants' request to transfer this action to the Eastern District of California, the DC court granted that request. ECF Nos. 8–12. Dr. Joslin then filed an amended complaint before this Court and now moves anew for a preliminary injunction.

**LEGAL STANDARDS**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). "The first factor—likelihood of success on the merits—is the most important factor[.]" *Chamber of Com. of the United States of Am. v. Bonta*, 62 F.4th 473, 481 (9th Cir. 2023). When the moving party seeks to enjoin the government, the final two factors—balancing the equities and the public interest—"merge." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted); *see also Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) ("[W]e have 'consistently recognized the significant public interest in upholding First Amendment principles.'" (citation omitted)).

When applying the *Winter* factors, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *see Fellowship of Christian Athletes*, 82 F.4th at 684 (noting the "lesser showing than likelihood of success" required by the "serious questions" test). And where a plaintiff "raise[s] serious First Amendment questions . . . the balance of hardships tips sharply in [their] favor." *Am. Beverage Ass'n*, 916 F.3d at 758 (cleaned up).

**ARGUMENT**

**III.    Dr. Joslin is likely to succeed on the merits.**

    **A.    Dr. Joslin's selective punishment was unconstitutional.**

Selectively enforcing a facially valid law based on the content of speech is unconstitutional. "Viewpoint discrimination is . . . an egregious form of content discrimination," and "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995); *see also NRA v. Vullo*, 602 U.S. 175, 198 (2024) ("[T]he First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech[.]"). And "[t]he pervasive restraint on freedom of discussion by the practice of the authorities under [a] statute is not any less effective than a statute expressly permitting such selective enforcement." *Cox v. Louisiana*, 379 U.S. 536, 557 (1965). This principal has been repeatedly reaffirmed by the Ninth Circuit.[6] *See Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1162–63 (9th Cir. 2022); *Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011); *see also McCullen v. Coakley*, 573 U.S. 464, 484 (2014) (citing *Hoye*, 653 F.3d at 849–52, as an example of "selective enforcement" of a facially valid restriction).

This circuit typically evaluates two elements for such a claim: (1) whether the plaintiff was similarly situated to others who did not have the law enforced against them, and (2) whether this selective enforcement infringed upon the plaintiff's constitutional rights. *See Waln*, 54 F.4th at 1163–64 (comparing plaintiff with other students before analyzing whether school district satisfied strict scrutiny as to its restriction of plaintiff's free speech rights); *Church of Scientology of*

---

[6] At times, the Ninth Circuit has diverged on the appropriate constitutional framing for a selective enforcement claim. *See Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011) (collecting cases evaluating selective enforcement claims as either "an 'as-applied' First Amendment challenge" or a "selective enforcement equal protection claim[]"); *see also Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998), *as amended on denial of reh'g* (July 29, 1998) (distinguishing between an as-applied constitutional challenge and "viewpoint discrimination in violation of the First Amendment," the latter of which requires "evidence of . . . alleged discriminatory enforcement of the ordinance"). Although Dr. Joslin believes the First Amendment is the correct vehicle, Dr. Joslin also asserts a claim under the Fifth Amendment. *See* Am. Compl., filed contemporaneously. And this motion supports a preliminary injunction under either constitutional provision; "Any difference between these two approaches is, at least in this case, semantic rather than substantive." *Hoye*, 653 F.3d at 855.

*California v. Comm'r*, 823 F.2d 1310, 1320–21 (9th Cir. 1987); *see also Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1136 (D.C. Cir. 2023).

Both elements are met here.[7] Defendants selectively enforced a facially neutral policy against Dr. Joslin, punishing Dr. Joslin for their pro-trans rights message while allowing other views. *See Waln*, 54 F.4th at 1162–63 ("[A] policy that is 'viewpoint neutral on its face may still be unconstitutional if not applied uniformly.'" (citation omitted)). And this discrepancy in treatment based on viewpoint transgresses Dr. Joslin's free speech rights. *See id.* Further, Dr. Joslin is entitled to First Amendment protections even as a government employee. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528–31 (2022).

