Clayton L. Bailey (DC Bar No. 1644867) (admitted *pro hac vice*)
Margaret (Emmy) Wydman (DC Bar No. 9007646) (admitted *pro hac vice*)
**Civil Service Law Center LLP**
1455 Pennsylvania Ave NW, Suite 400
Washington, DC 20004
(202) 571-7836

Paula Dinerstein (DC Bar No. 333971) (admitted *pro hac vice*)
**Public Employees for Environmental Responsibility**
962 Wayne Ave, Suite 610
Silver Spring, MD 20910
(202) 464-2293
pdinerstein@peer.org

*Counsel for Plaintiff Shannon "SJ" Joslin*

[Additional counsel listed on signature page]

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

DR. SHANNON "SJ" JOSLIN,

     *Plaintiff,*

     vs.

U.S. DEPARTMENT OF THE INTERIOR, *et al.*,

     *Defendants.*

Case No. 1:26-cv-2029-JLT-EPG

**DECLARATION OF SHANNON "SJ" JOSLIN**

I, Shannon "SJ" Joslin, state as follows:

1. I am the plaintiff in the above-captioned lawsuit. I am over the age of eighteen and am competent to testify as to the matters set forth in this declaration based on my own personal knowledge.

***Relevant Background***

2. I live in El Portal, California, and I use they/them pronouns.

3. I hold both a bachelor's degree and Ph.D. in genetics from the University of California, Davis, where I studied genome assembly and population genetics with a focus on

DECLARATION OF SHANNON "SJ"
JOSLIN RE PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION     -1-

endangered species. My doctoral studies culminated in my dissertation on a federally threatened and California State endangered fish on the brink of extinction, including how to develop genetic resources, such as computational tools, and monitor genetic diversity to prevent future population collapses in similar species. I also studied a specific humane gene mutation to better understand its role in human disease risk.

4. I am a lifelong climber, and I have been active in the Yosemite community for almost two decades. In addition to climbing as a sport and hobby, I am a national level USA Climbing Level 3 Routesetter and co-authored the latest Yosemite climbing guidebook, and am red-carded and have obtained a variety of park-related certifications—such as swift water rescue technician, wilderness first responder, search and rescue technician, avalanche safety, advance rope rescue technician, and am a wildland firefighter and natural and cultural resource advisor—to be able to assist in the park in as many ways as possible.

5. I have also participated in various non-climbing activities at Yosemite, including multiple of the park's Pride festivals, various political protests, and multiple years of Facelift—an event where visitors and locals spend a week cleaning up trash around Yosemite National Park.

6. Based on my experience at the park, I am aware of a long history of visitors and employees hanging flags or flying banners in various parts of Yosemite, including on the face of El Capitan, and have personally witnessed examples of this tradition. I am aware of large flag displays as recent as the fall of 2025, after Yosemite's flag ban. To my knowledge, no visitor or employee has been punished for any of these actions or been told that their action was against park rules.

***Employment***

7. From March 2021 until my termination on August 12, 2025, I was a wildlife biologist at Yosemite National Park.

8. In this role, I managed Yosemite's Big Wall Bat program as well as all of Yosemite's terrestrial wildlife data. For the Big Wall Bat project, my team and I developed novel methods for studying cliff-dwelling bats in the Pacific West and monitored for the spread of disease in the park's bat populations to better understand how climatically driven disease, such as the white-nose

DECLARATION OF SHANNON "SJ"
JOSLIN RE PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION        -2-

syndrome, are decimating bats species across the country and causing populations to collapse and/or go extinct. I was also midway through developing a Master's project for a potential future student looking into how species composition changes with ecological restorations projects in the park. Additionally, I was the only data manager for all of the park's data on wildlife and endangered species, such as great grey owls, Pacific Fisher, and the Sierra Nevada red fox.  In this component of my role, I both mentored interns to develop their computational careers for future positions and built databases to capture and share information on these at-risk species—including real-time location data to collared individual's locations and sensitive nest and den sites—with other stakeholders in the park, such as academic scientists conducting research on diseases within those populations and fire crews aiming to protect the sensitive sites and other agencies and parks to capture a broad picture of the health of imperiled endangered species.  Without this information, it is impossible to know what happens to animal populations in the park, including how mega fires and diseases impact them.