### 1. Dr. Joslin was similarly situated to others who were not punished.

Individuals are similarly situated to others not punished where "the decision to prosecute" a law against one but not the other is "deliberately based upon an unjustifiable standard" that falls outside the factors typically contemplated in "prosecutorial discretion[.]" *Wayte v. U.S.*, 470 U.S 598, 607–08 (1985) (citations omitted). For example, in *Waln*, a graduating high school student was prohibited from attending graduation due to the religious tribute—an eagle feather—affixed to her graduation cap. 54 F.4th at 1156. Although the school district had a facially content-neutral prohibition on decorating graduation caps, students who adorned their caps with secular messages— such as breast cancer awareness—were not punished. 54 F.4th at 1157, 1163. The Ninth Circuit thus concluded that "the District enforced its facially neutral policy in a selective way." *Id.* at 1163. So too here, where multiple individuals who engaged in similar speech to Dr. Joslin were not punished.

Given the long, documented history of displaying messages on El Cap and in Yosemite more broadly, *supra* at 2–3, there are unsurprisingly many similar displays that did not result in punishment. Three examples, all involving displays on El Cap, are highlighted here.

---

[7] While *Hoye* describes an intent requirement, that requirement can be met by satisfying the "similarly situated" element. 653 F.3d at 855 (holding that intent can be "extrapolate[d] from enforcement data); *see also Waln*, 54 F.4th at 1162–63 (omitting any discussion of "intent").

First, just three months before Dr. Joslin's display, a group that included park employees hung an upside-down American flag during "firefall," a natural phenomenon involving a colorful waterfall that attracts thousands of visitors specifically to El Cap each year. *See* Wydman Decl., Ex. 28. This display was designed to protest cuts to NPS and garnered significant media coverage that identified those involved. Wydman Decl., Exs. 29, 30. Second—zooming out to non-employees—in June 2024, a group called "Climbers with Palestine" displayed a 25-foot-by-15-foot banner reading "Stop the Genocide." Wydman Decl., Ex. 12. Again, no punishment followed. And third, in 2022 a group of climbers put up a banner that read "War Should Be Against Climate Change." Wydman Decl., Ex. 11. Much the same, and again, no punishment.[8] Each of these displays was "about matters of public concern and sought to disseminate a political message," and each was "proximate in time." *Frederick Douglass*, 82 F.4th at 1138. Yet, despite the lack of "distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions" between Dr. Joslin and myriad prior demonstrators, only Dr. Joslin was targeted and punished. *See id.* at 1137–38 (citation omitted). That alone reveals "that similarly situated defendants . . . could have been prosecuted, but were not," which satisfies Dr. Joslin's burden on this prong. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 920–21 (9th Cir. 2012) (citation omitted). "[E]xtrapolating from [this] series of enforcement actions"—or lack thereof—this arbitrary enforcement owes to Defendants' disagreement with Dr. Joslin's pro-trans rights message. *Hoye*, 653 F.3d at 855 (examining discriminatory intent "as manifested in the [] application of [a] written [ordinance]" (citation omitted)). Indeed, NPS's change to the Compendium to explicitly ban the same type of flag display as Dr. Joslin's immediately after their display, *supra* at 3, is also evidence that Dr. Joslin was singled out for punishment, including a *post hoc* attempt to justify that punishment.

---

[8] Even treating Dr. Joslin's message differently from non-political messages, like the innocuous birthday message mentioned above, is impermissible content-based discrimination. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (plurality opinion) (holding that law favoring "speech made for collecting government debt over political and other speech" was "a content-based restriction").

### 2. The government's actions violated Dr. Joslin's First Amendment rights.

"'[V]iewpoint discrimination' occurs when the government prohibits 'speech by particular speakers,'" and "it is 'axiomatic' that viewpoint-based suppression of speech is impermissible[.]" *Giebel v. Sylvester*, 244 F.3d 1182, 1188–89 (9th Cir. 2001) (citations omitted). Because "[d]iscrimination against speech because of its message is presumed to be unconstitutional," *Rosenberger*, 515 U.S. at 828, "[v]iewpoint-based restrictions on speech are subject to strict scrutiny," *Waln*, 54 F.4th at 1162.