9. The first two years of my employment as an NPS GS09-0401 Wildlife Biologist for Yosemite National Park were through a direct hiring authority resulting from COVID-19. Immediately after my first federal position ended at the end of March 2023, I was hired into a contract role working for Bat Conservation International, carrying out the same job and responsibilities as my previous GS09-0401 position with NPS.  A few months after this contract started, my boss rehired me into an NPS career seasonal position to continue in my same wildlife biologist role in a more permanent position with the park service, as I told him I wanted to work and live in the park for the rest of my life.  However, because initial NPS role qualified me as a COVID hire and therefore did not count toward my service with the federal government, I started a two-year probationary period on September 10, 2023.  I continued serving as a wildlife biologist until my termination on August 12, 2025.  Throughout my employment, I received uniformly positive performance reviews and was never subject to disciplinary action prior to last summer.

10. The day before my termination, my supervisor and the division chief signed the paperwork confirming that I had successfully completed my probationary period, thereby

DECLARATION OF SHANNON "SJ" JOSLIN RE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION          -3-

"finaliz[ing]" my appointment as a career seasonal employee—one of the most permanent positions for scientists employed by NPS—effective September 10, 2025. Ex. A. In so doing, they agreed that my continued employment "advances the public interest," taking into account my "performance and conduct" as well as whether my appointment "would advance the organizational goals of the [NPS]" and "advance the efficiency of the service." *Id.*

***Leading up to May 20, 2025***

11. As a queer nonbinary scientist at a national park, I am aware of and keep up to date on the Trump administration's attacks on both the LGBTQ+ community and national park staff. As a member of the LGBTQ+ community, I believe it is important to take discrete moments celebrate our identity and acceptance, especially in times of oppression.

12. On February 22, 2025, I attended a protest for federal workers' rights outside the Yosemite Welcome Center, where community members rallied against the administration's reductions in force across NPS, including at Yosemite.

13. On my way to this protest, I started brainstorming how to bring together and show solidarity with other queer and trans people. As I passed by El Capitan, I thought of the long history of flying flags from the landmark. I shared my idea with a group of climbing friends, including two other NPS employees, after the protest, and they agreed to join. We reached out to Pattie Gonia, a prominent figure in the queer community and advocate for park rangers, and we collectively decided to hang a trans pride flag as a celebration of my identity and my community.

14. After a few planning meetings, date changes, and trips up the wall to identify where we would rig the system, we had a plan in place to display the flag on El Capitan on the morning of Tuesday, May 20. We also consulted with park employee friends who had attended a recent Yosemite First Amendment training, who assured us that we enjoyed and could exercise all of our free speech rights in the park on our days off. We concluded that hanging a flag would not be an issue so long as we were not working that day, and factored this into scheduling the display. All of my involvement in the planning for the display happened while I was off-duty.

DECLARATION OF SHANNON "SJ"
JOSLIN RE PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION          -4-

15. On Sunday, May 18, a subset of our group, including me on my day off, climbed up to set up the rigging infrastructure in preparation for the Tuesday unfurling. We intentionally set up in a way that ensured no wildlife or visitor or climber experienced would be harmed. The whole group climbed up Monday night and slept under where we would hang the flag, as we had a permit to spend the night on the wall. I joined the group after I finished work on Monday, as I was off work on Tuesday.

***The flag flying***

16. The next morning, we unfurled the large trans pride flag about one-third of the way up El Capitan's cliff face at the base of a naturally formed heart feature around 9:00 a.m.

17. The flag included hand-written messages from members of the LGBTQ+ community and allies passing through Yosemite who wanted to express their support for our message and display.



18. While we wanted the flag to be large enough to look good at the base of the heart shaped feature, we also took steps to make sure it was not disruptive for other visitors or wildlife. We hung the flag, for example, outside of major climbing paths and at a time of the day when there are fewer people looking up at El Capitan or hiking around the park. The flag was also small in the

DECLARATION OF SHANNON "SJ"
JOSLIN RE PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION          -5-

context of El Cap: according to one photographer, the unfurled flag covered approximately .000069% of that total surface area, such that "[o]ne would need (approximately) 14,500 more flags of similar size to cover all of El Cap's face."[1]



19. Our group celebrated by taking photos and documenting the flag for social media, as our intention was to communicate to the trans community that being trans is natural and beautiful.