"[S]peech on public issues occupies the 'highest rung of the heirarchy [sic] of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (citation omitted); *see also Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection." (cleaned up)). Dr. Joslin's speech—the display of a trans pride flag—squarely relates to a matter of public concern, defined as "any matter of political, social, or other concern to the community" or "a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 453 (citations omitted). As discussed above, some of the messages that were not censored also involved matters of significant public concern. *See, e.g.*, *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 585 U.S. 878, 913 (2018) (listing both "climate change" and "sexual orientation and gender identity" as "undoubtedly matters of profound 'value and concern to the public'" (citation omitted)); *Stand With US Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 13 (1st Cir. 2025) (holding that "the conflict in Gaza" was a "matter of public concern"). Because "viewpoint discrimination occurs when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject," *Giebel*, 244 F.3d at 1188 (cleaned up), Defendants violated Dr. Joslin's First Amendment rights by excluding pro-trans rights content while allowing other messages of public concern.

Such a distinction cannot survive strict scrutiny, or even lesser forms of scrutiny.[9] NPS may well have a valid government interest for some speech restrictions within Yosemite and on El Cap,

---

[9] While some First Amendment challenges would require a forum analysis, considering the level of speech restriction allowable on different kinds of government property is unnecessary here "because, regardless of

PLAINTIFF'S PRELIM. INJ. MEMO.          - 11 -

but they certainly have no valid interest in favoring other types of speech over pro-trans rights speech. *See Waln*, 54 F.4th at 1159 (finding the government's interests unpersuasive where unpunished acts "present a nearly identical threat to those interests"); *see infra* Section II.B.

### 3. Dr. Joslin, even as a federal employee, is entitled to First Amendment protections.

Although federal employees give up some personal freedom when they decide to serve their country, "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."[10] *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). Courts therefore apply a two-step inquiry to determine whether a public employee's speech is protected under the First Amendment: (1) whether the employee "speaks as a citizen addressing a matter of public concern[,]" and (2) if so, whether the government's "interests as employer" outweigh the employee's speech rights. *Kennedy*, 597 U.S. at 528, 531 (applying the *Pickering-Garcetti* framework). In considering the government's interests, courts look to the speech's impact on the efficiency of the government's operations, *Connick*, 461 U.S. at 151–52, and the "more tightly the First Amendment embraces the speech, the stronger the showing of workplace disruption must be," *Gilbrook v. City of Westminster*, 177 F.3d 839, 867 (9th Cir. 1999) (cleaned up).

Dr. Joslin easily satisfies the first prong. First, as discussed, Dr. Joslin was off duty at the time of the display, and did not speak in their capacity as a Yosemite employee, nor did they hold themself out as affiliated with the park in any public manner, such as to the press or on social media. Joslin Decl. 7. Nor was Dr. Joslin's activity on El Cap on May 20 "performed pursuant to their official duties," *Garcetti*, 547 U.S. at 421; it had nothing to do with their role as a wildlife biologist.

---

the nature of the forum, viewpoint discrimination is impermissible." *Waln*, 54 F.4th at 1163 n.7 (cleaned up); *see also Flores v. Bennett*, 635 F. Supp. 3d 1020, 1032 (E.D. Cal. 2022) (Thurston, J.) (holding "the prohibition against viewpoint discrimination equally applies" regardless of forum), *aff'd*, 2023 WL 4946605 (9th Cir. Aug. 3, 2023).

[10] Because this so-called "*Pickering* balancing" applies only "when [the government] acts in its role as employer," *Garcetti*, 547 U.S. at 418, no *Pickering* analysis is necessary for relief related to criminal enforcement. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 466 (1995) (distinguishing *Pickering* cases that "usually . . . involve[] disciplinary actions taken in response to a government employee's speech" from statutory enforcement against "the public at large").

PLAINTIFF'S PRELIM. INJ. MEMO.                - 12 -

And second, Dr. Joslin's speech concerning "gender identity" is, in accordance with binding Supreme Court precedent, a "matter of profound value and concern to the public" that "occupies the highest rung of the hierarchy of First Amendment values." *Janus*, 585 U.S. at 913–14 (cleaned up).