[1] https://perma.cc/LH5M-E46F.

DECLARATION OF SHANNON "SJ" JOSLIN RE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION          -6-

But we did not otherwise coordinate with any other group for any other activity surrounding the hanging of the flag, such as an on-the-ground demonstration, as there was for the upside-down flag protesting the park staffing cuts; we wanted the flag to speak for itself online.

20. While we were rigging and flying the flag, two unaffiliated climbing groups passed nearby and expressed support for both our message and our choice of location. One of the groups even offered to help us with either the rigging or carrying our supplies down.

21. Around 11:00 a.m., one of the flag seams ripped from tension due to the wind, so we began to bunch up the flag. As a result, the flag was rigged and fully on display for less than two hours.

22. Shortly thereafter, I got a call from a climbing ranger who congratulated us on our event and informed me that they had been instructed to take the flag down. I explained that we had already started doing so, and they thanked us and told us to have a nice day.

23. The flag was fully unrigged by 11:30 a.m. or 12:00 p.m., less than three hours from unfurling.

24. We left no trace of the flag or its hanging; we used temporary climbing equipment such as cams, nuts, and carabiners to rig the flag—the same equipment big-wall climbers use. We did not use glue or anything that would have any kind of lasting effects, and we took everything we brought up the wall back down to the ground with us in addition to some trash that was left on the wall by other climbers.

25. At no point did we obstruct any climbing routes or any individual climbers.

26. After climbing down that day, various members of our group participated in different media interviews about our intentions and experience that day. Pattie Gonia's team also sent out a press release about our display, including a quote from me, as well as the two other park employees involved. Ex. B. (press release). The press release, at my direction, did not identify me as an employee of the NPS. In subsequent media interviews, I either did not mention that I was an NPS employee or asked the outlet to omit any reference to my NPS employment, instead generally

DECLARATION OF SHANNON "SJ"
JOSLIN RE PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION          -7-

mentioning my work as a conservation biologist. In fact, after asking one of the reporters not to mention my park affiliation, they responded that they did not even know I worked at Yosemite.

27. Over the course of the next week, our group received an outpouring of positive and supportive feedback about the flag from the media, the climbing community, and the LGBTQ+ community more broadly.

***NPS's actions***

28. The day after the celebration, the NPS's reaction shifted. The Yosemite acting superintendent published an updated Compendium, which is a compilation of park rules, policies, and regulations around, among other things, permit requirements and other restrictions. This Compendium, dated May 20, 2025 but signed May 21, 2025, included, for the first time, a prohibition on hanging or displaying flags, banners, or signs larger than fifteen square feet—which would have prohibited our trans pride flag.

29. About a week later, on May 27th, I received a Teams message from Stephen Troy, a law enforcement specialist with NPS's Pacific West Regional Office, requesting that I speak with him as part of his investigation into the May 20th flag display.

30. Troy scheduled my interview for the following day at the Fort, which is where the jail is in Yosemite. Troy and an Investigative Services Branch agent conducted the interview, first informing me of my Miranda rights. I then asked if I was under criminal investigation, and they said yes. I declined any further voluntary discussion without an attorney, so the interview concluded.

31. The following week, on June 1st, Troy emailed me to schedule an administrative interview as part of his ongoing investigation into the flag display. As administrative interviews are mandatory for federal employees, I asked to have legal counsel present, and they agreed.

32. Troy conducted the administrative interview over Teams on June 11th. Among other questions about the May 20th display, Troy asked me if I left glue on the rock face (no glue was used); if I got monetary compensation for hanging the flag (I did not); if I gave Pattie Gonia the flat-brimmed hat she wore in the photos she posted on Instagram (I did not); and if I planned anything on work time (I did not).