With the first prong satisfied, Defendants fail to carry their "burden of proving" Dr. Joslin's interest in free speech was outweighed by interference with the agency's regular operations. *Johnson v. Multnomah Cnty., Or.*, 48 F.3d 420, 426 (9th Cir. 1995); *see Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Given that, as discussed above, Dr. Joslin's speech is a matter of such great public concern, "defendants' showing of disruption, real or potential, must be correspondingly greater." *Gilbrook*, 177 F.3d at 867. In addition, courts "give less weight to the government's concerns about the disruptive impact of speech outside the workplace context." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 726 (9th Cir. 2022). Because the speech was unrelated to Dr. Joslin's job responsibilities, Dr. Joslin's speech did not implicate any of the "host of factors" the Ninth Circuit considers "[i]n balancing the competing interests": it did not "impair[] discipline or control by superiors," "interfere[] with [] performance of [] duties," or "obstruct[] routine office operations[.]" *Gilbrook*, 177 F.3d at 867–68. In no way does Dr. Joslin's off-duty speech in support of a marginalized community they are a member of implicate, let alone jeopardize, Dr. Joslin's ability to, for example, maintain the park's terrestrial data critical to monitoring and protecting endangered species. *See Roth v. Veteran's Admin. of Gov't of U.S.*, 856 F.2d 1401, 1407 (9th Cir. 1988) (requiring an "actual, material and substantial disruption").

Moreover, the case law is replete with examples of speech that courts found protected even though, unlike here, the speech at issue involved violent or offensive language or prompted complaints from coworkers. For example, the Sixth Circuit held that a public library security guard's "speech enjoys First Amendment protection" where, in the wake of nationwide Black Lives Matter protests, the guard reposted on his private Facebook page—which included his library position—an image emblazoned "All Lives Splatter" and "Nobody Cares About Your Protest" depicting an SUV running over protestors. *Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373, 378–79, 385 (6th Cir. 2024). Nor is media attention dispositive. *See, e.g.*, *Fenico v. City of Philadelphia*, 70 F.4th 151, 153, 168 (3d Cir. 2023) (reversing dismissal of First Amendment

claims where city punished several police officers after a "major online news organization" wrote an "expose [sic]" on the officers' social media posts that the court deemed "offensive, racist, and violent"). Media attention should be of even less relevance where, as here, much of the media attention was driven by the agency's response, not the original speech.

Particularly in light of the government's negligible interests, Dr. Joslin's interest prevails, so their speech is protected by the First Amendment.

**B.     This Court has jurisdiction to reinstate Dr. Joslin.**

As to the government's actions against Dr. Joslin as employer, standing is clear. NPS fired Dr. Joslin and Dr. Joslin remains without that job, caused solely by the agency's First Amendment violation. When federal workers seek to vindicate constitutional rights, however, the government sometimes argues that the claims must proceed, if at all, through channels created by the CSRA. But because Dr. Joslin's claims are constitutional and the CSRA does not include a guaranteed path to judicial review for probationary workers, the district court retains jurisdiction.

The Supreme Court has long maintained a general presumption of judicial review for constitutional claims. *See Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."). *Webster*'s heightened standard applies "to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster*, 486 U.S. at 603 (cleaned up).

The Ninth Circuit has applied *Webster* to the CSRA, holding that the CSRA did not "preclude[] colorable constitutional claims sounding in equity where the plaintiff has no other remedy[.]" *AFGE Loc. 1 v. Stone*, 502 F.3d 1027, 1034 (9th Cir. 2007) (citation omitted); *see also D'Angelo v. Winter*, 403 F. App'x 181, 182 (9th Cir. 2010) ("[T]his Court has held that a [federal employee] with no alternate avenue of review is not precluded from bringing constitutional claims seeking equitable relief."). Accordingly, courts in this circuit have considered the merits of constitutional claims by federal employees when the employees did not have direct access to the MSPB. *See, e.g.*, *Wilborn v. Napolitano*, 2012 WL 354494, at \*9 (S.D. Cal. Feb. 2, 2012) ("To the extent Plaintiff is seeking equitable relief, Plaintiff's constitutional claims would only be barred by