DECLARATION OF SHANNON "SJ"
JOSLIN RE PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION          -8-

33. I did not hear anything for a few weeks after that, during which time I continued my typical work duties.

34. Also during this time, I looked up the recommended punishment for having a demonstration in a non-First Amendment area—what I understood them to have believed me to have done. For a first-time offense, it is a written reprimand, and for a second-time offense, it is a one- to five-day suspension. So, I assumed that even if they charged me with a violation of the demonstration rule (which I did not believe would be right), the worst punishment I would receive would be a few day suspension.

35. On July 31st or August 1st, the acting deputy superintendent of Yosemite called my boss—Sarah Stock, the Terrestrial Wildlife Branch Lead—to request I come in for a meeting with her. This indicated to me that something serious was going to happen, as deputy superintendents do not typically make such requests to have meetings with employees so low in the chain of command. So, I was petrified.

36. After working for most of the day, I attended this meeting at the end of the day on August 12th. The entire meeting consisted of me walking into a room with the acting deputy superintendent and a police officer, the acting deputy superintendent shaking my hand, introducing herself, and handing me a notice of termination. I tried to ask questions about the decision, but was not provided with any additional information.

37. This termination notice explained that "[d]uring [my] trial period," I "failed to demonstrate acceptable conduct" by "participat[ing] in a small group demonstration in an area outside the designated protest and demonstration area without a permit as required by 36 CFR 2.51 and thus circumvented rules applicable to all park visitors." Ex. C. (termination notice). As a result, my "continued employment" as a biologist at Yosemite was "being terminated . . . effective . . . August 12, 2025." *Id.* I later received an SF-50 documenting my termination, which reiterated the "unacceptable conduct" justification for my termination. Ex. D (termination SF-50). SF-50's can have lasting effects on an individual's ability to secure other jobs in the future.

DECLARATION OF SHANNON "SJ"
JOSLIN RE PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION          -9-

38. NPS punished me in ways other than my termination, too. Since then, the government, including NPS representatives, has made clear in public statements that they intend to investigate me to the fullest extent of the law, both administratively and criminally.

***Post-termination activity and impact***

39. I felt—and still feel—blindsided by the repercussions from my involvement in the flag flying. There is a long history of visitors and employees hanging flags on El Capitan—including political ones—and none of the visitors or employees associated with putting up any of the other flags were punished. I also feel targeted. The seriousness of my punishment feels unfair in juxtaposition to the host of cis people who similarly exercised their free speech rights in support of other causes getting the same if not more media attention and affecting the visitor experience in a more overwhelming and public way. The upside-down American flag was hung during and next to Firefall in 2025. Firefall is a phenomenon where Horsetail Fall, a waterfall off El Capitan, glows golden during sunset. Thousands of visitors come to Yosemite specifically to see the phenomenon. It is such a large event that an entire lane on the park's two-lane road is shut down for pedestrian use and the park dedicates specific resources to document the resource damage by the intense visitor traffic during the days it occurs. The large (30x50 ft) upside-down American flag was hung for multiple days during the height of the event last year. Yet none of the employees that hung the flag were punished or told not to do it again. So, only I, as a non-binary person and person speaking out in support of trans rights, got fired and became subject to a criminal investigation.

40. I loved and miss my job. It was my dream job, in my favorite place on Earth. And I have been subject to myriad harms because of my termination from this job and the related investigatory actions. Financially, I have not had an income since August. I am also incurring job search-related costs, and may be required to relocate due to the limited number of jobs available in or around the park for my skillset, which would involve significant moving expenses. I do not want to incur these costs because I want my old job back. I also want to remain in Yosemite for personal reasons, as my park neighbors and colleagues are my community. The continuing separation from

DECLARATION OF SHANNON "SJ"
JOSLIN RE PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION          -10-

my job carries extra sting because I know that the only reason I cannot work today is because of the message of my speech.

41. On top of this, I tried to take advantage of my skillset—including my multiple search and rescue certifications and trainings—during my involuntary unemployment by applying to serve as a volunteer search and rescue (SAR) team member in Tuolumne Meadows to continue serving the park. I was encouraged to apply by other SAR members—including two SAR coordinators and the head of emergency medical services in the park, all of which I used as references on my application—given my extensive qualifications. Yet I did not even receive an interview for the position. And my rejection email stated that "[a]ll Yosemite Search and Rescue positions in both Tuolumne Meadows and Yosemite Valley have been filled for the 2026 season." Ex. E (SAR rejection email). But at that time, a colleague of mine who also applied—and was accepted—to SAR told me no offers had even been made yet. I believe that I was not selected because of my speech and my resulting termination.