the CSRA if the CSRA provides Plaintiff with an avenue for seeking his requested relief."); *Coleman v. Ridge*, 2008 WL 108895, at *2 (N.D. Cal. Jan. 8, 2008) (where a federal worker has "no remedies under the CSRA," they "may challenge constitutional violations . . . directly in federal court by seeking equitable relief" (cleaned up)). Under these standards, this Court has jurisdiction to hear Dr. Joslin's claims.

Because Dr. Joslin was fired as a probationary employee, they are not guaranteed judicial review through CSRA channels. Tenured employees may appeal their terminations to the Merit Systems Protection Board (MSPB), 5 U.S.C. § 7513(d), and then to the Federal Circuit. 5 U.S.C. § 7703(a), (b). Probationary employees like Dr. Joslin, by contrast, cannot directly petition the MSPB. *See* 5 U.S.C § 7511(a)(1)(A) (carving out individuals "serving a probationary . . . period" from the definition of "employee"); *see also* 5 C.F.R. § 1201.3(a)(3) (2026) (carving out "[t]ermination of probationary employment" from the MSPB's appellate jurisdiction other than narrow exceptions not relevant here). Instead, Dr. Joslin's allegations of unconstitutional conduct by NPS—a "prohibited personnel practice" under the CSRA, *see* 5 U.S.C. § 2302(a), (b)(12)—must be routed through the Office of Special Counsel (OSC), *see* 5 U.S.C. § 1214(a)(1)(A).

Unlike the direct path to judicial review paved for "employees," the OSC process involves a byzantine series of discretionary OSC determinations, most of which end without any possibility of review by an Article III court. Should the OSC decide not to pursue Dr. Joslin's complaint at the outset, the CSRA merely provides Dr. Joslin the opportunity to submit "written comments" on that decision. *See* 5 U.S.C. § 1214(a)(1)(D). Regardless, the process ends there. A finding by OSC that the complaint is supported by the evidence fares little better. While OSC "shall" report such a finding to the agency involved, the OSC need not include "recommendations for corrective action." 5 U.S.C. § 1214(b)(2)(B). And if the agency fails to act on said finding, the OSC "*may* petition the [MSPB] for corrective action." 5 U.S.C. § 1214(b)(2)(C) (emphasis added). Then, and only then, could Dr. Joslin play a role; they could submit "written comments" to the MSPB, 5 U.S.C. § 1214(b)(3)(B), and *only if* the MSPB then issues a "final order or decision" could Dr. Joslin reach the Federal Circuit, 5 U.S.C. § 1214(c)(1).

This roundabout process owes to OSC's peculiar nature, which is aimed "toward systemic" as opposed to "individual problems in the federal merit [system]." *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 162 (D.C. Cir. 1982). "[T]he duties of the Special Counsel are not equivalent to those of an employees' advocate." *Id.* OSC can, for example, "make compromises with the agency involved, seek corrective action short of that requested by the complainant, and, we assume, refuse to pursue the case at all." *Id.* Thus, "the principal recourse for individual employees who have suffered cognizable injury from a personnel action is to a Chapter 77 appeal [to the MSPB]—and not to the office of Special Counsel." *Id.* at 163. That "principal recourse" is not available to Dr. Joslin.