42. I have also been deprived of employment-related benefits, such as health insurance. I have had significantly higher healthcare costs as a result, as I have multiple diagnoses that require ongoing, regular care that I am now paying for out of pocket. Additionally, both my mental and physical health have declined due to the stress of my termination and the ongoing investigation, so I have spent more money on both medical care and mental health treatment.

43. I am also unable to continue speaking out in the manner I want for fear of additional repercussions, including future criminal and civil investigation and punishment. If not for these potential consequences, I would engage in similar expressive activities. I fear as much because of the government's reaction to my first display and the ongoing negative consequences of that exercise of my free speech rights. Additionally, no one has ever told me if the prior investigation has concluded or if no criminal charges will be brought. I believe I will face further punishment should I participate in the same actions again, despite my belief that I should be free to do so. The administration continues to attack federal workers and marginalized communities, including their unrelenting campaign to roll back protections for trans people, and I would like to show solidarity

DECLARATION OF SHANNON "SJ"
JOSLIN RE PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION          -11-

for my community—and others—through similar displays within Yosemite, but the government's actions to date make clear that my speech rights would again be undermined and attacked.

44. These concrete harms, fears, and concerns are why I chose to bring this lawsuit challenging the government's unconstitutional restriction of my First Amendment rights, and also to seek preliminary relief. Every additional day I have to live with this fear, separated from my job and facing efforts by the government to brand me as a criminal for my speech, is another day that I'm prevented from living my life in the way I choose, with what I always assumed were basic freedoms.

45. I also filed a complaint with the Office of Special Counsel, given that I was a probationary employee at the time of my termination. However, that route includes several potential discretionary actions by OSC that would deprive me of any possibility of administrative remedies or for meaningful review in a court. To date, it is my understanding that no action has been taken on my complaint. In March, I requested a stay of the personnel action against me pending resolution of my OSC complaint, which was denied.

46. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 30, 2026 in the state of California.

/s/ Shannon "SJ" Joslin*
Shannon "SJ" Joslin

*Pursuant to Local Rule 131(f), original signature maintained by attorney Margaret (Emmy) Wydman

DECLARATION OF SHANNON "SJ" JOSLIN RE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION          -12-

Dated: March 31, 2026

Respectfully submitted,

*/s/ Chloe Connolly*

**CIVIL SERVICE LAW CENTER LLP**
Clayton L. Bailey* (DC Bar No. 1644867)
Margaret (Emmy) Wydman* (DC Bar No. 9007646)
1455 Pennsylvania Ave NW, Suite 400
Washington, DC 20004
(202) 571-7836
cbailey@civilservicellp.com
ewydman@civilservicellp.com

**PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY**
Paula Dinerstein* (DC Bar No. 333971)
962 Wayne Ave, Suite 610
Silver Spring, MD 20910
(202) 464-2293
pdinerstein@peer.org

*Admitted *pro hac vice*

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Chloe Connolly, CA Bar #348962
50 California St., 22nd Fl.
San Francisco, CA 94111
(415) 875-6600
chloeconnolly@quinnemanuel.com

Marshall Searcy, CA Bar #169269
865 S. Figueroa St., 10th Fl.
Los Angeles, CA 90017
(213) 443-3000
marshallsearcy@quinnemanuel.com

MacKenzie Freed, CA Bar #353450
555 Twin Dolphin Dr., 5th Fl.
Redwood Shores, CA 94065
(650) 801-5000
mackenziefreed@quinnemanuel.com

*Counsel for Plaintiff Shannon "SJ" Joslin*

DECLARATION OF SHANNON "SJ" JOSLIN RE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION          -13-

**CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of and effectuate service on such as to the attorneys of record.

/s/ Chloe Connolly
Chloe Connolly, CA Bar #348962

DECLARATION OF SHANNON "SJ"
JOSLIN RE PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION          -14-