Neither *Elgin v. Department of Treasury*, 567 U.S. 1 (2012), nor *United States v. Fausto*, 484 U.S. 439 (1988), apply here. In *Elgin*, the Court found that the plaintiffs could not go directly to district court because they could press their claims through the MSPB process, such that "the CSRA does not foreclose all judicial review of petitioners' constitutional claims, but merely directs that judicial review shall occur in the Federal Circuit." 567 U.S. at 10. Judicial review, however, is not guaranteed through the OSC process, so Dr. Joslin is not seeking "an *additional* avenue of review in district court," *id.* at 12 (emphasis added), but rather a first and only avenue of review. *See Davis v. Billington*, 51 F. Supp. 3d 97, 109 (D.D.C. 2014) ("[T]he Court is unconvinced that the Supreme Court's *Elgin* decision has any effect other than to route the constitutional claims of civil servants who already have an administrative remedy to the Federal Circuit."); *see also Esparraguera v. Dep't of the Army*, 981 F.3d 1328, 1338 (Fed. Cir. 2020) (collecting cases post-*Elgin*). And *Fausto*, which held that an employee who did not have a remedy under the CSRA could not go to court instead, is "distinct" because that case "did not involve any constitutional claims." *Stone*, 502 F.3d at 1036.

The nature of the OSC process means that Dr. Joslin cannot obtain meaningful judicial review of their constitutional claims. Dr. Joslin's administrative recourse "provides only for judicial review of [any final order or decision of the MSPB], and not every [OSC] action is encapsulated in a final [MSPB] order or [decision]." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010); *see* 5 U.S.C. § 1214(c)(1) ("Judicial review of any final order or decision of the

[MSPB] under this section may be obtained by any employee, former employee, or applicant for employment adversely affected by such order or decision."). Indeed, OSC has already denied Dr. Joslin's request for a stay of their termination, the only administrative option that could have remedied Dr. Joslin's immediate and ongoing irreparable harm. Wydman Decl., Ex. 42. And because that determination is unreviewable by the MSPB, *see* 5 U.S.C. § 1214(b)(1), it is also unreviewable by any Article III court. Due to Dr. Joslin's lack of an avenue to judicial review of their constitutional claims through CSRA channels, this court has jurisdiction to hear them.

* * *

When it comes to remedy, where an adverse employment decision implicates an employee's constitutional rights, "[r]einstatement clearly is among those equitable remedies available[.]" *Hubbard v. U.S. EPA Adm'r*, 809 F.2d 1, 11 (D.C. Cir. 1986), *aff'd on reh'g sub nom. Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988). As such, this Court has jurisdiction to reinstate Dr. Joslin to their position of wildlife biologist in Yosemite.

**C.     This Court has jurisdiction to enjoin criminal enforcement against Dr. Joslin.**

Because Dr. Joslin faces no CSRA-preclusion issue as to criminal enforcement, there is no need to analyze channeling or administrative exhaustion for criminal-related relief. For this relief, Dr. Joslin has established standing, and thus the Court has jurisdiction to order relief.

To establish Article III standing, a plaintiff must demonstrate (1) injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) likelihood the injury will be redressed by a favorable decision. *Garcia v. Cnty. of Alameda*, 150 F.4th 1224, 1229 (9th Cir. 2025). "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). And "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381. This holds true for regulations backed by criminal penalties. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 152 (2014). And it holds true in this case.

As to the ongoing investigation, Dr. Joslin faces at least three injuries sufficient to establish standing. First, "a chilling of the exercise of First Amendment rights is, itself, a constitutionally

sufficient injury." *Garcia*, 150 F.4th at 1229 (citation omitted); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 224 n. 14 (1974) (explaining that where there is "a legal right, the requisite injury for standing would be found in an invasion of that right."). Second, the threat of prosecution is an injury. *See Susan B. Anthony List*, 573 U.S. at 158–59. And third, the government's public pursuit of criminal penalties, in statements to the press, creates a stigmatic injury. *See Meese v. Keene*, 481 U.S. 465, 473 (1987). There should be little doubt that these injuries were caused by the Defendants' initiation of a criminal investigation, and that an injunction blocking it would redress the harm. Additionally, because this lawsuit concerns a federal (rather than state) investigation and indictment does not appear imminent, the Court need not abstain from issuing an injunction. *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013); *Steffel v. Thompson*, 415 U.S. 452, 462 (1974).

As to criminal enforcement for future conduct, "the tendency to find standing . . . is stronger 'in First Amendment cases, for free expression-of transcendent value to all society, and not merely to those exercising their rights-might be the loser.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) (cleaned up); *see Woodhull Freedom Found. v. United States*, 948 F.3d 363, 371 (D.C. Cir. 2020) (observing that "courts' willingness to permit pre-enforcement review is at its peak when claims are rooted in the First Amendment" (cleaned up)). "Pre-enforcement injury is a special subset of injury-in-fact." *Geo Grp., Inc. v. Inslee*, 151 F.4th 1107, 1115 (9th Cir. 2025) (citation omitted). To demonstrate such an injury, a plaintiff need only show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 159). "[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite[.]" *Susan B. Anthony List*, 573 U.S. at 158.

Dr. Joslin has standing to obtain an injunction blocking future enforcement efforts. First, Dr. Joslin has stated that "I am [] unable to continue speaking out in the manner I want for fear of additional repercussions, including future criminal and administrative investigation and punishment" and that "[i]f not for these potential consequences, I would engage in similar expressive activities." Joslin Decl. 12–13. That is enough for purposes of standing. "[A] plaintiff need not

plan to break the law[;] courts must ask whether the plaintiff would have the intention to engage in the proscribed conduct, were it not proscribed." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024); *see also Free Enter. Fund*, 561 U.S. at 490 ("We normally do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law." (cleaned up)). "Were it otherwise, . . . [Dr. Joslin] would have no good way to vindicate [their] First Amendment rights: [They] would be trapped 'between the Scylla of intentionally flouting [the] law and the Charybdis of forgoing what [they] believe[] to be constitutionally protected activity' so as to avoid yet another criminal prosecution." *Olivier v. City of Brandon, Miss.*, 607 U.S. ___, 2026 WL 783725, at *5 (U.S. Mar. 20, 2026) (citation omitted).

Second, that fear of prosecution is credible. Defendants' position appears to be that Dr. Joslin's conduct broke the law, Joslin Decl., Ex. C (relying on 36 C.F.R. § 2.51), and warranted criminal investigation. Defendants told Dr. Joslin directly, and reiterated to the press, that criminal penalties were on the table. Joslin Decl. ¶¶ 30, 38. And Defendants have never told Dr. Joslin that the existing investigation has concluded or that no charges would be brought, Joslin Decl. 11, leaving them under the threat of criminal prosecution for the past flag display. It is reasonable to believe that a second offense would result in escalating enforcement, to include criminal charges, and Dr. Joslin can only "eliminate the threat of enforcement by not doing what they want to do," namely, speak in this manner again. *Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023). Because of Defendants' "specific warning[s] or threat[s]" and the "history of past prosecution or enforcement," Dr. Joslin credibly fears repeat targeting. *Id.* (citation omitted).

Because this Court has jurisdiction and Dr. Joslin has standing, the court should fashion an appropriate remedy in line with "the nature and scope of the constitutional violation[.]" *Milliken v. Bradley*, 433 U.S. 267, 280, 282 (1977) (cleaned up); *see also Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15–16 (1971); *Frederick Douglass*, 82 F.4th at 1137 ("[C]ourts may review selective enforcement claims to assess whether the executive's choice of prosecution targets infringes on constitutional rights."). An injunction against criminal enforcement of 36 C.F.R. § 2.51 and the revised compendium against Dr. Joslin for pro-LGBTQ+ speech is a tailored cure. *See, e.g.*,

*Dombrowski v. Pfister*, 380 U.S. 479, 491 (1965) ("[T]hose affected by a statute are entitled to be free of the burdens of defending prosecutions[.]").

## IV. The remaining factors also support Dr. Joslin's request for preliminary relief.

For the reasons set forth above, Dr. Joslin has established a strong likelihood of success on the merits of their First Amendment claims. Because Dr. Joslin has "raised serious First Amendment questions[,] . . . the balance of hardships tips sharply in [their] favor." *Am. Bev. Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc) (citation omitted). Under the serious questions test, then, "[a] preliminary injunction is appropriate[.]" *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Dr. Joslin also satisfies both additional factors.

### A. Dr. Joslin will suffer irreparable harm absent immediate relief.

As discussed above, Dr. Joslin has already suffered, and will continue to suffer, irreparable injury if this Court does not award preliminary relief.

"[W]here a plaintiff seeks a preliminary injunction because of an alleged constitutional violation" and "shows [they are] likely to prevail on the merits, that showing will almost always demonstrate [they are] suffering irreparable harm as well." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023); *see also, e.g.*, *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022); *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014). Similarly, it is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023) (citation omitted). Because Dr. Joslin is suffering an ongoing constitutional injury, *see supra* Section I.A, relief is necessary to end that irreparable harm. *See Fellowship of Christian Athletes*, 82 F.4th at 694–95.

### B. The balance of equities strongly favors Dr. Joslin.

This circuit has "consistently recognized the significant public interest in upholding First Amendment principles," and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Am. Bev. Ass'n*, 916 F.3d at 758 (cleaned up). As explained *supra*, the fact that Dr. Joslin "ha[s] raised 'serious First Amendment questions compels a finding that . . . at the

very least the balance of hardships tips sharply in [their] favor.'" *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (citation omitted).

Dr. Joslin is not privy to the rationale behind 36 C.F.R. § 2.51, but the Superintendent justified the flag ban in the May 21 Compendium update as, among other things, "necessary to . . . provide for an unimpaired visitor experience, protect natural and cultural resources," as well as "to maintain public safety, as it prohibits draping items that could endanger and interfere with permitted or allowable unpermitted climbing activity." Wydman Decl., Ex. 15, at 23–24.

Even accepting that Defendants' "asserted interest . . . may be important," *Fellowship of Christian Athletes*, 82 F.4th at 695, *selectively* targeting speech does not advance these purposes. *See supra* at 11–12. Moreover, Dr. Joslin's activity had an inconsequential, if any, impact on Defendants' asserted interest. The trans pride flag covered a negligible percentage—approximately 0.000069%—of the roughly 3,000-foot-tall rock formation, the face of which spans over a square mile, or almost 30 million square feet, and the flag was up for less than three hours, during which it did not block any climbing routes or climbers. Wydman Decl., Ex. 32. Nor can Defendants "reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," including by an order to stop infringing on citizens' First Amendment rights. *Baird*, 81 F.4th at 1042 (citation omitted).

**CONCLUSION**

For the foregoing reasons, Dr. Joslin respectfully requests a preliminary injunction reinstating Dr. Joslin's employment and enjoining criminal enforcement against Dr. Joslin for speech at Yosemite supporting LGBTQ+ rights.

Dated: March 31, 2026

Respectfully submitted,

*/s/ Chloe Connolly*

| | |
|---|---|
| **CIVIL SERVICE LAW CENTER LLP** | **QUINN EMANUEL URQUHART &** |
| Clayton L. Bailey* (DC Bar No. 1644867) | **SULLIVAN LLP** |
| Margaret (Emmy) Wydman* (DC Bar No. 9007646) | Chloe Connolly, CA Bar #348962 |
| 1455 Pennsylvania Ave NW, Suite 400 | 50 California St., 22nd Fl. |
| Washington, DC 20004 | San Francisco, CA 94111 |
| (202) 571-7836 | (415) 875-6600 |
| | chloeconnolly@quinnemanuel.com |

cbailey@civilservicellp.com
ewydman@civilservicellp.com

**PUBLIC EMPLOYEES FOR
ENVIRONMENTAL RESPONSIBILITY**
Paula Dinerstein* (DC Bar No. 333971)
962 Wayne Ave, Suite 610
Silver Spring, MD 20910
(202) 464-2293
pdinerstein@peer.org

*Admitted *pro hac vice*

Marshall Searcy, CA Bar #169269
865 S. Figueroa St., 10th Fl.
Los Angeles, CA 90017
(213) 443-3000
marshallsearcy@quinnemanuel.com

MacKenzie Freed, CA Bar #353450
555 Twin Dolphin Dr., 5th Fl.
Redwood Shores, CA 94065
(650) 801-5000
mackenziefreed@quinnemanuel.com

*Counsel for Plaintiff Shannon "SJ" Joslin*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of and effectuate service on such as to the attorneys of record.

/s/ Chloe Connolly

Chloe Connolly, CA Bar #348962