Clayton L. Bailey (DC Bar No. 1644867) (admitted *pro hac vice*)
Margaret (Emmy) Wydman (DC Bar No. 90007646) (admitted *pro hac vice*)
**Civil Service Law Center LLP**
1455 Pennsylvania Ave NW, Suite 400
Washington, DC 20004
(202) 571-7836

Paula Dinerstein (DC Bar No. 333971) (admitted *pro hac vice*)
**Public Employees for Environmental Responsibility**
962 Wayne Ave, Suite 610
Silver Spring, MD 20910
(202) 464-2293

*Counsel for Plaintiff Shannon "SJ" Joslin*

[Additional counsel listed on signature page]

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| DR. SHANNON "SJ" JOSLIN, | |
| *Plaintiff,* | Case No. 1:26-cv-2029-JLT-EPG |
| vs. | |
| U.S. DEPARTMENT OF THE INTERIOR, *et al.*, | |
| *Defendants.* | |

**SECOND DECLARATION OF MARGARET (EMMY) WYDMAN**

I, Margaret (Emmy) Wydman, state as follows:

1.    I am an attorney at the Civil Service Law Center LLP.  I am duly licensed to practice in the District of Columbia (DC Bar No. 90007646), and am admitted to this Court *pro hac vice*.

2.    I am counsel for plaintiff Dr. Shannon "SJ" Joslin in the above-captioned litigation.

3.    I submit this declaration in support of Plaintiff's Combined Opposition to Defendants' Motion to Dismiss and Reply in Further Support of Plaintiff's Motion for Preliminary Injunction, filed herewith.

SECOND DECLARATION OF
MARGARET (EMMY) WYDMAN            -1-

4.    Attached as **Exhibit 1** is a true and correct copy of a June 2018 Government Accountability Office report on the Office of Special Counsel, titled *Office of Special Counsel, Actions Needed to Improve Processing of Prohibited Personnel Practice and Whistleblower Disclosure Cases,* available at https://www.gao.gov/assets/gao-18-400.pdf.

5.    Attached as **Exhibit 2** is a true and correct copy of the Office of Special Counsel's Fiscal Year 2027 Congressional Budget Justification, last accessed May 13, 2026, available at https://www.osc.gov/~assets/docs/fy-2027-congressional-budget-justification.pdf.

6.    Attached as **Exhibit 3** is a true and correct copy of a U.S. Department of Justice Manual section titled "Confidentiality and Media Contacts Policy," last updated April 2018, available at https://perma.cc/36LY-CZYG.

7.    Attached as **Exhibit 4** is a true and correct copy of an April 24, 2026 CNN article by Lucy Bayly, titled *Jeanine Pirro drops criminal probe of Jerome Powell*, available at https://www.cnn.com/2026/04/24/business/doj-criminal-probe-of-powell.

8.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2026 in the District of Columbia.

*/s/ Margaret (Emmy) Wydman*
Margaret (Emmy) Wydman

SECOND DECLARATION OF
MARGARET (EMMY) WYDMAN              -2-

Dated: May 14, 2026

Respectfully submitted,

**CIVIL SERVICE LAW CENTER LLP**
Clayton L. Bailey* (DC Bar No. 1644867)
Margaret (Emmy) Wydman* (DC Bar No. 90007646)
1455 Pennsylvania Ave NW, Suite 400
Washington, DC 20004
(202) 571-7836
cbailey@civilservicellp.com
ewydman@civilservicellp.com

**PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY**
Paula Dinerstein* (DC Bar No. 333971)
962 Wayne Ave, Suite 610
Silver Spring, MD 20910
(202) 464-2293
pdinerstein@peer.org

*Admitted *pro hac vice*

/s/ Chloe Connolly
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Chloe Connolly, CA Bar #348962
50 California St., 22nd Fl.
San Francisco, CA 94111
(415) 875-6600
chloeconnolly@quinnemanuel.com

Marshall Searcy, CA Bar #169269
865 S. Figueroa St., 10th Fl.
Los Angeles, CA 90017
(213) 443-3000
marshallsearcy@quinnemanuel.com

MacKenzie Freed, CA Bar #353450
555 Twin Dolphin Dr., 5th Fl.
Redwood Shores, CA 94065
(650) 801-5000
mackenziefreed@quinnemanuel.com

*Counsel for Plaintiff Shannon "SJ" Joslin*

SECOND DECLARATION OF
MARGARET (EMMY) WYDMAN          -3-

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of and effectuate service on such as to the attorneys of record.

/s/ Chloe Connolly
Chloe Connolly, CA Bar #348962

SECOND DECLARATION OF
MARGARET (EMMY) WYDMAN            -4-

# Exhibit 1



United States Government Accountability Office

Report to Congressional Committees

**June 2018**

# OFFICE OF SPECIAL COUNSEL

# Actions Needed to Improve Processing of Prohibited Personnel Practice and Whistleblower Disclosure Cases

GAO-18-400

# GAO
# Highlights

Highlights of GAO-18-400, a report to congressional committees

June 2018

# OFFICE OF SPECIAL COUNSEL

## Actions Needed to Improve Processing of Prohibited Personnel Practice and Whistleblower Disclosure Cases

## Why GAO Did This Study

OSC is responsible for safeguarding the merit system in federal employment by protecting employees and applicants, including whistleblowers. Consequently, OSC must ensure its case processes are adequate to protect the federal workforce, including its own employees.

GAO was asked to review OSC case processes and procedures for whistleblower disclosures and PPPs. For both types of cases, this report among other things (1) examines trends in cases received and closed from fiscal year 2011 to 2016, (2) examines timeliness of cases closed from fiscal year 2011 to 2016, and (3) assesses the extent to which safeguards are in place for OSC employees who make allegations.

GAO reviewed OSC case guidance, processes, controls, and the latest available OSC data from fiscal year 2016. GAO also assessed whether OSC's processes adhered to *Standards for Internal Control in the Federal Government*; and surveyed and interviewed OSC employees.

## What GAO Recommends

GAO is making seven recommendations, including that OSC communicate timelines to whistleblowers and finalize a time frame for obtaining an independent internal review process for OSC employees. OSC agreed with GAO's recommendations.

View GAO-18-400. For more information, contact Yvonne D. Jones at (202) 512-2717 or JonesY@gao.gov.

## What GAO Found

Between fiscal years 2011 and 2016, the number of prohibited personnel practice (PPP) and whistleblower disclosure cases the Office of Special Counsel (OSC) received from employees of other federal agencies increased by 66 percent. Although the number of cases OSC closed increased by 62 percent during this period, the pace at which cases were closed did not keep pace with the number of cases received. As a result, the backlog also grew. OSC closed the vast majority of cases it received for various reasons, including a lack of sufficient evidence or lack of OSC jurisdiction.

**Trends in PPP and Whistleblower Disclosure Cases, Fiscal Years 2011 to 2016**



Source: GAO analysis of Office of Special Counsel (OSC) data. I GAO-18-400

OSC's processing time increased for both types of cases from fiscal year 2011 to 2016, but the time for processing whistleblower disclosure cases experienced a significantly greater increase, from a median of 10 days to 29 days. Because processing times for whistleblower disclosures include the time that agencies take to conduct investigations and respond to OSC, they can be significant, especially if an agency requests an extension from OSC for additional time. GAO found that in fiscal year 2016, OSC approved on average 2.7 extensions per whistleblower referral, and that the average time to process these cases was 1.8 years. However, OSC does not provide whistleblowers specific information on timelines for agency responses to OSC referrals; as a result these individuals may not know how long the process could potentially take.

OSC's process for reviewing and referring allegations submitted by its own employees includes the involvement of officials and staff. This involvement was identified as a key concern by OSC employees. Specifically, 17 of the 87 OSC employees who responded to GAO's survey reported that they considered filing internal allegations against another OSC employee but chose not to do so in part because they feared losing anonymity, feared management reprisal, or were uncertain how to file an internal OSC complaint. Congress recently enacted statutory changes to provide additional safeguards to OSC employees who file internal complaints, including establishing an agreement with an agency inspector general to review internal OSC cases. However, OSC has not yet fully implemented such an agreement.

**United States Government Accountability Office**

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 4 |
| | OSC's Data Show a Higher Number of Cases Received and Cases Closed from 2011 to 2016, although the Backlog Has Increased | 12 |
| | OSC's Time to Close Both Types of Cases Increased from Fiscal Year 2011 to 2016, but Review Times for Referred Whistleblower Disclosure Cases Increased the Most | 17 |
| | Some Aspects of OSC Case Processing Procedures Generally Adhere to Internal Control Principles, but Others Do Not | 22 |
| | OSC's Internal Complaint and Whistleblower Disclosure Process In Some Cases Does Not Provide OSC Employees Protections Afforded to Other Federal Employees | 30 |
| | Conclusions | 38 |
| | Recommendations for Executive Action | 39 |
| | Agency Comments and Our Evaluation | 39 |
| Appendix I | Objectives, Scope, and Methodology | 42 |
| Appendix II | Additional Data on Office of Special Counsel Prohibited Personnel Practice and Whistleblower Disclosure Cases | 48 |
| Appendix III | Comments from the Office of Special Counsel | 50 |
| Appendix IV | GAO Contact and Staff Acknowledgments | 51 |
| Tables | | |
| | Table 1: Number and Percentage of Prohibited Personnel Practice and Whistleblower Disclosure Case Backlog from Fiscal Years 2011-2016 | 16 |
| | Table 2: Different Entities Investigate Prohibited Personnel Practice (PPP) and Whistleblower Disclosure Cases Depending on Which Type of Office of Special Counsel (OSC) Employee Is the Subject Official | 30 |

Table 3: Some Procedural Concerns Contributed to Office of Special Counsel (OSC) Employees, Who Considered Filing Complaints, Deciding Not to File Those Complaints    33

Table 4: Employees Have a Range of Views on How the Office of Special Counsel's (OSC) Policy Addresses Several Components of Process for Internal Allegations    34

Table 5: Office of Speial Counsel (OSC) Prohibited Personnel Practice (PPP) and Whistleblower Disclosure Case Outcome Types    45

Table 6: Favorable Actions Claimed by Complaints Examining Unit (CEU), Fiscal Years 2011 to 2016    48

Table 7: Office of Special Counsel Is Generally Unable to Refer Whistleblower Disclosure Cases to Agencies within 45 Days    48

Table 8: Average Whistleblower Disclosure Case Complexity Shows Steady Trend amid Increasing Caseload    48

Table 9: Federal Agencies That Submit the Most Prohibited Personnel Practice Complaints to the Office of Special Counsel, Fiscal Year 2016    49

Table 10: Federal Agencies That Submit the Most Whistleblower Disclosures to the Office of Special Counsel, Fiscal Year 2016    49

Figures

Figure 1: Office of Special Counsel (OSC) Prohibited Personnel Practice (PPP) Process    6

Figure 2: Office of Special Counsel (OSC) Whistleblower Disclosure Process    9

Figure 3: Numbers of PPP and Whistleblower Disclosure Cases Received and Closed from Fiscal Years 2011 through 2016    13

Figure 4: The Median Number of Days to Close All PPP and Whistleblower Disclosure Cases from Fiscal Years 2011 to 2016    18

**Abbreviations**

| | |
|---|---|
| ADR | Alternative Dispute Resolution Unit |
| Army | Department of the Army |
| CEU | Complaints Examining Unit |
| CIGIE | Council of Inspectors General on Integrity and Efficiency |
| DHS | Department of Homeland Security |
| DU | Disclosure Unit |
| eCMS | Electronic Case Management System |
| IPD | Investigation and Prosecution Division |
| IPD-Field | Investigation and Prosecution Division-OSC field offices |
| IPD-HQ | Investigation and Prosecution Division-OSC headquarters |
| IG | inspector general |
| MSPB | Merit Systems Protection Board |
| NSF-OIG | National Science Foundation Office of Inspector General |
| OSC | Office of Special Counsel |
| OSC 2000 | OSC's electronic case management system |
| PPP | Prohibited Personnel Practice |
| RDU | Retaliation and Disclosure Unit |
| VA | Department of Veterans Affairs |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

June 14, 2018

Congressional Committees

The U.S. Office of Special Counsel (OSC) is an independent federal investigative and prosecutorial agency. Its primary mission is to safeguard the merit system in federal employment by protecting employees and applicants for federal employment from prohibited personnel practices (PPP), including reprisal for whistleblowing. OSC also reviews claims of wrongdoing within the federal government from current federal employees, former employees, and applicants for federal employment. These individuals, known as whistleblowers, report to OSC potential fraud, waste, and abuse in the federal government and threats to public safety or health.

You asked us to review OSC's processes and procedures for PPP and whistleblower disclosures cases. This report examines (1) the number of PPP and whistleblower disclosure cases OSC received and closed from fiscal year 2011 to 2016 and the effect on its existing caseload, (2) the timeliness of PPP and whistleblower disclosure cases closed from fiscal year 2011 to 2016, (3) the extent to which OSC's PPP and whistleblower disclosure case processes adhere to selected internal control principles, and (4) the extent to which safeguards are in place for OSC employees who file PPP and whistleblower disclosure complaints against OSC.

For the first objective, we reviewed case-level data from OSC's electronic case management system, OSC 2000, on PPP and whistleblower disclosure cases that OSC closed from fiscal years 2011 to 2016 (the most recent full fiscal year available at the time of our analysis). We identified and analyzed the number of PPP and whistleblower disclosure cases closed, the federal agencies from which they were received, the types of case resolutions, and the effect of case receipts and closures on OSC's existing caseload.

For the second objective, we analyzed OSC 2000 case-level data on the median number of days cases were open. We also analyzed OSC data and documents on agency extension requests granted for whistleblower disclosure cases and compared the median number of days whistleblower cases were open to relevant statutory requirements. We assessed the reliability of the OSC 2000 data, by reviewing relevant documentation, interviewing knowledgeable OSC officials, and electronically testing the data to identify obvious errors or outliers. We

determined that the OSC 2000 data used in our analysis were sufficiently reliable for our reporting purposes. For both objectives 1 and 2, we also interviewed OSC officials, federal agency liaisons, whistleblower advocacy organizations, and an employment law firm to obtain their views on the number of cases received and closed by OSC.

For the third objective, we reviewed OSC procedures, reports, and related guidance intended to help OSC implement its case processes for PPP and whistleblower disclosure cases. We also interviewed relevant OSC officials concerning their understanding of OSC's case processes and procedures. To obtain their respective views on OSC's PPP and whistleblower disclosure case processes, we interviewed OSC liaison officials from the three federal agencies that most frequently were the subject of PPP complaints and whistleblower disclosures in cases closed in fiscal year 2016, and interviewed officials from two whistleblower advocacy organizations and one law firm that specializes in federal employment law. We assessed whether OSC's procedures and related guidance adhered to relevant Standards for Internal Control in the Federal Government.[1]

To obtain OSC staff's perspective on the extent to which OSC adhered to relevant internal control principles related to processing PPP and whistleblower disclosure cases, we held small group discussions with employees from the six OSC work units involved in the PPP and whistleblower disclosure processes. For four of the six units, we held these discussions with a random, nongeneralizable selection of nonmanagement staff in those units. For the remaining two units, given their small size, we held discussions with all nonmanagement staff in those units. A GAO analyst reviewed all six write-ups of our small group discussions to code identified themes from the discussions. Another GAO analyst reviewed the coding. If there was a disagreement, the two analysts reviewed and discussed until they reached agreement. As a result of the analysis, we identified the major themes that covered the relevant internal control principles we discussed with the participants.

To assess how well OSC implemented its PPP and whistleblower disclosure case procedures and processes, we reviewed five distinct groups of PPP and whistleblower disclosure cases closed in fiscal year

---

[1]GAO, *Internal Control: Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: Sept. 10, 2014).

2016.[2] Given the larger size of case populations for two of these groups, we examined randomly selected, generalizable samples of cases. For the remaining three groups, none of which totaled more than 84 cases, we reviewed all cases of that case type. We selected these groups to include the various types of case outcomes for PPP and whistleblower disclosure cases. We used uniform data collection instruments for our file reviews to help ensure we consistently captured information on the completeness of required documentation for PPP and whistleblower disclosure cases. OSC officials reviewed and verified the elements of the data collection instruments we used to review case files. To ensure the accuracy of our reviews, two GAO analysts reviewed each case file and reconciled any differences between responses. We then identified common themes from our reviews.

For the fourth objective, we examined OSC procedures for its employees to file PPP and whistleblower disclosure allegations. We interviewed officials from OSC, the National Science Foundation Office of the Inspector General (NSF-OIG), and the Council of Inspectors General for Integrity and Efficiency (CIGIE). We interviewed officials from these entities because they review certain complaints and disclosures from OSC employees. In addition, we assessed whether OSC's procedures aligned with relevant Standards for Internal Control in the Federal Government.

We also sent a survey to all 132 OSC employees to obtain their views on processes by which they could file PPP complaints and make whistleblower disclosures. The survey questions and subsequent responses helped us identify OSC employees who had filed or considered filing an allegation against another OSC employee. We conducted in-person and phone interviews with this group of OSC employees to allow them to discuss their views and experiences with OSC's internal allegations procedures in more detail. We supplemented these views with information from OSC's Federal Employee Viewpoint Surveys from fiscal years 2012 to 2017. Finally, we reviewed all PPP complaints and whistleblower disclosures from fiscal years 2011 through 2016 that OSC submitted to the CIGIE Integrity Committee and the NSF-OIG, as well as all OSC PPP complaints and whistleblower disclosures

---

[2]These included (1) whistleblower disclosure cases referred to an agency, (2) whistleblower disclosure cases not referred to an agency, (3) PPP cases with a favorable action taken in the Complaints Examining Unit (CEU), (4) PPP cases referred for investigation, and (5) cases closed in CEU without a favorable action.

where OSC reviewed allegations against OSC employees. For additional details on our scope and methodology, see appendix I.

We conducted this performance audit from March 2017 to June 2018 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## Office of Special Counsel

Individuals who believe that a prohibited personnel practice (PPP), such as nepotism, has been committed may file complaints with OSC.[3] OSC has a number of other responsibilities as well. It operates as a secure channel for federal whistleblowing disclosures of violations of law, rule, or regulation; gross mismanagement; gross waste of funds; abuse of authority; and substantial and specific dangers to public health or safety. OSC also provides advisory opinions and enforces Hatch Act restrictions on political activities of individuals employed by the federal government as well as certain state and local government employees employed in connection with programs financed by federal funds. Finally, the agency enforces the rights of federal employees and applicants for federal employment under the Uniformed Services Employment and Reemployment Rights Act of 1994.[4]

OSC is led by the Special Counsel, who is appointed by the President and later confirmed by the Senate to serve a 5-year term.[5] The current Special Counsel was confirmed on October 16, 2017. OSC is headquartered in Washington, D.C., with three field offices in Dallas,

---

[3]Nepotism is the hiring, promotion, or advocating the hiring or promotion of relatives. See 5 U.S.C. § 2302(b)(7).

[4]Pub. L. No. 103-353, 108 Stat. 3149 (Oct. 13, 1994), *codified* at 38 U.S.C. §§ 4301-4335.

[5]5 U.S.C. § 1211(b).

Detroit, and Oakland. As of fiscal year 2017, OSC had 135 full-time equivalent employees.[6]

OSC tracks its workload across case types through its computerized system, known as OSC 2000. OSC 2000 is designed to store case status updates on all case types, from the initial filing of the complaint, whistleblower disclosure, or request for advisory opinion until closure and archiving of the file. OSC staff also maintain paper case files. OSC is transitioning to a new data tracking system, the electronic Case Management System (eCMS). According to OSC, eCMS will allow OSC to track and maintain electronic cases, as well as provide capacity to deliver customizable reports.

## Prohibited Personnel Practices

Federal law designates 14 PPPs.[7] If a federal employee, applicant, or former employee believes he or she has been subjected to 1 or more of these PPPs, he or she can file a complaint with OSC using OSC Form 11—Complaint of Possible Prohibited Personnel Practice or Other Prohibited Activity—or submit a correspondence. In fiscal year 2016, OSC received 4,111 PPP complaints, about 68 percent of its total cases received that year. See figure 1 for OSC's PPP process.

---

[6]Full-time equivalent employees equal the number of employees on full-time schedules plus the number of employees on part-time schedules converted to a full-time basis.

[7]5 U.S.C. § 2302(b).

**Figure 1: Office of Special Counsel (OSC) Prohibited Personnel Practice (PPP) Process**



### Process Map for PPP Case

GAO analysis of Office of Special Counsel (OSC) documentation. I GAO-18-400

Note: CEU may also forward cases to the Retaliation and Disclosure Unit (RDU) for hybrid cases that involve both a whistleblower disclosure and an allegation of retaliation. In addition, CEU may directly refer some cases to ADR and some directly to IPD. IPD or RDU may also refer cases back to ADR.

PPP complaints are received by OSC's Complaints Examining Unit (CEU). The CEU Chief assigns cases to CEU examiners based on the following: case complexity, case priority, examiner's case preferences, examiner position, examiner availability, and the examiner's current

caseload. A CEU examiner may determine a complaint contains evidence of a PPP or other prohibited activity, which warrants further investigation by OSC. To make this determination, the examiner reviews the information contained in the complaint, speaks with the complainant, and may also contact liaison officials at the federal agency in question. The examiner may also request information from those parties. After CEU's review is complete, CEU could: (1) close the case, (2) refer the case to the Alternative Dispute Resolution (ADR) Unit for evaluation for potential mediation, or (3) refer the case to the Investigation and Prosecution Division (IPD) for further investigation. When referring a case to either office, CEU has determined that there are reasonable grounds to believe that a PPP has occurred, exists, or will occur.

ADR reviews complaints to determine whether they are appropriate for mediation after CEU has referred them for investigation, but before any investigation has occurred. If the mediation is successful, both parties agree to settlement terms and the agreement is put into writing. If settlement is not reached, the complaint will proceed to IPD for investigation.

IPD investigates PPP allegations for OSC. When IPD receives a case, an attorney or investigator is assigned who may request additional documentation and also interview the parties involved. Attorneys are assigned based on their current caseload and the complexity of cases. After the IPD attorney completes the investigation, IPD management discusses the case evidence and applicable law and recommends an outcome that is subject to review by OSC management. Depending on the recommendation, IPD will (1) close the complaint because no further action is warranted, or (2) pursue corrective or disciplinary action (or both) against the subject officials.[8]

OSC allows complainants 13 days to comment on preliminary determinations and the reason for the determinations made in a case. After reviewing any response from the complainant, IPD or CEU will

---

[8]In some instances where there is evidence that supports the allegations in a complaint, IPD may attempt to settle a complaint with the agency or refer the case to ADR if the investigator deems it appropriate.

decide whether further investigation is warranted or the complaint should be closed.[9]

At any time during the PPP complaint process, OSC units may pursue favorable actions on cases. A favorable action is an outcome in a case that could result in a specific benefit to the complainant, an outcome aimed at disciplining the subject official and deterring future bad conduct, or an improvement to agency processes. OSC tracks the following types of favorable actions that result from its involvement in PPP cases:

- stays (e.g., delay in an agency decision to demote the employee),

- corrective actions (e.g., agency rescinds a suspension),

- systemic corrective actions (e.g., subject agency changes deficient regulation), and

- disciplinary actions (e.g., agency official is suspended).[10]

If the agency does not take the corrective or disciplinary action requested or grant the stay within a reasonable period, OSC can file a petition with the Merit System Protection Board (MSPB).[11]

## Whistleblower Disclosures

OSC also responds to employees', former employees', and applicants' disclosures of alleged wrongdoing (termed "whistleblower disclosures") within federal agencies. In fiscal year 2016, OSC received 1,714 whistleblower disclosures, about 28 percent of its total caseload received that year.[12] OSC has jurisdiction and may take further action if the whistleblower disclosure alleges a violation of law, rule, or regulation; gross mismanagement; gross waste of funds; abuse of authority; or a substantial and specific danger to public health or safety.[13] Figure 2

---

[9]Complainants can request that OSC reconsider the closure. At this point, OSC management reviews both the complainant's submission and the case.

[10]OSC tracks stays of personnel action, settlements, corrective actions, and disciplinary actions as performance metrics based on its Strategic Plan.

[11]MSPB's mission is to protect the merit system principles and promote an effective federal workforce free of prohibited personnel practices. MSPB's primary role is to adjudicate the cases brought to the Board. 5 U.S.C. §§ 1204.

[12]The remaining cases closed by OSC in fiscal year 2016 were Hatch Act and Uniformed Services Employment and Reemployment Rights Act of 1994 cases.

[13]5 U.S.C. § 1213(a).

illustrates OSC's process for reviewing these cases, and a more detailed description of each step follows below.

**Figure 2: Office of Special Counsel (OSC) Whistleblower Disclosure Process**

### Process Map for Whistleblower Disclosure



GAO analysis of Office of Special Counsel (OSC) documentation. I GAO-18-400

OSC takes the following steps in the whistleblower disclosure process:

1. OSC management reviews the case to determine whether it constitutes a whistleblower disclosure as defined by statute and if OSC has jurisdiction over the matter. If not, OSC closes the case.

2. If OSC determines the case constitutes a whistleblower disclosure, an attorney in the Disclosure Unit (DU) is assigned. He or she examines the material forwarded by the whistleblower, interviews the whistleblower, and requests additional information if needed. Attorneys are assigned cases based on their current caseload and the complexity of the case. The assigned attorney determines whether there is a substantial likelihood that the information discloses one of the types of wrongdoing described above. Prior to December 2017, OSC was required by law to make this determination within 15 days of receiving the whistleblower disclosure. Because of a statutory change in December 2017, OSC now has 45 days to make this determination.[14]

3. If OSC determines that the substantial likelihood threshold is met, it formally refers the allegations to the head of the subject agency.[15] OSC will close a case if it determines that there is not a substantial likelihood that the alleged action occurred. Prior to referring a whistleblower disclosure, OSC must ask whether the whistleblower consents to the release of his or her name to the agency.[16] If the whistleblower declines, OSC is to inform the whistleblower that it may be possible for agency officials to identify the whistleblower based on the information disclosed, and that anonymity may affect the agency investigation. In referred cases, when OSC submits a referral letter to the agency head, the agency head is required to investigate the allegations and provide a written report to OSC in 60 days or within any longer period agreed to in writing by the Special Counsel. OSC

---

[14]National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, § 1097(c)(2)(A), 131 Stat. 1283, 1618 (Dec. 12, 2017), amending 5 U.S.C. § 1213(b).

[15]5 U.S.C. § 1213(c). In cases where OSC does not make a positive substantial likelihood determination, OSC may, with the consent of the whistleblower, transmit the information to the head of the agency concerned. The agency head is required to inform OSC in writing, within a reasonable time, of what action has been or is being taken, and when such action will be completed. OSC is required to inform the whistleblower of the agency's report. 5 U.S.C. § 1213(g)(2).

[16]OSC may determine that the whistleblower disclosure of the individual's identity is necessary because of an imminent danger to public health or safety or imminent violation of any criminal law. 5 U.S.C. § 1213(h).

also notifies the whistleblower of the referral to the agency. OSC can grant multiple time extensions if the agency requests additional time to respond. Each extension could provide 60 or more additional days for the agency to respond to the referral. OSC also can informally refer the allegations to the subject agency's general counsel office if the allegations do not meet the substantial likelihood threshold and are less egregious in nature.[17]

4. The agency is to investigate the whistleblower disclosure and submit a report to OSC with its findings. The report is required to include the agency's findings and a description of any action taken or planned as a result of the investigation, including policy changes the agency has implemented in response to the whistleblower disclosure.[18]

5. When OSC receives the agency's report, OSC's assigned attorney is to review the report to determine whether it contains the information required and whether the report's findings appear to be reasonable. OSC may request a supplemental agency report if it believes the agency did not include the necessary information or the findings do not appear reasonable. OSC is then to share the agency response with the whistleblower, who may provide comments.

6. Finally, OSC is to submit the agency report and any supplemental reports, the whistleblower's comments, and any comments or recommendations from OSC to the President and the chairmen and ranking members of the congressional committees with oversight responsibility for the involved agency. OSC also sends the involved agency and the whistleblower a closure letter and posts the case information on OSC's public website.[19]

---

[17]OSC also has the discretionary authority to refer information to the agency head from a whistleblower who reasonably believes the information evidences wrongdoing within an agency other than the one where the individual is, was employed by, or has applied to, or where the information is obtained outside the performance of the individual's duties. The agency must inform OSC of the actions taken, or to be taken, in response to the referral, and when such action shall be completed. OSC is required to inform the whistleblower of the agency's response. 5 U.S.C. § 1213(g)(1).

[18]5 U.S.C. § 1213(c), (d).

[19]See www.osc.gov. Whistleblowers may request that OSC reconsider its review of a case. Generally, a whistleblower is limited to two requests for reconsideration. Upon receipt of a request for reconsideration, the attorney is to review the request and contact the whistleblower to determine if any additional information has been provided. If there is no information presented that reverses the initial determination, the attorney is to prepare a closure letter for review and signature by OSC management.

# OSC's Data Show a Higher Number of Cases Received and Cases Closed from 2011 to 2016, although the Backlog Has Increased

## Number of Cases Received and Cases Closed Increased More than 60 Percent between Fiscal Years 2011 and 2016

OSC reported that it received a total of 5,825 PPP and whistleblower disclosure cases in 2016, an increase of 66 percent over the 3,511 cases it received in fiscal year 2011. (See figure 3.) OSC and agency officials believe that the passage of the Whistleblower Protection Enhancement Act of 2012 likely contributed to the increase. The act amended federal personnel law to, among other things, clarify the breadth of disclosures that are afforded protection, expand the right to bring reprisal claims for certain protected activities, and enhance the remedies available to federal whistleblowers who have suffered retaliation.[20]

---

[20]Pub. L. No. 112-199, 126 Stat. 1465 (Nov. 27, 2012).

**Figure 3: Numbers of PPP and Whistleblower Disclosure Cases Received and Closed from Fiscal Years 2011 through 2016**

Source: GAO analysis of Office of Special Counsel (OSC) data. I GAO-18-400

OSC's previous Special Counsel attributed some of the increase in cases received to OSC's expanded educational outreach efforts to federal employees. For example, in fiscal years 2015 and 2016, OSC reported it completed over 300 outreach events to agencies and certified 69 new agencies under its 2302(c) Certification Program. According to OSC, this program helps agencies meet their statutory requirements for informing employees of their whistleblowing rights.[21] Additionally, on its website, OSC promotes favorable actions received for individuals in PPP and whistleblower cases. OSC also issues various press releases regarding case closures, and posts favorable results on social media. According to

---

[21]Agency heads are required to ensure, in consultation with OSC, that employees are informed of the rights and remedies available to them under the Whistleblower Protection Act, as amended. 5 U.S.C. § 2302(c)(1)(B), (2)(C). In 2002, OSC established a "2302(c) Certification Program" to provide agencies and agency components with a process for meeting this statutory requirement.

OSC, these actions promote greater awareness among federal employees of the services OSC provides.

OSC also reported that the number of cases closed increased between fiscal years 2011 and 2016. As shown in figure 3 above, the total number of closed PPP and whistleblower disclosure cases increased from 3,374 in fiscal year 2011 to 5,471 in fiscal year 2016, a 62 percent increase. In 2016, the number of closed PPP cases (3,803) was about 50 percent more than in 2011 (2,503), and the number of closed whistleblower disclosure cases nearly doubled from 871 in 2011 to 1,668 in 2016. During this time, staff available to work on these cases full time increased by 29 percent, from 76 employees in 2011 to 98 employees in 2016.

During the period we reviewed, OSC did not refer the majority of cases it ultimately closed to either IPD (in PPP cases) or the subject agency (in whistleblower disclosure cases) for additional investigation. OSC closed these cases for at least one of the following reasons:

1.  The case lacked sufficient evidence to warrant further investigation.

2.  OSC lacked jurisdiction over the case, which happens if the whistleblower in question is not a current, former, or prospective federal employee, or if the individual has the basis of an Equal Employment Opportunity complaint. [22]

3.  The case had been misfiled, meaning complainants incorrectly filed PPPs as whistleblower disclosures.

From fiscal years 2011 through 2016, at least 80 percent of OSC's case closures were the result of one these OSC determinations. According to OSC staff, many federal workers and applicants for the federal workforce incorrectly submit PPP allegations as whistleblower disclosure allegations because they do not understand the difference between PPPs and whistleblower disclosures and their respective filing systems (i.e., Form 11 for PPPs and Form 12 for whistleblower disclosures). Such misfiling in turn delays OSC's processing of the case. Once correctly identified, DU closes the whistleblower disclosure case, and notifies CEU staff to open a PPP case, then CEU staff process the cases in accordance with CEU procedures.

[22]OSC also has no jurisdiction over allegations filed by employees of intelligence agencies, the armed forces, ourselves, the Postal Rate Commission, and the Federal Bureau of Investigation.

OSC has undertaken efforts to replace the separate filing systems with a one-stop filing system, known as Form 14, for both types of cases. OSC staff believe Form 14 could reduce misfiling because the single form should remove the need for filers to distinguish between PPP and whistleblower disclosure allegations. OSC promulgated a final rule adopting Form 14 effective July 2017 but has since encountered delays.[23] OSC officials told us that they are looking to implement this system in tandem with the rollout of OSC's new electronic case management system, which is still in testing.

We also found that OSC's caseload, in terms of case closures, is not spread evenly across federal agencies. In fiscal year 2016, 51 percent of all OSC case closures involved cases at three agencies, the Department of Veterans Affairs (VA), the Department of the Army (Army), and the Department of Homeland Security (DHS). The percentage of closed PPP and whistleblower disclosure cases that involved VA increased from 20 percent (678 cases) in 2011 to 34 percent (1,853 cases) in 2016. During the same period, the percentage of cases that involved DHS and Army remained stable. In fiscal year 2011, DHS and Army represented 18 percent of OSC's closed PPP and whistleblower disclosure cases and 17 percent in fiscal year 2016. Thus, VA's caseload can account for much of the increase in OSC's closed cases during the period of our review. VA officials attributed the higher number of VA cases to increased publicity stemming from congressional hearings and media attention surrounding lengthy patient wait times at VA.

OSC reported having taken several actions to help process the higher caseload. OSC officials said that, starting in 2013, incoming PPP cases were assigned to nonCEU staff across the agency, including employees in the Hatch Act Unit, which normally processes cases involving alleged illegal political activities. In addition, OSC revised its review process in 2014 to help process the higher number of cases originating from VA. This process included a focus on expedited settlements for whistleblower retaliation cases. Finally, in fiscal year 2016, OSC established its Retaliation and Disclosure Unit (RDU) as a permanent unit to process hybrid cases that involve both a whistleblower disclosure and an allegation of retaliation. Previously, CEU, DU, and IPD reviewed these cases separately.

---

[23]82 Fed. Reg. 26,739 (June 9, 2017).

## OSC Case Backlog Persists despite OSC's Efforts

Heading into fiscal year 2011, OSC already had a PPP and whistleblower disclosure case backlog of 953 cases. As previously discussed, OSC has received an increased number of PPP and whistleblower disclosure cases every year except 1 since 2011, including approximately 2,000 more cases in fiscal year 2016 than it received in fiscal year 2011. This resulted in nearly doubling backlogged cases from fiscal years 2011 to 2016 and an increase in the proportion of total caseload backlogged each year except 2012 and 2014. As shown in table 1, OSC's case backlog at end of fiscal year 2016 was over 1,850 PPP and whistleblower disclosure cases and represented over 24 percent of the PPP and whistleblower disclosure caseload. The trend of an increasing backlog was particularly evident in whistleblower disclosure cases, where the number of cases carried over as a percentage of total whistleblower caseload increased from 8.4 percent in fiscal year 2011 to 20.8 percent in fiscal year 2016.

**Table 1: Number and Percentage of Prohibited Personnel Practice and Whistleblower Disclosure Case Backlog from Fiscal Years 2011-2016**

|  | Fiscal Year | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** |
| Cases remaining from prior years | 953 | 1,074 | 1,381 | 1,241 | 1,851 | 1,858 |
| New cases received | 3,511 | 4,117 | 4,064 | 4,926 | 6,014 | 5,825 |
| Total caseload | 4,464 | 5,191 | 5,445 | 6,167 | 7,865 | 7,683 |
| Percent of caseload backlogged | 21.3 | 20.7 | 25.4 | 20.1 | 23.5 | 24.2 |

Source: GAO analysis of Office of Special Counsel data. | GAO-18-400.

A sustained backlog puts OSC's ability to fulfill its mission of protecting federal employees at risk. As OSC noted in its fiscal year 2017 Performance and Accountability Report, a longer backlog risks further delay for processing newly received cases. Further, lengthy processing times delays attaining desired favorable actions and remedying wrongdoings. Without timely resolutions, whistleblowers may be discouraged from filing whistleblower disclosures.

## OSC's Time to Close Both Types of Cases Increased from Fiscal Year 2011 to 2016, but Review Times for Referred Whistleblower Disclosure Cases Increased the Most

### OSC is Taking Longer to Process Cases

As discussed above, the majority of OSC's case closures do not require full investigation. However, overall OSC is taking longer to review and close PPP and whistleblower disclosure cases (measured as the median number of days from when OSC receives a case).[24] According to OSC management, processing times are affected by the complexity of a particular case, the cooperation level of involved parties, and agency requests for additional time. Figure 4 shows the median number of days OSC took to close all PPP and whistleblower disclosures cases from fiscal year 2011 through fiscal year 2016. Median closure times for whistleblower disclosure cases showed a greater relative increase over this time than PPP cases, increasing from 10 days in 2011 to 29 days in 2016.

---

[24]We report case processing times in terms of medians because some cases that are referred for further investigation can have extremely long processing times. Despite being generally rare, these cases can distort averages that are described in terms of means.

**Figure 4: The Median Number of Days to Close All PPP and Whistleblower Disclosure Cases from Fiscal Years 2011 to 2016**



Source: GAO analysis of Office of Special Counsel (OSC) data. I GAO-18-400

## Cases Referred to Agencies Often Take the Longest to Process

The increase in the median number of days to close all whistleblower disclosure cases, from 10 to 29 days, was also influenced by the time it took OSC to close the small subset of cases that it referred to agencies for investigation. While these cases represented only 5 percent of the whistleblower disclosure cases OSC closed in fiscal year 2016, they took significantly longer to close. The median lifespan of whistleblower disclosure cases that OSC referred to agencies for investigation increased from 450 days to 668 days from fiscal years 2011 to 2016, a 48 percent increase, with some cases taking as long as 1,523 days (or almost 4.2 years) to close.[25]

---

[25]Some whistleblower disclosure referrals are closed out quickly in OSC's case management system because they are anonymous and are thus referred directly to the agencies' Inspector General instead of the agencies themselves. The median closure time for these referrals ranged from 2 to 7 days. As a result, we omitted them from this analysis.

**GAO-18-400  Office of Special Counsel**

Referred whistleblower disclosure cases have lengthy review times across multiple stages of the case review process. The 2018 OSC Reauthorization, part of the National Defense Authorization Act for 2018, grants OSC 45 days, instead of 15, to determine whether there is a substantial likelihood that the information disclosed one or more of the categories of wrongdoing.[26] Even though this change gives OSC increased processing flexibility, OSC may not be able to meet these revised standards. Of the 71 referrals under subsection 1213(c) we reviewed that were closed in fiscal year 2016, 55 would not have met the 45-day requirement. In contrast, 16 would have met the 45-day requirement, with 8 of the 16 referred to an agency within 15 days. Among the closed cases that we reviewed in fiscal year 2016, the median number of days OSC took between opening and referring a case was 91 days. Between fiscal years 2011 and 2016, prior to the change in law, OSC made referrals within 45 days less than half the time in every year except for fiscal year 2012.[27]

A major factor contributing to the lengthy processing times for referred whistleblower disclosure cases is the length of time it takes agencies to conduct their investigations in response to OSC. By law, the subject agency is required to respond to the allegations within 60 days.[28] OSC may grant one or more extensions of this timeline to agencies that request them, and OSC did so in most cases we reviewed. From fiscal year 2011 through fiscal year 2016, OSC granted on average 88 percent of all extension requests received from agencies. In any given year during this period, OSC granted at least 83 percent of extension requests. While OSC procedures normally allow up to two extensions, the disclosure worksheet included in case files has slots for up to five extensions. We found that OSC granted between 2.7 and 4 agency extension requests per case on average from fiscal years 2011 through 2016.

Our review of cases closed in fiscal year 2016 also showed similar results. OSC did not receive agencies' responses within 60 days for any of the 71 referrals under subsection 1213(c) it closed in fiscal year 2016 that we reviewed. The median number of days between when the referral

---

[26]5 U.S.C. § 1213(b) and Pub. L. No: 115-91, § 1097, 131 Stat. 1283, 1618 (Dec. 12, 2017).

[27]See table 8 in appendix II for more information.

[28]5 U.S.C. § 1213(c)(1)(B). The time the agency has to respond can be longer than 60 days if agreed to in writing by the Special Counsel.

letter was sent to the agency and when the initial agency response was received by OSC was 169 days, and 33.8 percent (23 of 68) took more than 200 days.[29] In certain instances OSC may ask the agency for a supplemental report if OSC believes the agency's report was insufficient. The median number of days between when the referral letter was sent to the agency and when OSC received the final supplemental report response was 289 days and 69.6 percent (48 of 69) took more than 200 days.[30] Two agencies, VA and DHS, accounted for 56 of the 71 referrals made under section 1213(c). For those referrals, the median number of days for VA's initial responses to the referrals was 168, and DHS's was 165 days. The median number of days for OSC to receive a final supplemental report from VA was 266 days, and from DHS was 370 days.

Agency officials we interviewed told us that they routinely request extensions and OSC rarely or never rejects their initial requests. They explained that in most cases they need extensions to compile the necessary information to respond to the referral and to have the investigation approved internally. Because OSC information requests can be quite expansive, according to agency officials, agencies have to spend more time identifying the specific issues at the root of any allegations.

OSC has discretion in approving these requests, however, and whistleblower advocacy representatives told us that OSC could use its case closure letters to the President and Congress to apply pressure on agencies to respond more timely to allegations. OSC officials told us that their preference is to give agencies the needed time to complete investigations. They explained that if they have to close a case because an agency did not conduct a full investigation in a timely manner, the whistleblower is ultimately disadvantaged because he or she will have to refile the allegations if he or she wants them fully investigated. OSC's strategic plan for fiscal years 2017 to 2022 includes an objective for OSC to ensure agencies provide timely and appropriate outcomes for referred whistleblower disclosures. To achieve this objective, OSC says it plans to undertake strategies that include engaging agencies in the development of investigation plans of referred whistleblower disclosures and maintaining communications with agencies before, during, and after

---

[29]Three of the referrals we reviewed did not have data on timeframes for agencies' initial responses.

[30]Two of the referrals we reviewed did not have data on timeframes for agencies' final responses.

agencies' investigations of referred whistleblower disclosures, among others. Until OSC reviews and determines whether its policy for extensions is appropriate, it will be unable to meet its strategic goal for timely and appropriate outcomes.

## OSC Does Not Communicate Potential Processing Timelines to Whistleblowers

OSC's procedures for notifying whistleblowers initially and when their cases are referred to the agency do not require OSC to communicate time frames for the referral and agency response. The referral notification letter to whistleblowers notes that agencies may ask for an extension and that the investigation may take longer than 60 days. In March 2018, OSC revised its referral letter template for whistleblowers to inform the whistleblower that agency investigations may take longer than 60 days and that agencies frequently request and receive extensions beyond the initial 60 days. This language, however, does not include agency-specific information on typical length of time a whistleblower could expect in their case.

*Standards for Internal Control in the Federal Government* notes that it is important for an agency to communicate quality information to external parties in order to achieve the agency's objectives.[31] However, given that disclosure cases that were referred and closed in fiscal year 2016 took on average almost 1.8 years to resolve, whistleblowers are waiting a long time for cases to close. As whistleblower representatives noted, whistleblowers may be subject to retaliatory work environments during these extended processing times. In some instances whistleblowers may have changed positions, left the agency, or otherwise given up on a remedy, which presents uncertainty for all involved. Similarly, agency liaisons noted that officials who are the subject of allegations may have also changed positions during the interim, which limits the corrective or disciplinary actions an agency can take. By not providing sufficient transparency on realistic time frames for the referral and agency referral response process, OSC risks and limits whistleblowers' ability to adequately plan for the whistleblower disclosure case process and have a better understanding of the potential timeline for case closure.

---

[31]GAO-14-704G.

# Some Aspects of OSC Case Processing Procedures Generally Adhere to Internal Control Principles, but Others Do Not

We identified eight internal control principles that are relevant to ensuring that OSC has an effective process in place so that its objective will be achieved for resolving PPP and whistleblower disclosure cases. These eight internal control principles include (1) establishing a structure, responsibility, and authority; (2) defining objectives and risk tolerances; (3) identifying, analyzing, and responding to change; (4) communicating internally; (5) performing monitoring activities; (6) implementing control activities through policies; (7) design control activities; and (8) committing to competence. Based on our review, OSC generally adhered to five of the relevant internal control principles, but did not fully adhere to three.

## OSC Generally Adhered to Five Relevant Internal Control Principles

### Establish Structure, Responsibility, and Authority

We believe that OSC has established a structure for PPP and whistleblower case processing, and assigned responsibilities and authorities. Specifically, CEU guidance outlines criteria for when to refer cases to IPD for investigation. The guidance includes a checklist of factors to aid the ADR Unit in evaluating whether a case is suitable for mediation. OSC's units have established and documented the key roles needed to carry out unit responsibilities. OSC also has documentation that assigns units responsibilities for working with external stakeholders, such as complainants, whistleblowers, and federal agencies, and that establishes reporting lines for OSC to communicate with these parties. OSC also provides training to federal agencies on whistleblower disclosures and PPPs and certifies that federal agencies have informed their employees about the PPP and whistleblower disclosure processes.

### Define Objectives and Risk Tolerances

We believe that OSC has defined program objectives and risk tolerances for PPP and whistleblower case processing. Specifically, OSC's most recent two strategic plans outline program objectives as well as implementation strategies, and specify PPP and whistleblower disclosure case metrics to track. OSC unit mangers, via staff meeting minutes, notes, and various reports, document how they communicate objectives and track progress towards achieving those objectives.

### Identify, Analyze, and Respond to Change

We believe that OSC has identified, analyzed, and responded to changes that could affect its case processing. Specifically, OSC's agency-wide Enterprise Risk Management process, established in early 2017, documents OSC's key risk identification and management process. According to the risk management profile and meeting minutes, the

| | Enterprise Risk Management group has met twice since being established to identify risks, develop responses, and follow up on previous responses and risks identified. |
|---|---|
| Communicate Internally | We believe that OSC has established a process to communicate internally. Specifically, OSC management communicates information about PPP and whistleblower case processes using internal communication channels such as mass emails, employee newsletters, one-on-one meetings, and meeting agendas. OSC staff also told us they utilize informal communication channels and that OSC management are available to discuss PPP and whistleblower case processes. OSC management also provided policy memos and procedures that communicate certain PPP and whistleblower disclosure case processes. |
| Perform Monitoring Activities | We believe that OSC has established a process to monitor case activities. Specifically, OSC's monitoring of case operations include a variety of reports that track cases received, pending cases, and case resolutions to assess the effectiveness of OSC's PPP and whistleblower disclosure operations. Key pieces of information from these reports are shared via the internal meeting structures with staff and management. IPD, DU and RDU management also conduct docket reviews of cases with their staffs. OSC management provided examples of monitoring the caseloads of staff as well as how they discussed and monitored the status of open cases at meetings. For example, CEU tracks which staff are assigned certain cases and whether the cases were closed or referred to another unit |

## OSC Generally Did Not Adhere to Three Relevant Internal Control Principles

| Implementation of Control Activities through Policies | We believe that for the PPP and whistleblower disclosure processes OSC did not implement its control activities through policies. |
|---|---|
| | **Prohibited Personnel Practices:** CEU receives and processes PPP cases and is OSC's largest unit in terms of staff and caseload. However, CEU lacks documented, complete procedures for processing cases, such as a comprehensive guide or manual describing procedures for reviewing and resolving PPP cases. We identified the following specific procedures, for which CEU lacks documentation: (1) case priorities, (2) obtaining favorable actions, (3) staff productivity expectations, and (4) supervisory review. |

First, regarding case priorities, CEU management described to us seven different types of cases that should be prioritized but did not provide documentation for them. OSC cases files also lacked documentation regarding case prioritization. In May 2016, CEU conducted a "Best Practice Survey," in which CEU staff were asked their views on CEU's case processes. One of the many themes identified was that CEU needs to clarify its case priorities.

Second, concerning favorable actions, CEU lacks procedures for how staff should determine when a favorable action is warranted, how to obtain and negotiate favorable actions with agencies, and how to document favorable actions in case files. A favorable action is an outcome in a case that could result in a specific benefit to the complainant, an outcome aimed at disciplining the subject official and deterring future bad conduct, or an improvement to agency processes. OSC lists the number of favorable actions as a key performance metric in its budget and performance documents. CEU, in particular since 2014, has sought favorable actions, especially in cases that do not merit referral to its investigative unit or mediation unit. According to OSC officials, this initiative was part of an effort by the prior Special Counsel to expand CEU's investigative role beyond that of an intake unit. CEU increased its share of OSC's favorable actions from approximately 1 percent in fiscal year 2011(1 of 75) to 31 percent in fiscal year 2016 (77 of 251). However, without documentation of procedures, OSC staff may not consistently perform required steps to attain favorable actions. For example, we found that 18 of the 61 cases (29.5 percent) where CEU claimed a favorable action lacked documentation of OSC's involvement in obtaining the favorable action, the agencies' implementation of the favorable action, whether the favorable action was achieved in another OSC unit but claimed by CEU, or some other discrepancy. The "Best Practice Survey" results noted that CEU staff would like written procedures for obtaining favorable actions.

Third, CEU lacked documentation for staff productivity expectations. In August 2017, according to an OSC official, CEU staff were expected, though not required, to resolve at least 36 PPP cases per quarter. CEU officials were unable to provide documentation on how the goal was communicated to staff. Another finding from OSC's "Best Practice Survey" was that CEU staff need clarity regarding case resolution requirements. In addition, during our small group discussion with CEU staff in September 2017, the staff raised concerns regarding OSC's case resolution expectations. They said that productivity expectations are unwritten and vary depending on whether staff telework or not. One staff

person was concerned that management had an unwritten expectation for staff to close significantly more than the 36 cases per quarter. OSC shared documentation in April 2018 clarifying staff expectations for case productivity. The expectations, which are effective June 1, 2018, and vary depending on the grade level of the OSC employee, were emailed to all CEU staff. However, while OSC has documented and communicated CEU staff productivity expectations, the expectations did not include guidance on how staff should balance resolving a certain number of cases over a specified time period and obtaining favorable actions, which OSC has also emphasized for CEU staff.

Fourth, CEU does not have written procedures specifying supervisory review of CEU cases. CEU management officials told us they are required to review (1) PPP closure letters; (2) all cases that allege reprisal for whistleblowing; and (3) all cases referred to other units, such as those referred for mediation and investigation. However, OSC lacked procedures for these review processes. As a result, OSC staff has not followed some steps in case files consistently. For example, of the 61 cases we reviewed with a corrective action taken in CEU, 45 alleged reprisal for whistleblowing. We found that 15 of these 45 cases did not have a CEU management review. Also, of those cases without a corrective action that were not referred for investigation, we estimate that 58.8 percent did not include CEU managerial review of the closure letter.[32] For cases referred for investigation, we found that 44.7 percent did not include CEU managerial review of the referral memorandum.[33] The OSC "Best Practice Survey" results also indicated that CEU staff would like to standardize the unit's review procedures.

*Standards for Internal Control in the Federal Government* states that management should implement control activities through policies by documenting them. CEU management said these specific steps, though not documented, could be discussed during staff's initial training, at midterm and annual reviews, when assigning cases, and at OSC meetings. CEU management officials said they are formalizing guidance and have orally communicated these case processes to staff during off-site training and informal communications. Without documented

---

[32]The margin of error of the estimates is no larger than +/- 10.8 percentage points. We reviewed a sample of 85 cases and our estimates apply to the 3,168 cases in population.

[33]The margin of error of the estimates is no larger than +/- 11.1 percentage points. We reviewed a sample of 47 cases and our estimates apply to the 106 cases in population.

procedures, there is an increased risk that employees will not consistently follow management's directives.

**Whistleblower Disclosures:** OSC has written procedures for processing whistleblower disclosure cases. These procedures, among other things, describe case productivity requirements for staff, specify managerial involvement for cases, and outline the case prioritization process, as well as other case processes. However, these procedures also include outdated processes. For example, OSC's case prioritization process specifies three priority levels but we found whistleblower disclosure priority worksheets in case files that specify four priority levels. In addition, OSC's written procedures outline an informal referral process to agencies' respective inspector general (IG) offices. According to OSC's procedures, OSC uses this referral process in cases where the whistleblower disclosure is less egregious in nature and does not warrant a referral to the head of the federal agency. However, according to OSC officials, OSC no longer refers whistleblower disclosures informally to IG offices, but instead refers whistleblower disclosures informally to agencies' respective general counsel offices.

*Standards for Internal Control in the Federal Government* states that management should periodically review policies, procedures, and related control activities for continued relevance and effectiveness. An OSC official told us OSC had not updated its procedures due to OSC's high caseload for whistleblower disclosures. In April 2018, OSC provided us with updated case procedures for case prioritization and informal referrals. OSC officials said they will communicate the updated procedures to the appropriate staff during a staff meeting and will make the procedures available on OSC's intranet page. The updated procedures should help OSC staff implement case processes as intended by OSC management.

## Design Control Activities

To conduct our case file review, we asked OSC to locate and retrieve 396 PPP and whistleblower disclosure paper case files that were closed in fiscal year 2016. OSC told us after several months, that it was unable to locate 18 files (4.5 percent) and was still retrieving 36 case files (9 percent). Ultimately, OSC could not locate 20 case files and told us 13 cases would be unavailable within the course of our review. These 33 cases were opened by OSC in fiscal years 2012 to 2016, although a majority were opened in fiscal years 2015 and 2016. Based on our

estimates, OSC would not be able to locate 8.3 percent of closed case files.[34]

According to OSC officials, some of the difficulty of finding their files is because they are maintained in paper files. OSC officials said that one full-time OSC employee oversees the maintenance and retrieval of closed OSC paper case files. They explained that records are stored at multiple locations: OSC headquarters, OSC's field offices, and at federal record and archive centers. OSC officials told us that, if given additional time beyond our January 2018 deadline, then they could locate the remaining cases files but could not provide us a time frame for doing so.

OSC is planning to implement a new electronic case management system (eCMS), which is designed to mitigate the need to maintain physical case files. According to OSC, staff could then retrieve electronic case files as needed. OSC documentation indicated that eCMS will allow OSC to take an electronically filed Form 14 and create an electronic case file.[35] Based on OSC's functional requirements for eCMS, the system should also allow staff to quickly locate case files that may be connected to other cases. This system would also allow staff to search e-mails and documents based on a particular filter, among other capabilities. OSC's original time frame was to have eCMS operational in October 2017.

However, OSC has had issues migrating data from OSC 2000 to eCMS, has not implemented the new system, and continues to maintain paper files. As of March 2018, OSC was determining whether its contracted vendor would be able to migrate the OSC 2000 data to eCMS. In addition, OSC was examining (1) whether eCMS as constructed can reach full functionality so that OSC can eliminate paper case files, and (2) if so, what further system development is required to accomplish this. OSC officials said their tentative goal is to transition from OSC 2000 to eCMS at the beginning of fiscal year 2019.

Under *Standards for Internal Control in the Federal Government*, management should clearly document internal control and all transactions and other significant events in a manner that allows the documentation to be readily available for examination. In addition, according to OSC

---

[34]The margin of error of the estimates is no larger than +/- 3.03 percentage points.

[35]As of March 2018, OSC said that it plans to roll out Form 14 in line with its implementation of eCMS at the beginning of fiscal year 2019.

regulations, OSC is to maintain records to (1) document how OSC handled each matter; (2) provide a resource for consistency in interpretation and application of the law; and (3) allow for statistical reports and analysis of matters processed at OSC.[36] Until OSC develops an electronic case management system that would allow individual staff to perform customizable case history searches and manage their caseloads, it cannot ensure that cases related to a specific individual or agency will be located in a timely manner, which could also delay the work of OSC staff.

| | |
|---|---|
| Commitment to Competence | OSC does not have a systematic, standardized training program for OSC employees who review and process PPP and whistleblower disclosure cases. CEU and DU, OSC's two largest units in terms of cases closed, described a number of aspects of training for entry level employees. For example, OSC officials said both units provide a training manual to new staff. The training manuals cover a number of topics, such as unit and OSC policies, case processes, and relevant case law, and include examples. In DU, OSC officials said new staff receive some training on PPPs, and are assigned less difficult cases although they did not provide documentation. They explained that new staff become familiar with DU's procedures through on-the-job training. In CEU, OSC officials described a 2-week training course, but could not provide documentation of the training, such as a syllabus or a list of course participants. OSC officials said the 2-week training course was being updated and formalized. They added that the guidance currently used for the training is informal and not regularly available for staff to access. |

In April 2018, OSC provided us with additional documentation regarding training provided in CEU. The documentation included an outline of PPP topics and the CEU training manual we had previously received. As we discussed earlier, to help manage OSC's caseload, PPP cases were assigned to staff to outside of CEU as part of the CEU project. Staff not accustomed to working PPP cases on a regular basis were asked to do so. However, OSC officials said that no formal training was provided to these staff as part of this project.

OSC nonmanagement staff told us they would like more regular, standardized training. During our small group discussions, OSC staff discussed two consistent themes related to training: (1) on-the-job

---

[36]Notice of a modified system of records, 82 Fed. Reg. 45,076 (Sept. 27, 2017).

training at OSC is emphasized, and (2) existing training for entry-level employees could be enhanced. For example, one participant in our small group discussions stated that although the nature of their work requires that much is learned via on-the-job training, OSC could do better by providing a systematic approach for new hires that helps them understand the life of a case (e.g., documenting case lifecycle or formalizing checklists). Also, as part of the OSC's "Best Practice Survey" CEU staff identified the need for regular quarterly training meetings to discuss OSC policy issues, developments in case law, and changes and clarifications on CEU case processing procedures.

*Standards for Internal Control in Federal Government* state that management should demonstrate a commitment to recruit, develop, and retain competent individuals. This includes tailoring training based on the needs of the role. In addition, OSC's strategic plan for fiscal years 2017 to 2022 has an objective on recruiting, developing, and retaining a highly talented, engaged, and diverse workforce. OSC officials noted that given OSC's small size, OSC does not have a regular, standardized training program. OSC officials did explain and provide documentation regarding continuous training provided to staff, such as external training staff attended. They also told us that efforts to find staff external training opportunities depend on the extent to which funding is available.

As OSC's caseload continues to increase, efficiently recruiting and onboarding staff may help OSC better manage its caseload. The lack of standardized training poses a risk to the consistency with which cases are worked, reviewed, and closed, especially since staff not accustomed to working PPP cases as part of the CEU project were not provided training because OSC lacks standardized training based on the documentation we reviewed. Ensuring consistent training among staff could help alleviate any issues created by absences and employee turnover. Such training would also help OSC manage its caseload if nonPPP staff are again asked to work PPP cases.

# OSC's Internal Complaint and Whistleblower Disclosure Process in Some Cases Does Not Provide OSC Employees Protections Afforded to Other Federal Employees

## OSC Processes for Reviewing and Referring Internal Allegations Involve OSC Officials and Staff

OSC's policy for reviewing of internal PPP and whistleblower disclosure allegations involves OSC officials and staff at various points in the process depending on the complainants, whistleblowers, and subject officials involved. Table 2 summarizes the various review scenarios for both PPP and whistleblower disclosure cases at OSC.

**Table 2: Different Entities Investigate Prohibited Personnel Practice (PPP) and Whistleblower Disclosure Cases Depending on Which Type of Office of Special Counsel (OSC) Employee Is the Subject Official**

| Type of case | Allegations involving Special Counsel or Principal Deputy Special Counsel | Allegations involving other political appointees and senior managers | Allegations involving nonleadership employees who review PPP or whistleblower disclosure cases, respectively | Allegations involving all other employees |
|---|---|---|---|---|
| PPP Complaint | Council of the Inspectors General for Integrity and Efficiency (CIGIE) receives case from complainant directly or from OSC Authorized Individual, then reviews case. | National Science Foundation Office of Inspector General (NSF-OIG) receives case from OSC Authorized Individual or Special Counsel, then reviews case.[a] | Complaints Examining Unit receives and reviews case (same as external process). | Principal Deputy Special Counsel receives and reviews case. |

| Type of case | Allegations involving Special Counsel or Principal Deputy Special Counsel | Allegations involving other political appointees and senior managers | Allegations involving nonleadership employees who review PPP or whistleblower disclosure cases, respectively | Allegations involving all other employees |
|---|---|---|---|---|
| Whistleblower Disclosure | CIGIE receives case from whistleblower directly or from OSC Authorized Individual, then reviews case. | NSF-OIG receives case from OSC Authorized Individual or Special Counsel, then reviews case.[a] | Disclosure Unit receives and reviews case and may make referral determination to Special Counsel. If referred, the case would be investigated by either the NSF-OIG or OSC investigators from a different location than the subject official. | Principal Deputy Special Counsel receives and reviews case and may make referral determination to Special Counsel. If referred, the case would be investigated by either the NSF-OIG or OSC investigators from a different location than the subject official. |

Source: GAO analysis of OSC and NSF-OIG documentation. I GAO-18-400

[a]The NSF-OIG may decline to review the allegations, in which case OSC conducts the review.

According to OSC Directive 57, OSC's policy document that explains the internal allegations process, the Principal Deputy Special Counsel reviews allegations against CEU, IPD, or DU non–senior management staff. CEU and DU chiefs review their respective categories of allegations made against employees outside of those units who are not senior managers. The Special Counsel can either refer internal whistleblower disclosure allegations against employees other than senior managers to the NSF-OIG or appoint OSC investigators from another office location. However, it is unclear how this selection process works in practice because, of the five cases in our case file review in which OSC played an investigative role, OSC could only locate one of the cases, which was a PPP instead of a whistleblower disclosure case. For allegations against political appointees, senior executives, and senior managers other than the Special Counsel and Principal Deputy Special Counsel, OSC employees must first submit allegations with either the Special Counsel or with OSC's Authorized Individual—an employee elected by OSC's workforce—before NSF-OIG can decide to provide investigative services. If NSF-OIG declines to provide such services, Directive 57 notes that OSC reviews the allegations in question.

An OSC employee can choose to file with the Authorized Individual or file directly with a third party when the allegations are against either the Special Counsel or Principal Deputy Special Counsel. Pursuant to the Inspector General Reform Act of 2008, the Council of Inspectors General for Integrity and Efficiency (CIGIE) Integrity Committee reviews

allegations made against IGs, their designated Office of Inspector General staff members, and OSC's Special Counsel and Principal Deputy Special Counsel.[37] Until 2016, the Special Counsel was also a member of this committee.[38] Per OSC Directive 57, OSC employees may file directly with this committee.

OSC officials noted that, in their opinion, the internal allegations process available to OSC staff has challenges and is not ideal. Officials had concerns that partnering with an agency IG that is large or that may frequently have employees that file allegations for OSC to review could create conflicts of interest if the agency IG in turn has to review OSC employee allegations. According to officials, OSC has actively tried to strengthen its internal allegation process by securing an agreement with the NSF-OIG.

OSC's memorandum of understanding with NSF-OIG specified that NSF-OIG staff would determine whether to provide investigative services for allegations that OSC referred to them either via the Special Counsel or the Authorized Individual. NSF-OIG is to present a summary of facts to the Special Counsel after it concludes its investigation, but does not exercise enforcement authority in these matters. The Special Counsel is responsible for initiating corrective or disciplinary action. According to OSC officials familiar with the negotiations that resulted in the initial 2014 agreement, NSF-OIG was concerned with the resources that would be involved if it were charged with independently undertaking investigations of allegations made against OSC without an authorization from OSC. The result of these concerns, via Directive 57, was to have either the Special Counsel or the Authorized Individual route allegations to NSF-OIG before NSF-OIG staff decided whether to accept the case.

[37]Pub. L. No. 110-409, § 7, 122 Stat. 4302, 4306 (Oct. 14, 2008).

[38]Until December 2016, the Special Counsel was a sitting member of the committee. Our review of CIGIE Integrity Committee meeting minutes showed that then-Special Counsel Carolyn Lerner recused herself from committee proceedings involving all five cases filed by OSC employees against OSC leadership.

## One-Fifth of OSC Employee Survey Respondents Have Considered Filing Allegations but Cited Clarity and Reprisal Concerns

Of the 87 (of 132) OSC employees who responded to our survey (representing a 66 percent response rate), 17 told us that they either had filed or had considered filing a PPP or whistleblower disclosure allegation against another OSC employee over the course of their careers.[39] Five of these 17 employees said they ultimately filed allegations. These 5 also said they had considered filing additional allegations but ultimately chose not to do so.[40] Table 3 shows that concerns about the integrity of OSC's process for internal allegations played significant roles in the 17 respondents' decisions not to file. These employees, in follow-up discussions with us, cited similar themes. While a majority of these employees said they were able to resolve their issues informally, this was the least common reason to contribute either moderately or very much to an employee's decision not to file.

**Table 3: Some Procedural Concerns Contributed to Office of Special Counsel (OSC) Employees, Who Considered Filing Complaints, Deciding Not to File Those Complaints**

| Concern | Number of respondents who considered filing but said concern either moderately or very much contributed to decision not to file |
|---|---|
| Ability to resolve issue informally | 9 of 17 |
| Fear of reprisal from within OSC | 15 of 17 |
| Not sure how to file | 9 of 17 |
| Concern about objectivity or conflict of interest within complaint process | 16 of 17 |

[39]Response rates were higher than average in the Investigation and Prosecution Division and Complaints Examining Unit. Nonmanagement staff responded at higher rates than did management staff. Among respondents, per-question response rates for all of the questions summarized in this report were at or above 85 percent.

[40]OSC employees were given the ability to file allegations against political appointees, senior executives, and other senior managers apart from the Special Counsel and Principal Deputy Special Counsel in 2014 with the signing of a memorandum of understanding with NSF-OIG. While we reviewed available information on cases filed with NSF-OIG since 2014, our survey asked employees about their experiences both before and after 2014.

| Concern | Number of respondents who considered filing but said concern either moderately or very much contributed to decision not to file |
|---|---|
| Concern about length of process | 10 of 17 |
| Fear that anonymity would be compromised | 16 of 17 |

Source: GAO survey of OSC employees. | GAO-18-400

Some OSC employees, regardless of whether they had previously considered filing an allegation, expressed concerns about OSC's process for internal PPP and whistleblower disclosure allegations, as shown in table 4.[41]

**Table 4: Employees Have a Range of Views on How the Office of Special Counsel's (OSC) Policy Addresses Several Components of Process for Internal Allegations**

| Concern | Employees who said OSC's policy addressed concern not at all well or somewhat well | Employees who said OSC's policy addressed concern very well or moderately well |
|---|---|---|
| Address all stages of the process of filing | 31 of 87 | 44 of 87 |
| Explain employee appeal rights | 36 of 87 | 38 of 87 |
| Identify the entities who will review the allegations | 25 of 87 | 49 of 87 |
| Protect against a conflict of interest in responding to allegations | 30 of 87 | 45 of 87 |
| Identify Authorized Individual who refers allegations for investigation | 28 of 87 | 48 of 87 |
| Protect the anonymity of the employee | 33 of 87 | 41 of 87 |

Source: GAO survey of OSC employees. | GAO-18-400

We found that OSC employees had expressed similar concerns in recent editions of the Federal Employee Viewpoint Survey. From 2012 to 2015,

---

[41]Nonresponse rates for subparts of this survey question ranged from 13 to 15 percent.

OSC experienced increases in negative responses on questions concerning whether PPPs are tolerated, whether employees feel they can disclose violations of law without fear, and on the honesty and integrity of their leaders. In particular, the percentage of negative responses on the question of whether employees felt they could disclose violations of law without fear rose from 10 percent in 2012 to 37 percent in 2015. Scores on these questions generally improved beginning in 2016, and the agency-wide response rate rebounded significantly from 2015 to 2016.[42]

During our follow-up discussions with survey respondents, a theme emerged that anonymity is difficult to maintain, in part owing to the perception that OSC has a culture of informal discussion. Given the roles that OSC leadership and other officials currently play in this process, these concerns may be valid. Having an authorized individual and multiple OSC managers responsible for examining case files against OSC employees cannot assure employees that their claims can be reviewed anonymously and independently. Consequently, employees told us they are reluctant to report their workplace concerns in part because OSC management and the Authorized Individual are involved in the review process for certain cases. This in turn increases OSC's risk that workplace violations go unreported.

*Standards for Internal Control in the Federal Government* states that agencies should segregate management authority and oversight duties to reduce the risk of fraud, waste, and abuse.[43] We found no instances in which top OSC leadership were directly involved in the review of allegations made against them. However, OSC is a small agency of only 135 employees. Without separating management authority and oversight from the review of OSC allegations, the likelihood of an allegation involving someone closely related to or frequently in contact with agency management—even if not involving a member of management directly—is greater and could promote a perception of a conflict of interest.

---

[42]The OSC-wide response rate was 85 percent in 2014 before declining to 61 percent in 2015 and increasing to 92 percent in 2016.

[43]GAO-14-704G.

## Statutory Changes Increase Safeguards for OSC Employees, but OSC Has Not Yet Taken All Steps to Implement Changes

Congress has taken multiple actions to increase the independence of reviews of internal PPP and whistleblower disclosure allegations at OSC. As previously noted, the Inspector General Reform Act of 2008 and subsequent CIGIE procedures provided the CIGIE Integrity Committee as an avenue where OSC employees could directly file allegations against either the Special Counsel or Principal Deputy Special Counsel. The Inspector General Empowerment Act of 2016 further bolstered the independence of CIGIE Integrity Committee reviews of OSC cases by removing OSC officials from the committee in these cases.[44] More recently, the 2018 OSC Reauthorization requires OSC to establish an agreement with at least one agency. Under such an agreement, an IG can receive allegations for investigation directly without the need for an OSC Authorized Individual.[45] The legislation authorizes OSC to reimburse the third-party IG for any expenses related to their investigations.

In March 2018, OSC officials told us OSC extended the existing agreement with NSF-OIG, with a revised expiration date of August 2018. OSC officials said they are working with CIGIE and other agencies to secure a new IG arrangement, though they had not finalized one. Officials added that they intend to adopt language as part of a future arrangement that will allow OSC employees to contact the IG directly. However, it is still unclear who will provide these investigative services. Given the concerns stated above, it is important that OSC employees have a resource that can receive allegations directly, independently investigate allegations, and pursue favorable actions when appropriate. These features of PPP and whistleblower disclosure investigations are protections that federal employees and applicants currently are afforded by OSC and the IG community. The impending expiration of OSC's current agreement with NSF-OIG presents an opportunity for OSC to secure a fully independent review for internal OSC allegations.

---

[44]Pub. L. No. 114-317, § 3(3)(A)(i), 130 Stat. 1595, 1596 (Dec. 16, 2016).

[45]Pub. L. No: 115-91, § 1097(g), 131 Stat. 1283, 1683 (Dec. 12, 2017) *codified* at 5 U.S.C. § 1212(i). The OSC reauthorization enacted additional changes for OSC unrelated to OSC's internal allegation process.

## Uncertainty over How to File Also Inhibits Some Employees from Reporting Concerns

We also found that there is some uncertainty among OSC staff of OSC's policy for making these allegations. Of the 17 employees who responded to our survey and said that they ultimately chose not to file allegations, 9 said that uncertainty about how to file either moderately or very much contributed to their respective decisions. Moreover, while 44 of 87 employees surveyed said that they were both familiar with and had read OSC's policies for internal allegations, 19 of 87 said they either could not locate OSC's policies or did not know they existed. OSC management told us that OSC has not routinely included information on its internal allegations process as part of its new employee orientation program nor included this information as part of all-staff meetings. The OSC employee newsletter includes an announcement that OSC employees can file allegations and have them reviewed by NSF-OIG. However, in the two most recent examples provided to us, the announcement language did not provide information on the Authorized Individual and did not directly address other types of cases that may not fall under NSF-OIG's jurisdiction.

Regardless of the nature of employees' concerns with their workplace or with the process for investigating allegations, it is important that employees have the information they need to report those concerns. *Standards for Internal Control in the Federal Government* emphasizes that agency management needs to communicate quality information throughout all levels of an organization.[46] Moreover, management should take opportunities to evaluate how it is communicating information in light of its audience, the legal and regulatory environment, and the nature of the information. Implementing recent statutory changes, if successful, may prompt fundamental alterations in how OSC employees' PPP and whistleblower disclosure allegations are investigated. Given the timing of these changes and the sensitivities of employees with workplace concerns, OSC has an opportunity to bolster its information outreach in this area and help promote a greater awareness of OSC internal complaint policies and procedures. In March 2018, after we discussed our preliminary findings, the Special Counsel notified all OSC employees of their rights to disclose wrongdoing at OSC, and officials reported displaying posters with the revised information. OSC officials also said that, in May 2018, OSC started to include a copy of the poster explaining how to make disclosures in every new employee orientation packet.

---

[46]GAO-14-704G.

Continuing this type of outreach periodically may help notify OSC employees of their rights going forward.

## Conclusions

The position that OSC occupies in the defense of merit system principles in the federal government carries great weight, but it also presents many challenges. OSC's increased caseload has led to a continuing backlog of unresolved cases, both in absolute numbers and in terms of their proportion of total caseload. Alongside this trend has been an increase in the time OSC takes to close individual PPP and whistleblower disclosure cases, with a particularly significant increase for whistleblower disclosure cases that OSC refers to other agencies. OSC's strategic plan for fiscal years 2017 to 2022 includes objectives for OSC to ensure agencies provide timely and appropriate outcomes for referred whistleblower disclosures. However, as cases linger in OSC, there is a greater chance that the individual making the allegations and officials in question may have changed positions, moved jobs, or given up seeking a remedy altogether. OSC has not undertaken a review of its practice of approving multiple extensions at the request of agencies conducting investigations. These extensions have resulted in longer processing times, which have not been transparently communicated to whistleblowers. Whistleblowers therefore have limited understanding of OSC's review process and cannot adequately plan for the complete disclosure case process.

OSC's practices are generally consistent with certain internal control standards for internal communication, risk management, and monitoring. However, it has not fully adhered to internal control principles with regard to fully documenting its policies, particularly within CEU, and ensuring staff receive consistent training. Moreover, the lack of an effective electronic case file management and storage capability limits OSC's ability to quickly retrieve cases as needed for its work and thus improve its efficiency.

OSC's lack of a fully independent internal complaints filing process has reduced the confidence some OSC employees have in its process for reviewing PPP and whistleblower disclosure allegations. Although Congress has taken steps to mitigate potential conflicts of interest, challenges at OSC include a review process that continues to involve OSC staff and officials, uncertainty among employees about how to file cases, and uncertainty about the future of obtaining permanent investigative services. Leveraging existing resources with CIGIE, NSF-OIG, and others as needed would help OSC ensure that its employees can voice their concerns free from OSC involvement. Once such a

process is established, it will be important for OSC to continue to provide its employees outreach and information so they are fully aware of how the process works.

## Recommendations for Executive Action

We are making the following seven recommendations to OSC:

The Special Counsel should review and revise as appropriate, its policy for agency extension requests. (Recommendation 1)

The Special Counsel should communicate expected processing timelines to whistleblowers. (Recommendation 2)

The Special Counsel should develop, document, and implement case processing procedures for OSC's Complaints Examining Unit, including procedures for how cases are prioritized, how to take favorable actions, how to balance obtaining favorable actions with meeting staff productivity expectations, and how cases should be reviewed by supervisors. (Recommendation 3)

The Special Counsel should identify and implement additional controls and tools needed to ensure closed case files can be tracked and located efficiently. (Recommendation 4)

The Special Counsel should develop, document, and implement a standardized training program for entry-level employees, across units. (Recommendation 5)

The Special Counsel should finalize a time frame for completing work with CIGIE and agency Inspectors General to obtain a fully independent review process for internal OSC allegations. (Recommendation 6)

The Special Counsel should increase and clarify ongoing outreach to OSC employees regarding OSC's process for handling internal PPP claims or whistleblower disclosure allegations. (Recommendation 7)

## Agency Comments and Our Evaluation

We provided a draft of this report to the Special Counsel. In its comments, reproduced in appendix III, OSC agreed with all seven of our recommendations and said it is already taking steps to implement them. We also received technical comments from OSC, which we incorporated where appropriate.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies to the appropriate congressional committees, the Special Counsel, and other interested parties. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report please contact me at (202) 512-2717 or jonesy@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix IV.

Yvonne D. Jones
Director
Strategic Issues

*List of Committees*

The Honorable Ron Johnson
Chairman
The Honorable Claire McCaskill
Ranking Member
Committee on Homeland Security and Governmental Affairs
United States Senate

The Honorable Charles E. Grassley
Chairman
Committee on the Judiciary
United States Senate

# Appendix I: Objectives, Scope, and Methodology

The objectives of this engagement were to examine (1) the trends in the number of Prohibited Personnel Practice (PPP) and whistleblower disclosure cases Office of Special Counsel (OSC) received and closed from fiscal year 2011 to 2016 and the effect on its existing caseload, (2) the trends in the timeliness of PPP and whistleblower disclosure cases closed from fiscal year 2011 to 2016, (3) the extent to which OSC's PPP and whistleblower disclosure case processes adhere to relevant internal control principles, and (4) the extent to which safeguards are in place for OSC employees who file PPP and whistleblower disclosure complaints against OSC.

To examine PPP and whistleblower disclosure cases received and closed from fiscal years 2011 to 2016, we requested and obtained all case-level data from OSC's electronic case management system (OSC 2000) for the PPP and whistleblower disclosure cases closed from fiscal years 2011 through 2016 (the most recent full fiscal year available). We identified unique cases (i.e., case type, fiscal year case is opened, and four-digit identification number) to analyze case receipts and closures (by OSC unit of closure, type of resolutions, number of allegations per case, allegation type, federal agency, and referral type). To analyze by allegation type, we grouped 36 allegation codes into the 13 PPP allegation types and had OSC officials verify those groupings. Because a case filed with OSC can contain multiple allegations, we used the unique case identifiers to analyze allegations without over counting the number of cases. When we discuss the types of case closures, we are doing so by the types of allegations closures because different allegations of the same case could be closed in different ways. We also requested and reviewed relevant OSC 2000 documentation, including the data dictionary and reference files to identify appropriate data tables and variables. We also analyzed publicly available data on OSC's website as well as data from OSC 2000 to determine how PPP and whistleblower disclosure case receipts and closures have affected OSC's existing caseload.

To examine PPP and whistleblower disclosure timelines from fiscal years 2011 to 2016 and the effect on OSC's existing caseload, we requested and obtained OSC 2000 data for the PPP and whistleblower disclosure cases closed from fiscal years 2011 through 2016. We analyzed OSC 2000 data on the median number of days cases were open, including by federal agency from which cases were received. We also analyzed OSC 2000 data on agency extension requests granted for whistleblower disclosure cases and compared the median number of days whistleblower cases were open to select statutory requirements. Our

analysis included presenting information from our review of closed case files, which is discussed below.

For both of the OSC 2000 data objectives above, we also interviewed OSC officials, federal agency liaisons, whistleblower advocacy organizations, and a law firm to obtain their views on changes in the OSC data, which are also discussed in more detail below.

For the purposes of this review, we determined that the OSC 2000 data used in our analysis were reliable. Our data reliability assessment included reviewing relevant documentation, conducting interviews with knowledgeable OSC officials, such as OSC's Chief Information Officer, and electronic testing for missing data, outliers, and obvious errors.

To evaluate the extent to which OSC's case management processes and procedures for PPP and whistleblower disclosures adhere to relevant internal control standards, we compared documentation for OSC's PPP and whistleblower disclosure processes to selected standards in the *Standards for Internal Control in the Federal Government*.[1] We also reviewed OSC's case processing documentation including case procedures, checklists, fact sheets, training manuals, case reports, example templates documents, and OSC's strategic plan, as well as other documentation. We then assessed whether these documents adhered to the relevant standards for internal control in the federal government. To determine which internal control standards were most relevant, we utilized our Internal Control Management and Evaluation Tool, in conjunction with observations based on our preliminary audit work, to select the standards that most closely related to OSC activities.[2] We then focused our assessment of OSC internal controls around our selected standards by interviewing OSC officials in each of the units and divisions responsible for PPP and whistleblower disclosures case processes, and reviewing available documentation. We interviewed OSC officials from the following units and divisions: the Complaints Examining Unit (CEU), Investigation and Prosecution Division (IPD), Disclosure Unit (DU), and Retaliation and Disclosure Unit (RDU). Because IPD is overseen by different managers in OSC's Washington, D.C. headquarters and in

---

[1]GAO, *Internal Control: Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: Sept. 10, 2014).

[2]GAO, *Internal Control Management and Evaluation Tool*, GAO-01-1008G (Washington, D.C.: Aug. 1, 2001).

OSC's field offices in Detroit, Oakland, and Dallas, for our internal control evaluation we considered IPD-HQ and IPD-Field separately. Similarly, for much our audit, we were unable to interview the Alternative Dispute Resolution (ADR) unit manager due to personal reasons. Thus, we were unable to complete our internal control evaluation because a new manager was not put in place by the time we completed our evaluation.

We also interviewed the OSC liaison officials from the three federal agencies that most frequently were the subject of PPP complaints and whistleblower disclosures in cases closed in fiscal year 2016, to discuss their views on working with OSC. We held similar discussions with two whistleblower advocacy organizations and one law firm that specializes in federal employment law. To obtain the views of nonmanagement OSC staff on our selected internal controls, we held small group discussions with each of the six units responsible for PPP and whistleblower disclosure case processing (CEU, IPD-HQ, IPD-Field, ADR, RDU, and DU). For DU, IPD-Field, CEU, and IPD-HQ, we held the small group discussions with a random selection of six staff in each of those units. In RDU and ADR, since those units have fewer than six staff, we held small group discussions with all staff. We asked questions on internal control–related topics, such as their understanding of key case processes, training, and internal communication in OSC. The IPD-Field discussions were held over the phone while the remaining discussions were held in person at our headquarters. We used NVivo qualitative data analysis software to analyze and summarize the small group discussions. An analyst examined all six write-ups of our small group discussions to code and quantify identified themes from them. Another analyst reviewed the coding. If there was a disagreement, the two analysts reviewed and discussed until they reached an agreement. As a result of the analysis, we identified the major themes that covered the five internal control principles we discussed with the participants.

To assess how well OSC implemented its PPP and whistleblower disclosure case procedures and processes, we reviewed five groups of cases closed in fiscal year 2016. For three of these groups, we examined randomly selected, generalizable samples of cases. For the remaining two groups, we attempted to review all cases of that case type. We selected those groups to include the various resolutions for PPP and whistleblower disclosure cases. We used uniform data collection instruments for our file reviews to consistently capture information on the completeness of required documentation related to PPP and whistleblower disclosure cases. OSC reviewed and verified the elements of the data collection instruments we used to review case files. See table

Appendix I: Objectives, Scope, and
Methodology

5 for case outcome types. We also reviewed a sixth group of cases where OSC was the subject of the allegations. We planned to review five of these cases, which were closed between fiscal years 2011 to 2016.

**Table 5: Office of Special Counsel (OSC) Prohibited Personnel Practice (PPP) and Whistleblower Disclosure Case Outcome Types**

| Case outcome type | Case type | Population size | Sample size | Cases not reviewed[a] |
|---|---|---|---|---|
| Referred to the agency | Whistleblower Disclosures | 84 | 84 | 4 |
| Not referred to the agency | Whistleblower Disclosures | 1,558 | 92 | 3 |
| Complaints Examining Unit cases with a corrective action | Prohibited Personnel Practice | 65 | 65 | 4 |
| Cases referred for investigation | Prohibited Personnel Practice | 106 | 55 | 8 |
| Cases without a corrective action and not referred for investigation | Prohibited Personnel Practice | 3,168 | 95 | 10 |
| Cases where OSC is the subject of the allegations | Both | 5 | 5 | 4 |

Source: GAO analysis of OSC documentation. I GAO-18-400

[a]These cases were not available by our deadline in January 2018 because OSC could not locate them or they were still being retrieved when we ended our case file review.

OSC officials agreed these five case outcome types covered the range of potential outcomes for PPP and whistleblower disclosure cases. Since each sample could have provided different estimates, we express our confidence in the precision of our particular sample's results as a 95 percent confidence interval (i.e., a margin of error of plus or minus 7 percentage points). This is the interval that would contain the actual population value for 95 percent of the samples we could have drawn.

There were three types of case outcomes for which we planned to review all cases: (1) cases referred to the agency; (2) CEU cases with a corrective action; and (3) cases where OSC is the subject of the allegations. Of these, four cases were unavailable to be reviewed by us for each case group. For the agency referral and CEU corrective action case groups, we continued to treat our case file review results as a census. For the remaining group, where OSC was the subject of the allegations, we did not speak about the one case we reviewed due to concerns about disclosing the individual who filed the allegations.

Appendix I: Objectives, Scope, and
Methodology

For the case file review, we developed a data collection instrument for
PPPs and whistleblower disclosures for each case outcome type. The
steps we planned to review were based on OSC guidance as well as
testimonial evidence from OSC officials and steps we would expect to find
in the closed case files. We shared the data collection instruments with
OSC for its review and incorporated its comments as appropriate. To
ensure accuracy, two analysts reviewed each case file and reconciled
any differences in responses. We then analyzed the results of these data
collection efforts to identify main themes and develop summary findings.

For the fourth objective on OSC's internal allegations process, we
reviewed OSC procedures for OSC employees to file PPP complaints and
make whistleblower disclosures specifically found in OSC Directive 57.
We also interviewed OSC officials, National Science Foundation Office of
the Inspector General (NSF-OIG) officials, and Council of the Inspectors
General on Integrity and Efficiency (CIGIE) officials on how these
procedures are carried out and, at a high level, what experiences these
entities had with cases they have investigated. We interviewed officials
from these entities because they review certain complaints and
disclosures from OSC employees. To assess how OSC and third-party
entities were carrying out the documented procedures, we reviewed all
PPP complaints and whistleblower disclosures submitted to the CIGIE
Integrity Committee and NSF-OIG by OSC. We also reviewed all OSC
PPP complaints and whistleblower disclosures where OSC was the
subject agency from fiscal years 2011 to 2016. As discussed above, OSC
was only able to locate one of the five complaints or whistleblower
disclosures filed with OSC where OSC was the subject of the allegations.
Finally, we reviewed the 2018 OSC reauthorization enacted during the
course of our audit, and interviewed OSC officials on its potential effects
on OSC's internal allegation process.[3] We reviewed OSC's overall
process for internal PPP and whistleblower disclosure allegations to
determine whether it adhered to selected Standards for Internal Control in
the Federal Government—specifically standards for internal
communication and segregation of duties within an agency.

To obtain OSC employees' views on how their agency's internal PPP and
whistleblower disclosure allegations processes are designed and
implemented, we fielded a Microsoft Word-based survey of all 132 OSC

---

[3]National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, § 1097, 131
Stat. 1283, 1618 (Dec. 12, 2017).

**Appendix I: Objectives, Scope, and Methodology**

employees on board as of July 31, 2017, from August through September 2017. We pretested this survey with five separate individuals in July 2017 to verify that the questions were clear and accurately addressed the relevant terms and concepts. Employees' emailed submissions were coded and saved anonymously, with original submissions saved only for the purposes of following up with respondents as needed to clarify responses. We received submissions from 87 of 132 employees for a response rate of 66 percent. We also analyzed the response rates by unit and supervisory status to account for any potential nonresponse bias. In addition, we also incorporated the aggregated responses of OSC employees to relevant questions on the Federal Employee Viewpoint Survey—particularly those concerning PPPs, workplace environment, organizational leadership, and workload—from years 2012 through 2017 to supplement the survey responses we received.

To better understand employees' views and any concerns expressed in the survey about OSC's internal processes and workplace environment, we offered to hold short interviews with each survey respondent who indicated that he or she either had filed an allegation against another OSC employee or had considered doing so but ultimately chose not to. We interviewed 12 respondents who said they had considered or filed allegations. We also interviewed individual OSC employees who reached out to us to discuss their views of the OSC workplace culture independent of the survey. We offered these interviews as either in-person at our headquarters or phone-based discussions. At multiple points during our engagement, we also offered OSC employees the ability to contact us and our Fraudnet hotline. Fraudnet is an anonymous service whereby concerned employees can report waste, fraud, or abuse to our investigators. Our investigators then may offer to meet and interview the employee(s) in question. We then reviewed these interviews and follow-up discussions using the qualitative analytical software NVivo to code for common themes. Once aggregated, these responses formed the basis for how we presented what were the most frequent testimonial observations and concerns of OSC employees about the internal allegations process.

We conducted this performance audit from March 2017 to June 2018 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: Additional Data on Office of Special Counsel Prohibited Personnel Practice and Whistleblower Disclosure Cases

**Table 6: Favorable Actions Claimed by Complaints Examining Unit (CEU), Fiscal Years 2011 to 2016**

| Fiscal Year | Number of favorable actions claimed agency-wide in prohibited personnel practice (PPP) cases | Number of favorable actions claimed by CEU in PPP cases | Percent of agency's favorable actions claimed by CEU in PPP cases |
|---|---|---|---|
| 2011 | 75 | 1 | 1.3 |
| 2012 | 150 | 6 | 4.0 |
| 2013 | 151 | 9 | 6.0 |
| 2014 | 175 | 33 | 18.9 |
| 2015 | 269 | 58 | 21.6 |
| 2016 | 251 | 77 | 30.7 |

Source: GAO analysis of Office of Special Counsel data. | GAO-18-400.

**Table 7: Office of Special Counsel Is Generally Unable to Refer Whistleblower Disclosure Cases to Agencies within 45 Days**

| Fiscal Year | Number of whistleblower disclosure cases referred for investigation under 1213(c) | Number of referrals made within 45 days | Percent of referrals made within 45 days |
|---|---|---|---|
| 2011 | 21 | 5 | 23.8 |
| 2012 | 24 | 12 | 50.0 |
| 2013 | 56 | 3 | 5.4 |
| 2014 | 25 | 3 | 12.0 |
| 2015 | 76 | 27 | 35.5 |
| 2016 | 84 | 18 | 21.4 |

Source: GAO analysis of Office of Special Counsel data. | GAO-18-400.

**Table 8: Average Whistleblower Disclosure Case Complexity Shows Steady Trend amid Increasing Caseload**

| Fiscal Year | Total number of whistleblower disclosure cases | Average number of types of alleged wrongdoing per whistleblower disclosure case |
|---|---|---|
| 2011 | 871 | 2.67 |
| 2012 | 1053 | 2.51 |
| 2013 | 1157 | 2.57 |
| 2014 | 1310 | 2.61 |

**Appendix II: Additional Data on Office of
Special Counsel Prohibited Personnel Practice
and Whistleblower Disclosure Cases**

| Fiscal Year | Total number of whistleblower disclosure cases | Average number of types of alleged wrongdoing per whistleblower disclosure case |
|---|---|---|
| 2015 | 1949 | 2.43 |
| 2016 | 1668 | 2.52 |

Source: GAO analysis of Office of Special Counsel data. | GAO-18-400.

**Table 9: Federal Agencies That Submit the Most Prohibited Personnel Practice
Complaints to the Office of Special Counsel, Fiscal Year 2016**

| Federal Agency | Total number of PPP complaints |
|---|---|
| Department of Veterans Affairs | 1225 |
| Department of Homeland Security | 333 |
| Department of the Army | 288 |
| Department of Defense | 225 |
| Department of the Navy | 206 |
| Department of Justice | 153 |
| Department of Agriculture | 124 |
| Department of Health and Human Services | 110 |
| Department of The Air Force | 89 |
| Social Security Administration | 78 |
| Other | 972 |

Source: GAO analysis of Office of Special data. | GAO-18-400.

**Table 10: Federal Agencies That Submit the Most Whistleblower Disclosures to the
Office of Special Counsel, Fiscal Year 2016**

| Federal Agency | Total number of whistleblower disclosures |
|---|---|
| Department of Veterans Affairs | 628 |
| Department of Homeland Security | 188 |
| Department of the Army | 125 |
| Department of the Navy | 84 |
| Department of Justice | 78 |
| Department of Agriculture | 58 |
| Department of Defense | 58 |
| Department of Health and Human Services | 57 |
| Department of The Air Force | 43 |
| Department of Transportation | 37 |
| Other | 312 |

Source: GAO analysis of Office of Special Counsel data. | GAO-18-400.

# Appendix III: Comments from the Office of Special Counsel



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505
202-804-7000

May 30, 2018

Ms. Yvonne Jones
Director, Strategic Issues
United States Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Dear Ms. Jones:

The Office of Special Counsel (OSC) appreciates the opportunity to review and comment on the Government Accountability Office (GAO) draft report entitled *Office of Special Counsel: Actions Needed to Improve Processing of Prohibited Personnel Practice and Whistleblower Disclosure Cases* (GAO-18-400). In the report, GAO makes seven recommendations for improving case processing at OSC. We concur in all seven recommendations and, in fact, have already undertaken steps to implement them.

OSC appreciates the significant time and effort GAO expended reviewing our processes and generating this thoughtful report. I especially want to acknowledge and thank the GAO team for their professionalism, diligence, and commitment to understanding fully the challenges OSC faces in carrying out its dual mission to safeguard the merit system in federal employment and to provide a safe channel for employees, applicants and former employees for disclosing wrongdoing in their federal government agencies. I trust that GAO's recommendations, along with additional changes that I am instituting at OSC, will ensure OSC's robust enforcement of the laws entrusted to us, now and into the future.

We look forward to receiving the final report.

Sincerely,

Henry J. Kerner
Special Counsel

# Appendix IV: GAO Contact and Staff Acknowledgments

## GAO Contact

Yvonne D. Jones, (202) 512-2717 or jonesy@gao.gov

## Staff Acknowledgments

In addition to the contact named above, Clifton G. Douglas Jr. (Assistant Director), Jason Vassilicos (Analyst-in-Charge), Devin Braun, Karin Fangman, Steven Flint, Ted Hu, Farrah Graham, Robert Graves, Steven Putansu, Andrew J. Stephens, Sonya Vartivarian, and Ralanda Winborn made significant contributions to this report.

Assisting with this report were Michael Bechetti, Caitlin Cusati, Krista Loose, Meredith Moles, James Murphy, Constance Satchell, Stewart W. Small, and Helina Wong.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (https://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to https://www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: Website: https://www.gao.gov/fraudnet/fraudnet.htm Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | James-Christian Blockwood, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

# Exhibit 2

# FISCAL YEAR 2027
# CONGRESSIONAL BUDGET JUSTIFICATION
# —*and*—
# PERFORMANCE BUDGET GOALS



U.S. OFFICE OF SPECIAL COUNSEL
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505
www.osc.gov

# Table of Contents

**INTRODUCTION** ........................................................................................................... **3**

**PART 1 – BUDGET REQUEST OVERVIEW** ......................................................... **4**

    Budget Request .................................................................................................... 4

    Appropriations Language .................................................................................... 4

    OSC's Caseload ................................................................................................... 4

    OSC's Docket........................................................................................................ 6

    Strategic Goals .................................................................................................... 7

**PART 2 – COMPONENTS OF OSC'S BUDGET REQUEST** ................................ **9**

    Budget by Program............................................................................................ 10

**PART 3 – FY 2027 BUDGET REQUEST – ADDITIONAL INFORMATION** ..................................... **11**

    FY 2027 Budget Request by Budget Object Class.................................... 11

    Analysis of Resources Table ........................................................................ 13

**PART 4 – OSC'S PROGRAM RESULTS**......................................................... **14**

    FY 2025 Case Activity and Results ............................................................. 14

    Prohibited Personnel Practices Investigation and Prosecution ........... 15

    Alternative Dispute Resolution Unit............................................................ 19

    Disclosure Unit................................................................................................. 22

    Hatch Act Unit .................................................................................................. 25

    USERRA ............................................................................................................. 28

    Outreach, Training, and Compliance (OTC) Unit ..................................... 30

**PART 5 – ENHANCEMENT OF OPERATIONS**................................................ **32**

    Strategic Management of Human Capital................................................... 32

    Financial Performance..................................................................................... 33

    Competitive Sourcing ..................................................................................... 33

    Maximizing Efficiencies through Shared Service Providers ................... 34

    IT Modernization Initiatives .......................................................................... 35

    IT Goals for FY 2026 and 2027.................................................................... 36

    Continuity of Operations ................................................................................ 37

    Management – Risk Management and Program Evaluation ................... 37

**APPENDICES** ........................................................................................... **38**

    Appendix I: Organizational Structure .......................................................... 38

    Appendix II: FY 2026 Agency Performance Plan ...................................... 40

    Appendix III: Organizational Chart .............................................................. 49

## INTRODUCTION

The U.S. Office of Special Counsel (OSC) submits this Congressional Budget Justification for **Fiscal Year (FY) 2027**, requesting **$31,585,000** in appropriated funding. This amount is consistent with OSC's FY 2024, FY 2025, and FY 2026 appropriation, reflecting flat funding for the third consecutive year.

Established by the Civil Service Reform Act of 1978, OSC is an independent investigative and prosecutorial agency that safeguards the merit system by protecting employees from prohibited personnel practices, especially whistleblower retaliation. It also enforces the Hatch Act, provides a forum for employees to disclose government wrongdoing, and protects veterans' job rights under the Uniformed Services Employment and Reemployment Rights Act (USERRA).

OSC saves the federal government millions of dollars per year by quickly resolving cases brought by federal employees that would otherwise take a more costly, time-consuming path through the federal court system. By providing a safe channel for whistleblower disclosures, OSC regularly reins in waste, fraud, abuse, and threats to public health and safety that pose the very real risk of catastrophic harm to the public and potentially huge remedial and liability costs for the government.

In FY 2025, OSC received an agency record 9,820 cases, a 57 percent increase over FY 2024's 6,251 new cases received. At the same time, OSC's workforce went from 129 employees at the end of FY 2024 to 123 at the end of FY 2025. By the numbers, OSC is a highly efficient agency with talented civil servants that work increasingly harder to do more with less in fulfilling the agency's statutory duties.

OSC's FY 2027 appropriated funding request will allow the agency to sustain operations, add full-time equivalent staff to help manage rising caseloads, and continue improving its electronic case management system and cybersecurity posture. However, OSC faces growing challenges in meeting statutory deadlines and maintaining service quality for the federal workforce.

OSC remains committed to its mission. We will continue to defend whistleblowers, enforce the law, and promote accountability across the federal government.

**U.S. Office of Special Counsel FY 2027 Congressional Budget Justification**

## PART 1 – BUDGET REQUEST OVERVIEW

Established by the Civil Service Reform Act of 1978, the U.S. Office of Special Counsel (OSC) is an independent agency tasked with safeguarding the merit system and holding the government accountable. In pursuit of this mission, OSC:

- Provides a safe channel for federal employees to report wrongdoing.
- Investigates and prosecutes prohibited personnel practices and partisan political activity.
- Issues advice on civil servants' partisan political activity restrictions.
- Protects and enforces the federal employment rights of uniformed service members.
- Educates the federal community to prevent violations of civil service laws.
- Files amicus curiae briefs to weigh in on questions impacting whistleblower law and practice.

With a limited budget and approximately 123 full-time equivalent (FTE) employees by the end of FY 2025, OSC serves as a vital resource for approximately two million federal civilian employees worldwide.

### Budget Request

**For Fiscal Year (FY) 2027, OSC's authorized funding request is $31,585,000.** This amount is the same as OSC's FY 2025 and FY 2026 appropriation. This request will support approximately **123 FTE** in FY 2027, an increase of approximately four FTE over the projected FY 2026 staffing level. OSC is already operating at peak efficiency to meet statutory deadlines and additional FTEs will enable the agency to manage its record caseload and continue delivering successful results for the American public.

### Appropriations Language

**OFFICE OF SPECIAL COUNSEL**
*FEDERAL FUNDS*
SALARIES AND EXPENSES

*For necessary expenses to carry out functions of the Office of Special Counsel, including services as authorized by 5 U.S.C. § 3109, payment of fees and expenses for witnesses, rental of conference rooms in the District of Columbia and elsewhere, and hire of passenger motor vehicles, $31,585,000.*

### OSC's Caseload

In FY 2025, OSC broke new records in terms of the number of complaints received and cases reviewed. Specifically, OSC received a record-setting 9,820 new cases, a 57 percent increase from FY 2024.

4



In the last five years, the agency has experienced a 120 percent increase in new cases. OSC does not anticipate this trend to end anytime soon. OSC must maintain adequate staffing to manage rising caseloads, lower pending cases, and ensure timely, effective resolution of whistleblower and other claims.

As a small agency with an expansive mission, OSC continues to face challenges. Currently, OSC serves as a resource for more than two million federal civilian employees with a limited budget and approximately 123 FTEs (at the end of FY 2025), down 15 FTEs from FY 2020.



**U.S. Office of Special Counsel FY 2027 Congressional Budget Justification**

Conversely, OSC's funding level has held steady at $31.585 million since FY 2024. Since OSC's funding peak in FY 2023, the agency has experienced a 114 percent increase in new cases. Mandatory cost increases for personnel compensation and benefits coupled with inflation further reduce the agency's ability to fund the staffing needed.

**OSC APPROPRIATIONS FY 2020 — FY 2026**

*(shown in millions)*



OSC prioritizes efficacy and efficiency and has streamlined decision making, automated processes, and invested in its staff. As a result, OSC set new records in the numbers of cases reviewed in FY 2025 while improving customer service and promoting a culture where federal employees feel they can safely disclose wrongdoing.

Demand for OSC's services has never been greater. While OSC's recent achievements are significant, challenges remain. OSC's authorized funding request of $31,585,000 for FY 2027 will help the agency address its current caseload and continue to invest in additional staffing. The request will also help OSC sustain operations, including information technology (IT) security and artificial intelligence (AI) capabilities, and improve the agency's electronic case management system, eCMS.

## OSC's Docket

OSC is a critical resource for whistleblowers to report evidence of waste, fraud, abuse, or threats to public health or safety. When a whistleblower reports wrongdoing at a federal agency, OSC ensures the whistleblower's concerns are heard and, when warranted, fully investigated and addressed. OSC also protects federal employees from prohibited personnel

6

practices (PPPs), such as retaliation for making a disclosure of wrongdoing. In addition, OSC promotes a fair and unbiased federal government through its enforcement of the Hatch Act of 1939, which prohibits certain federal employees from engaging in partisan political activity while on duty. OSC also defends returning service members and reservists against employment discrimination by enforcing their rights under the Uniformed Services Employment and Reemployment Rights Act (USERRA) of 1994.

**Whistleblower Disclosures**

OSC provides whistleblowers a secure channel to report instances of wrongdoing, and whistleblower disclosures are a significant portion of the agency's caseload. For example, in FY 2025, OSC received 2,535 new disclosures. That is a 44 percent increase over FY 2024 for new disclosures, and 112 percent higher than the prior five-year average. OSC also processed and closed 2,609 disclosures, and referred 23 disclosures of waste, fraud, or abuse to other federal agencies for investigation.

**Prohibited Personnel Practices**

In FY 2025, OSC received 6,572 new PPP complaints, a 126 percent increase over the prior five-year average. In addition, OSC also achieved 397 favorable outcomes in PPP cases in FY 2025. Addressing PPP complaints is central to OSC's mission and essential for maintaining whistleblower and federal employee confidence in the agency.

**Hatch Act**

The Hatch Act helps ensure that federal employees are not influenced by political considerations in their work. While Hatch Act complaints are typically highest during a significant election cycle (e.g., presidential election year), FY 2025 defied the trend. For example, in FY 2025, OSC resolved 710 Hatch Act cases – a 117 percent increase over the prior five-year average and 82 percent higher than the 2024 presidential election cycle. In addition, OSC issued 94 warning letters and successfully obtained 13 disciplinary actions against federal government agency officials who committed Hatch Act violations.

**USERRA**

The Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA) establishes rights and responsibilities for uniformed service members and their employers. A complainant may file a complaint with the U.S. Department of Labor (DOL) who then investigates and attempts to resolve it. If unsuccessful, the now claimant may ask DOL to refer the matter to OSC for representation before the Merit Systems Protection Board (MSPB). In FY 2025, OSC received 19 USERRA referrals, closed 19 cases, and obtained corrective action in three of the cases closed.

## Strategic Goals

The Office of Special Counsel has three strategic goals, enumerated below, each of which is supported by a series of operational objectives. These operational objectives are included in the Appendix II (FY 2026 Agency Performance Plan).

## OSC's FY 2027 Strategic Goals and Costs per Goal[1]

1. Protect and promote the integrity and fairness of the federal workplace.  $21,647
2. Ensure government accountability.                                          $ 5,404
3. Achieve organizational excellence.                                         $ 4,534

Note: Costs are aligned with OSC's FY 2026 Agency Performance Plan. OSC's FY 2026-FY 2030 Strategic Plan is currently under development.

---

[1] Strategic Plan costs per goal numbers appear in thousands; derived from percentage costs based on projected budget totals.

8

**U.S. Office of Special Counsel FY 2027 Congressional Budget Justification**

## PART 2 – COMPONENTS OF OSC'S BUDGET REQUEST

The following chart estimates how OSC's FY 2027 funding request will be distributed on a percentage basis. Personnel compensation and benefits comprise approximately 83 percent of the agency's budget.



**U.S. Office of Special Counsel FY 2027 Congressional Budget Justification**

## Budget by Program

The following table provides an estimate of the FTE and budgetary resources for each program of the agency, during FY 2026 and 2027.

| Budget by Program – Agency Request[2] | | | | | | |
|---|---|---|---|---|---|---|
| | FY 2026 Estimate | | FY 2027 Estimate | | Increase/Decrease | |
| Program | Amount (in actual dollars) | FTE | Amount (in actual dollars) | FTE | Amount (in actual dollars) | FTE |
| Case Review Division/Office of the Clerk[3] | $2,746,227 | 10 | $2,694,637 | 11 | ($51,590) | 0 |
| Investigation and Prosecution Division | $14,833,369 | 56 | $14,544,626 | 57 | ($288,743) | 1 |
| Retaliation and Disclosure Unit | $1,730,709 | 7 | $1,693,772 | 7 | ($36,937) | 0 |
| Hatch Act Unit | $2,527,853 | 10 | $2,720,301 | 11 | $192,448 | 1 |
| Disclosure Unit | $2,766,996 | 10 | $2,694,637 | 11 | ($72,358) | 0 |
| USERRA Unit | $265,715 | 1 | $256,632 | 1 | ($9,083) | 0 |
| Alternative Dispute Resolution Unit | $627,127 | 2 | $667,244 | 3 | $40,116 | 0 |
| Immediate Office of the Special Counsel | $1,167,719 | 4 | $1,539,793 | 6 | $372,074 | 2 |
| Office of the General Counsel | $531,429 | 2 | $513,264 | 2 | ($18,165) | 0 |
| Outreach, Training, and Compliance Unit | $402,135 | 2 | $410,611 | 2 | $8,476 | 0 |
| Operations Division | $3,985,720 | 15 | $3,849,482 | 15 | ($136,238) | 0 |
| Totals | $31,585,000 | 119 | $31,585,000 | 123 | $0 | 4 |

---

[2] Numbers are rounded, so they may not appear to add up correctly in the table.
[3] The Office of the Clerk transitioned from the Operations Division to the Case Review Division in FY 2023, following a successful pilot initiative.

10

**U.S. Office of Special Counsel FY 2027 Congressional Budget Justification**

## PART 3 – FY 2027 BUDGET REQUEST – ADDITIONAL INFORMATION

OSC's authorized request for FY 2027 is **$31,585,000** to fund approximately 123 FTEs and related non-personnel costs. This number reflects four FTEs above the estimated FY 2026 FTE number of 119. OSC believes that funding to support the increase in FTEs is necessary to keep pace with the current and anticipated caseloads.

### FY 2027 Budget Request by Budget Object Class

Below is the detailed projection of expenditures required for each Budget Object Class (BOC) during FY 2027, along with the actuals for FY 2025 and projections for FY 2026.

| Table 1 – Budget Object Classification of Obligations: FY 2025–2027 (in thousands of dollars) | | | |
|---|---|---|---|
| **Budget Object Classification of Obligations** | *FY 2025 (Actuals)* | *FY 2026 (Projected)* | *FY 2027 (Projected)* |
| **11.0 Personnel compensation** | $19,409 | $19,056 | $19,294 |
| **12.0 Civilian Personnel Benefits** | $6,637 | $6,602 | $6,863 |
| **13.0 Benefits for Former Personnel** | $5 | $0 | $0 |
| **21.0 Travel and transportation of persons** | $73 | $50 | $30 |
| **22.0 Transportation of things** | $0 | $1 | $1 |
| **23.1 Rental payments to GSA** | $1,721 | $1,742 | $1,765 |
| **23.3 Communications, utilities, and misc. charges** | $62 | $78 | $73 |
| **24.0 Printing and reproduction** | $8 | $0 | $0 |
| **25.0 Other services** | $3,303 | $3,877 | $3,064 |
| **26.0 Supplies and materials** | $48 | $102 | $62 |
| **31.0 Equipment** | $86 | $77 | $433 |
| **32.0 Leasehold improvements** | $0 | $0 | $0 |
| **Total** | **$31,352** | **$31,585** | **$31,585** |

**Notes on the Above BOC Line Items:**

Object Class 11.0 Personnel Compensation Costs*:*
Overall personnel compensation will increase slightly in FY 2027 in response to adding four FTE.

Object Class 12.0 Civilian Personnel Benefits Costs*:*
These costs are for employee benefits, including Medicare, Federal Employees' Group Life Insurance (FEGLI), health benefit contributions, old age survivors and disability insurance, and retirement plan contributions. Total benefits costs in FY 2027 are expected to increase due to the increase of adding four FTE.

Object Class 13.0 Benefits for Former Personnel:
These costs include pensions, annuities, and other benefits (i.e., voluntary separation payments or severance pay) for former employees, or their survivors, based on (at least in part) the length of service to the government. OSC had nominal related costs in FY 2025.

Object Class 21.0 Travel and Transportation of People:
During FY 2025, these costs supported critical casework-related travel and mission-related efforts. In FY 2026 and FY 2027, OSC intends to minimize such costs.

Object Class 23.1 Rental Payments to GSA:
This category reflects the lease costs for the agency's headquarters facility, along with rent and tax escalations. OSC estimates that total agency rent will be slightly over $1.765 million for FY 2027, as compared to $1.74 million for FY 2026.

Object Class 23.3 Communications and Utilities:
This category reflects the cost to sustain the agency's headquarters facility telephone and high-speed internet connections in FY 2027.

Object Class 25.0 Other Services:
OSC outsources its accounting services, financial systems, payroll services, travel services, and procurement services, all of which fall under the Services BOC. This category also includes IT-related efforts, including, but not limited to, continued improvements to OSC's eCMS and implementing AI tools.

Object Class 31.0 Equipment:
In FY 2027, the increase in equipment costs is due to OSC's lifecycle replacement of agency laptops, which will reach the end of life.

12

## Analysis of Resources – Fiscal Years 2025-2027

For a high-level analysis of OSC's resources during fiscal years 2025-2027, see Budget Table 2 below.

| Table 2 – Analysis of Resources | | | | |
|---|---|---|---|---|
| FY 2025-2027 | | | | |
| (in thousands of dollars) | | | | |
| Description | | FY 2025 (Actual) | FY 2026 (Projected) | FY 2027 (Projected) |
| Budget authority | Direct | 31,585 | 31,585 | 31,585 |
| | Reimbursable | 18 | 0 | 0 |
| Total | | 31,603[4] | 31,585 | 31,585 |
| Outlays | | 29,785 | 28,512 | 28,512 |
| Employment | Direct-full time equivalent | 123 | 119 | 123 |
| | Reimbursable - full time equivalent | 0 | 0 | 0 |
| Total | | 123 | 119 | 123 |

---

[4] OSC had reimbursable funding associated with work done on behalf of other agencies in FY 2025.

13

## PART 4 – OSC'S PROGRAM RESULTS

### FY 2025 Case Activity and Results

By the numbers, OSC is a highly efficient agency that has increasingly done more with less in fulfilling its statutory duties. In FY 2025, OSC received 9,820 new cases and resolved 9,536 cases, and achieved 397 favorable outcomes in PPP cases.

Table 3 below summarizes overall OSC case intake and dispositions in FY 2025, with comparative data from the previous five fiscal years.

| TABLE 3 - Summary of All OSC Case Activity | | | | | | |
|---|---|---|---|---|---|---|
| | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
| Cases active at start of fiscal year | 1,888 | 1,736 | 1,526 | 1,292 | 1,440 | 1,792 |
| New cases received | 4,453 | 3,518 | 3,458 | 4,611 | 6,251 | 9,820 |
| Cases closed | 4,615 | 3,711 | 3,677 | 4,455 | 5,854 | 9,536 |
| Cases active at end of fiscal year | 1,732 | 1,551 | 1,303 | 1,444 | 1,836 | 2,075 |
| Hatch Act advisory opinions issued | 1,461 | 1,043 | 757 | 614 | 967 | 777 |

More detailed data can be found in the following sections below relating to the four major program areas of OSC's mission— whistleblower disclosures, PPP cases, Hatch Act cases, and USERRA cases.

Of the federal agencies whose employees file cases with OSC, the U.S. Department of Veterans Affairs (VA) continues to outpace any other. The chart below depicts the agencies from which employees file the most cases with OSC. To address this outsized trend, OSC has implemented a streamlined system of managing VA cases, which includes monthly status calls with the agency regarding pending retaliation and other PPP investigations.

14



Agencies' participation in OSC's Section 2302(c) Certification Program offers a valuable opportunity to train an increasing number of federal employees—especially supervisors—and reinforces compliance with whistleblower protection laws. Notably, in FY 2025, OSC certified 31 additional agencies and registered 7 agencies for certification.

In FY 2025 OSC's Outreach, Training, and Compliance Unit conducted 273 trainings to inform the federal workforce about its authority to provide a secure channel for employees to disclose government wrongdoing.[5]

Through its outreach efforts and communication of successes, OSC has significantly raised its profile among federal employees, increasing awareness of the agency as a channel for reporting wrongdoing and seeking redress for PPP violations. In FY 2025, OSC experienced a 57 percent increase in new cases compared to FY 2024. OSC expects similar case numbers in FY 2026 and FY 2027, which may challenge OSC's ability to manage new complaint filings while sustaining recent progress in reducing active cases.

## Prohibited Personnel Practices Investigation and Prosecution

- In FY 2025, OSC experienced a 64 percent increase in new PPP cases compared to FY 2024. Relative to pre-pandemic levels, FY 2025 PPP case volume was approximately 65 percent higher than the five-year average (FY 2015 – FY 2019). OSC anticipates this elevated caseload will persist through FY 2026 and beyond.

- As shown in the chart below, new PPP complaints have significantly exceeded pre-pandemic levels. These cases are some of the most time- and resource-intensive cases for OSC, requiring substantial effort to investigate and resolve. PPP cases serve as a critical

---

[5]  Please note that separate outreach presentations may include more than one training, such as, PPP training, Whistleblower Disclosure training or Annual Supervisory training.

mechanism for strengthening whistleblower confidence by ensuring individuals are protected from retaliation when they disclose government wrongdoing.



**New PPP Complaints**

4168
*3811
**2829
**2304
**2287
3101
4017
6572

FY 2018  FY 2019  FY 2020  FY 2021  FY 2022  FY 2023  FY 2024  FY 2025

*OSC experienced a partial government shutdown in FY 2019, which likely affected the number of PPP complaints the agency received.
**OSC received fewer PPP complaints during the pandemic years.

- A significant increase in demand for OSC's services in FY 2027 may challenge the agency's ability to meet statutory case resolution deadlines. In FY 2025, OSC processed 89 percent of PPP complaints within 240 days, a performance level roughly 9 percent above the previous five-year average. Maintaining this pace amid rising caseloads will require careful resource management.

**Resource Estimates**

During FY 2027, OSC's Case Review Division/Office of the Clerk is projected to operate with approximately 11 FTE at a cost of $2,694,637. For FY 2026, the unit is expected to require 10 FTE at a cost of $2,746,227.

During FY 2027, OSC's Investigation and Prosecution Division (IPD) is projected to operate with approximately 57 FTE at an estimated cost of $14,544,626. During FY 2026, the unit is projected to have 56 FTE at a cost of $14,833,369.

During FY 2027, OSC's Retaliation and Disclosure Unit is projected to operate with approximately seven FTE at a cost of $1,693,772, compared to seven FTE at a cost of $1,730,709 in FY 2026.

| TABLE 4 – Summary of All Prohibited Personnel Practice Complaints Activity – Receipts and Processing | | | | | |
|---|---|---|---|---|---|
| | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
| **Active complaints carried over from prior fiscal year** | 1,147 | 1,046 | 940 | 1,155 | 1,372 |
| **New complaints received** | 2,304 | 2,287 | 3,101 | 4,017 | 6,572 |
| ***Total complaints*** | 3,451 | 3,333 | 4,041 | 5,172 | 7,944 |

16

| Total complaints processed and closed | | 2,390 | 2,382 | 2,879 | 3,768 | 6,210 |
|---|---|---|---|---|---|---|
| Complaint processing times | Within 240 days | 1,883 | 1,870 | 2,446 | 3,281 | 5,543 |
| | Over 240 days | 499 | 522 | 433 | 487 | 655 |
| Percentage processed within 240 days | | 79% | 79% | 85% | 87% | 89% |

Table 5 below provides information regarding the number of corrective actions obtained in PPP cases.

| TABLE 5 – Summary of All Favorable Outcomes – Prohibited Personnel Practice Complaints | | | | | | |
|---|---|---|---|---|---|---|
| | | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
| Total favorable outcomes negotiated with agencies (all PPPs) | No. of actions | 393 | 424 | 418 | 450 | 397 |
| | No. of cases | 295 | 310 | 289 | 318 | 295 |
| Total favorable outcomes negotiated with agencies (reprisal for whistleblowing) | No. of actions | 304 | 324 | 312 | 332 | 282 |
| | No. of cases | 223 | 261 | 234 | 257 | 219 |
| Disciplinary actions negotiated with agencies | | 33 | 37 | 35 | 32 | 46 |
| Stays negotiated with agencies | | 38 | 44 | 45 | 46 | 44 |
| Stays obtained from MSPB | | 0 | 2 | 1 | 0 | 8 |
| Stay extensions obtained from MSPB | | 0 | 2 | 9 | 1 | 1 |
| Corrective action petitions filed with the MSPB | | 0 | 0 | 0 | 0 | 1 |
| Disciplinary action complaints filed with the MSPB | | 0 | 0 | 0 | 0 | 0 |

**Prohibited Personnel Practices – Goals and Results**

OSC received 6,572 new PPP complaints in FY 2025, representing a 126 percent increase over the prior five-year average. This surge underscores a continuing trend, and OSC anticipates similar numbers of new PPP complaints in FY 2026 and FY 2027.

In FY 2025, OSC achieved 397 favorable outcomes related to PPP complaints, including positive resolutions in 295 cases, a figure consistent with previous years.



**Notable FY 2025 Prohibited Personnel Practice Case Summaries**

- The complainant, who served as the agency's Chief Financial Officer, alleged that after filing complaints with leadership, the Office of Inspector General, and Congress, agency leadership retaliated by suspending their security clearance, placing them on administrative leave, and ultimately terminating their employment. The matter was resolved through a settlement agreement that included a $600,000 lump-sum payment, among other terms.

- The complainant, who served as a Deputy Associate Director at the agency, alleged that after reporting nepotism and raising concerns about the mishandling of their harassment complaint, leadership retaliated by terminating them during their probationary period. The case was resolved through a global settlement that included a $322,000 lump-sum payment, among other terms.

- An employee at a Department of Defense component in Washington, D.C., filed a complaint with OSC after the agency refused to rescind their resignation. Following the complaint, the agency placed the employee on administrative leave, partly because of the OSC filing. OSC investigated and issued a PPP report finding that the agency's actions violated 5 U.S.C. § 2302(b)(9) and (b)(12) . After extensive negotiations, the parties reached a settlement that included over $160,000 in damages and attorney fees, as well as a fully funded two-year non-reimbursable detail to another federal agency. On OSC's recommendation, the agency also suspended the official responsible.

***OSC's Amicus Working Group***
Established in 2015, OSC's Amicus Working Group (AWG) seeks to make effective use of amicus curiae (friend of the court) briefs before MSPB and in federal courts. Members of the AWG serve a one-year collateral duty rotation under the leadership of an Associate Special Counsel and two senior attorneys. The AWG strategically files amicus curiae briefs where OSC's unique

18

perspective may help to develop or clarify the law, particularly in appeals involving claims of retaliation for whistleblowing or engaging in other protected activities, as defined under 5 U.S.C § 2302(b)(8) and (b)(9).

In FY 2025, OSC filed an amicus brief in *Remolona v. Department of Veterans Affairs*, a whistleblower retaliation appeal before the MSPB. The appellant, Remolona, alleged retaliation after cooperating with a VA Administrative Investigation Board (AIB). The MSPB Administrative Judge (AJ) dismissed the claim under 5 U.S.C. 2302(b)(9), relying on *Graves v. Veterans Affairs* (2016) which held that cooperation with AIBs was not protected under section 2302(b)(9)(B). However, the AJ did not consider whether the activity was protected under section 2302(b)(9)(C), which Congress amended after *Graves* to include cooperation with agency components responsible for internal investigations or reviews. In its brief, OSC argued that Remolona's cooperation with the AIB falls squarely within the amended section 2302(b)(9)(C) and that *Graves* is therefore inapplicable.

## Alternative Dispute Resolution Unit

OSC offers ADR to resolve PPP and USERRA complaints. The ADR process involves inviting both parties to mediation, where a neutral third party assists in reaching a voluntary resolution. If mediation results in a resolution, the agreement becomes binding on both parties.

Key factors in determining whether mediation is appropriate include the complexity of the issues, the nature of the personnel action, and the relief sought by the complainant. Once a case is identified as appropriate, an OSC ADR specialist engages the parties to explain the voluntary program and outline the process. Pre-mediation discussions help participants establish realistic expectations and clearly defined objectives for the mediation.

Over the last five years, OSC's ADR Unit has achieved an average settlement success rate of nearly 74 percent. These outcomes save significant time and resources by reducing the need for costly investigations and prosecutions.

### Goals and Results

In FY 2025, 47 cases were offered for mediation by OSC after referral to the ADR Unit. Of these, 27 mediations were completed, resulting in 19 settlements.

OSC's mediation unit offers a streamlined resolution process that empowers both parties to craft solutions tailored to their needs. Mediation helps break workplace impasses between employees and managers, fostering collaboration and reducing conflict. By providing an alternative to resolving disputes, OSC and federal agencies save considerable time and taxpayer-funded resources. Table 6 reflects the positive impact OSC's ADR Unit has on reducing and expediting the agency's case numbers.

19

| Table 6 - ADR Unit Activity – Mediation of Prohibited Personnel Practice Complaints | | | | | | |
|---|---|---|---|---|---|---|
| | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
| **Cases Reviewed for Mediation** | 60 | 39 | 65 | 73 | 83 | 67 |
| **Mediations Offered** | 57 | 39 | 45 | 60 | 68 | 47 |
| **Mediations Conducted** | 40 | 31 | 38 | 34 | 43 | 38 |
| **Cases Withdrawn Before Mediation Completed** | 10 | 3 | 6 | 8 | 10 | 11 |
| **Completed Mediations** | 30 | 28 | 32 | 26 | 33 | 27 |
| **Completed Mediations Resulting in Settlement** | 23 | 16 | 27 | 21 | 25 | 19 |
| **Percentage of Completed Mediations Resulting in Settlement** | 77% | 57% | 84% | 81% | 76% | 70% |
| **Cases Resolved Without Need for Mediation** | 2 | 1 | 0 | 1 | 0 | 0 |
| **Carryover to Next FY – Mediations in Process** | 22 | 17 | 13 | 15 | 19 | 15 |
| **Carryover to Next FY – Cases in Review** | 1 | 2 | 3 | 0 | 4 | 5 |

Table 7 reflects how OSC's ADR Unit reached the number of corrective actions obtained through mediation of PPP complaints.

| Table 7 - ADR Unit Activity – Corrective Actions Obtained through Mediation of Prohibited Personnel Practice Complaints | | | | | |
|---|---|---|---|---|---|
| | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
| **Total Corrective Actions** | **17** | **28** | **26** | **34** | **21** |
| *Mediated Settlement Agreements* | *16* | *27* | *21* | *25* | *19* |
| *Initial Informal Stays* | *0* | *0* | *1* | *1* | *0* |
| *Other Individual Corrective Actions* | *0* | *0* | *1* | *0* | *0* |
| *Systemic Corrective Actions* | *1* | *1* | *3* | *8* | *2* |

**Resource Estimates**

In FY 2027, the ADR Unit is projected to operate with three FTEs at an estimated cost of $667,244. For FY 2026, the unit includes two FTEs at a cost of $627,127.

OSC's Strategic Goal 1 is to protect and promote the integrity and fairness of the federal workplace, further defined by Objective 1 and Objective 2 to fairly and promptly investigate and

20

prosecute cases and obtain timely and effective relief, in cases (see Appendix II for OSC's FY 2026 Agency Performance Plan).

**Notable FY 2025 ADR Case Summaries[6]**

- The complainant alleged retaliation for making patient health and safety disclosures, including being detailed, reassigned, and receiving a lowered performance rating. Through mediation, the complainant conveyed the personal and professional impact of these actions and shared career goals with the agency. In response, the agency offered the complainant a new position that aligned with those goals. The new position also qualified for a retention incentive. Additionally, the agency agreed to provide a monetary payment and restore annual and sick leave.

- The complainant alleged retaliation for disclosing violations of the Federal Acquisition Regulation, gross mismanagement, gross waste of funds, and abuse of authority. During mediation, the complainant outlined their concerns, including systemic issues tied to the chain of command structure at their former duty station. Agency representatives requested detailed information to address those concerns and implement necessary changes, which the complainant welcomed. To resolve the matter, the agency agreed to provide a monetary payment and restore the complainant's leave.

- The complainant, a member of medical staff, alleged retaliation for whistleblowing through a suspension and creation of a hostile work environment. During OSC's mediation process, the parties addressed concerns regarding patient care and mediation objectives. The settlement resulted in a commitment to conduct a full investigation into physician oversight of patient care, rescind the suspension, provide OSC-led whistleblower law training, and issue a monetary payment to cover attorney fees.

- The complainant alleged retaliation for whistleblowing and engaging in protected activity, including retaliatory investigations, removal from an overseas assignment, and a negative suitability determination that prevented him from competing for a position within the agency. He was also encouraged to withdraw from competition for an internal role. During mediation, the complainant expressed concerns about the impact on his career trajectory and future opportunities. To resolve the matter, the agency agreed to amend his personnel record to address assignment gaps caused by the negative determination, seal the determination and related records, and grant an agency award recognizing his contributions for improving efficiency. Additionally, the agency provided monetary compensation to the complainant.

---

[6] Note: Mediations by OSC are conducted pursuant to the Administrative Dispute Resolution Act of 1996; therefore, personally identifying information is withheld.

21

**U.S. Office of Special Counsel FY 2027 Congressional Budget Justification**

## Disclosure Unit

Not all federal agencies have the resources or expertise to detect and address wrongdoing or wasteful spending. Whistleblowers – and by extension, OSC – serve as a critical safeguard, helping ensure agencies are responsible stewards of taxpayer dollars. Over the last year, OSC has worked with numerous whistleblowers to uncover waste and deliver significant cost savings across the federal government.

Under 5 U.S.C. § 1213(a), federal employees, former federal employees, or applicants for federal employment may disclose information they reasonably believe evidences a violation of law, rule, or regulation, or gross mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety. OSC reviews information submitted by whistleblowers and advises the Special Counsel on whether there is a substantial likelihood that the type of wrongdoing described in § 1213(a) has occurred or is occurring. When the Special Counsel makes a substantial likelihood determination, OSC refers the disclosure to the head of the relevant agency for action. The agency is required to investigate and submit a report to OSC describing the results of the investigation and steps taken in response to the findings. Under § 1213(e), the whistleblower also receives a copy of the report for review and comment.

The Special Counsel reviews the agency's report to determine whether it meets the requirements of the statute, and findings appear reasonable. OSC forwards the report to the President and appropriate congressional oversight committees. By statute, OSC may use an alternative process to refer matters to the agencies with the whistleblower's consent, without requiring the Special Counsel to make a substantial likelihood determination.

OSC is working diligently to meet statutory deadlines for making a substantial likelihood determination in its whistleblower disclosure cases—that is, whether to close a matter or refer it for review or investigation. By law, OSC must determine within 45 days to refer a disclosure to the appropriate agency or close it without further action. In FY 2025, OSC met this requirement in 97 percent of cases, an exceptional performance that reflects the agency's commitment to timely and effective case management.

**Resource Estimates**
In FY 2027, OSC's Disclosure Unit is projected to operate with approximately 11 FTEs at a cost of $2,694,637. In FY 2026, the unit will operate with 10 FTEs at a cost of $2,766,996.

**Disclosure Unit – Goals and Results**
OSC's Strategic Goal 2 is to ensure government accountability. It has two objectives: 1) provide employees with an effective, efficient, and safe channel to report government wrongdoing; and 2) ensure agencies provide timely and appropriate outcomes for referred whistleblower disclosures.

22

The following chart reflects the recent increase in new whistleblower disclosure cases, with the agency reaching a record high of over 2,500 new cases, a nearly 30 percent increase over the previous FY 2015 record.



Table 8 depicts a more detailed breakdown of OSC's whistleblower disclosure activity and closure rates.

| TABLE 8 - Summary of Whistleblower Disclosure Activity – Receipts and Dispositions | | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|
| Active disclosures carried over from prior fiscal year | | 241 | 199 | 150 | 218 |
| New disclosures received | | 928 | 1,237 | 1,757 | 2,535 |
| *Total disclosures* | | 1,169 | 1,436 | 1,907 | 2,753 |
| Disclosures referred to agency heads for investigation and report | | 27 | 19 | 28 | 23 |
| Referrals to agency IGs | | 0 | 0 | 0 | 0 |
| Agency head reports sent to President and Congress | | 74 | 70 | 43 | 49 |
| Results of agency investigations and reports | Disclosures substantiated in whole or in part | 45 | 44 | 34 | 30 |
| | Disclosures unsubstantiated | 29 | 26 | 8 | 17 |
| Disclosure processing times | Within 45 days | 911 | 1,216 | 1,666 | 2,495 |

23

| | Over 45 days | 6 | 3 | 19 | 78 |
|---|---|---|---|---|---|
| Substantial likelihood determinations made | | 99.3% | 99.8% | 98.9% | 97.0% |
| Disclosures processed and closed | | 967 | 1,285 | 1,678 | 2,609 |

In May 2025, OSC also initiated a **new policy** of recommending monetary rewards for meritorious whistleblower disclosures. The initiative is designed to shift agency culture toward valuing transparency and proactive problem-solving, especially cost-saving and prevention of waste, fraud, and abuse.

**Notable FY 2025 Whistleblower Disclosure Case Summaries**
OSC is authorized to refer to the head of an agency for investigation whistleblower disclosures of wrongdoing in six areas: (1) violations of a law, rule, or regulation; (2) gross mismanagement; (3) gross waste of funds; (4) abuse of authority; (5) substantial and specific danger to public health or safety; and (6) censorship related to research, analysis, or technical information. In FY 2025, OSC achieved several notable successes involving whistleblower disclosures, including the following:

- In one **case**, OSC received disclosures from Mine Safety and Health Administration (MSHA) employees who revealed that active mines in U.S. Pacific Territories were falsely designated as "abandoned," allowing MSHA to avoid mandatory inspections required under federal law. The agency investigation substantiated the allegations, uncovering serious oversight failures and misleading reporting to Congress about inspection rates. Thanks to the whistleblowers' courage and OSC's referral, MSHA has been forced to confront systemic failures that endangered miners and misrepresented its compliance with the Mine Act.

  Given the significance of the disclosures and the contribution to the safety of miners, OSC recommended the agency authorize monetary awards to the whistleblowers. OSC also recently honored the whistleblowers with the Outstanding Public Servant Award for 2025.

- In another **case**, whistleblowers at the USDA's Beltsville Agricultural Research Center (BARC) disclosed widespread safety hazards and infrastructure failures across the campus, including broken elevators, lack of running water, and nonfunctional fire suppression systems. OSC's referral led to a comprehensive investigation that substantiated the allegations and revealed gross mismanagement, violations of federal safety regulations, and damage to scientific equipment and research. OSC recommended that USDA formally acknowledge the whistleblowers' efforts in enhancing government efficiency and improving the safety of BARC workers, and consider granting a monetary award in recognition of their contributions.

- In yet another **case**, a whistleblower at the Bureau of Prisons (BOP) exposed serious lapses in the management of inmate financial obligations, revealing that court-ordered payments were not being properly recorded or collected. A targeted audit confirmed that over $2.5

24

million in obligations were mishandled, including nearly $70,000 that became permanently uncollectible. OSC's referral prompted BOP to initiate new oversight measures, including monthly reminders, staff training, and regional check-ins to ensure compliance.

## Hatch Act Unit

The Hatch Act of 1939 protects the federal merit system from improper partisan political influence. In FY 2025, OSC received 694 new complaints, an increase of 52 percent over FY 2024.

OSC enforces the Hatch Act by investigating allegations to determine if a violation occurred. Upon finding evidence of a violation, OSC issues warning letters, negotiates settlements, or prosecutes cases before the MSPB.

In addition to enforcement, OSC also provides advisory opinions and guidance to federal, state, and local government employees, as well as the public. OSC's Hatch Act advisory function provides opinions and guidance to help individuals determine whether they are covered by the Act and whether their considered activities are permitted. In this capacity, OSC provides guidance to the White House, cabinet members, and other senior management officials, as well as state and local government officials and the media.

### Investigations

OSC investigates allegations to determine whether evidence supports corrective or disciplinary action for Hatch Act violation. When a violation is confirmed, OSC may issue a warning letter, seek informal resolution, negotiate a settlement, or prosecute the case before the MSPB. Where there is no violation, the matter is closed. In FY 2025, OSC processed and closed 710 Hatch Act complaints (see Table 9 below).

### Advisory Opinions

In FY 2025, OSC responded to 777 advisory opinion requests, and issued 14 written advisory opinions.

### Resource Estimates

In FY 2027, the Hatch Act Unit is projected to require approximately 11 FTEs at an estimated cost of $2,720,301, compared to FY 2026, when the unit is expected to require 10 FTEs at a cost of $2,527,853.

### Outreach and Training

To strengthen its advisory role, OSC's Hatch Act Unit is actively engaged in training and outreach initiatives. Hatch Act attorneys regularly conduct Hatch Act training for employees at federal agencies, federal employee unions, and other organizations to ensure they understand their rights and responsibilities under the Hatch Act. While these efforts are traditionally emphasized during presidential elections when there is an increase in Hatch Act inquiries, FY 2025 saw an even greater demand for guidance. In response, the unit delivered 32 training sessions during FY 2025.

25

**Hatch Act Unit – Goals and Results**

OSC's Strategic Goal 1 under its Strategic Plan is to protect and promote the integrity and fairness of the federal workplace, further defined by Objective #4 to provide timely and quality Hatch Act advisory opinions and guidance.

In recent years, OSC has maintained exceptional efficiency in resolving cases with its current Hatch Act Unit staffing levels. As illustrated below, the unit processed and closed complaints at an unprecedented rate in FY 2025.

| TABLE 9 - Summary of Hatch Act Complaint and Advisory Opinion Activity | | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| Formal written advisory opinion requests received | | 60 | 23 | 21 | 21 | 18 | 13 |
| Formal written advisory opinions issued | | 56 | 28 | 22 | 17 | 23 | 14 |
| Total advisory opinions issued | | 1,461 | 1,043 | 757 | 614 | 967 | 777 |
| New complaints received [7] | | 440 | 289 | 224 | 263 | 458 | 694 |
| Complaints processed and closed | | 280 | 375 | 313 | 277 | 391 | 710 |
| Warning letters issued | | 34 | 62 | 73 | 41 | 81 | 94 |
| Corrective actions taken by cure letter recipients | Withdrawal from partisan races | 2 | 4 | 7 | 3 | 9 | 5 |
| | Resignation from covered employment | 0 | 0 | 7 | 4 | 5 | 4 |
| | Other | 10 | 0 | 8 | 12 | 35 | 15 |
| | Total | 12 | 4 | 22 | 19 | 49 | 24 |
| Disciplinary action complaints filed with MSPB | | 4 | 3 | 5 | 1 | 1 | 4 |
| Disciplinary actions obtained (by negotiation or ordered by MSPB) | | 8 | 7 | 8 | 3 | 7 | 13 |
| Complaints active at end of fiscal year | | 323 | 236 | 145 | 131 | 197 | 178 |

**Notable FY 2025 Hatch Act Case Summaries**

- In FY 2025, OSC investigated a case that resulted in recent **complaints** filed with MSPB against a sitting sheriff and undersheriff in Chesapeake, Virginia, alleging several serious Hatch Act violations to win a primary and general election. The violations involved soliciting political contributions from subordinates, coercive fundraising practices, misuse of staff and official events for campaign purposes and applying undue political pressure on office staff. Employees also reported fear of retaliation for insufficient support of the sheriff's campaign.

---

[7] Includes cases that were reopened.

26

- Also in FY 2025, an MSPB hearing was held in a case where OSC charged a Pentagon Force Protection Agency employee with violating the Hatch Act by being a candidate for partisan political office, and knowingly soliciting, accepting, or receiving political contributions, among other prohibited activities. Despite OSC repeatedly warning the employee, he continued his candidacy for sheriff while remaining a federal employee. OSC is awaiting a decision on the case as of January 2025.

- In yet another case in FY 2025, OSC entered into a settlement agreement with a U.S. Department of Veterans Affairs psychology technician who, while administering a mental health diagnostic test to a patient on Election Day, repeatedly expressed their support for a presidential candidate and opposition to a political party, questioned the patient's opposing views, and told the patient they hoped they had changed the patient's mind by the end of the test. The employee agreed to accept a 21-day unpaid suspension as disciplinary action for violating the Hatch Act prohibitions against using his official authority or influence to affect an election and engaging in political activity while on duty and in a federal building.

- In September 2025, OSC filed a complaint for disciplinary action against a U.S. Department of Veterans Affairs (VA) employee who, while on duty, used his personal Facebook account and his official VA email and Teams accounts to send and post numerous messages in support of and opposition to candidates in the 2024 presidential election. The case is ongoing.

- Also in September 2025, OSC filed a complaint for disciplinary action against a U.S. Department of Veterans Affairs (VA) employee who, while on duty, used his personal Facebook account and his official VA email and Teams accounts to send and post numerous messages in support of and opposition to candidates in the 2024 presidential election. The case is ongoing.

- In May 2025, OSC transmitted a report to the President finding that Martin O'Malley, former Commissioner of the Social Security Administration (SSA), violated the Hatch Act prior to the 2024 presidential election when he engaged in political activity while giving an interview in his official capacity

- In February 2025, OSC filed a MSPB complaint against a former Federal Emergency Management Agency employee, who in October 2024 instructed subordinates to avoid visiting homes with Donald Trump campaign signs. OSC charged the individual with violating the Hatch Act prohibitions against engaging in political activity while on duty and using her official authority or influence to interfere with or affect the results of an election. While the case is ongoing OSC received a favorable ruling confirming its jurisdiction over former federal employees.

- In November 2024, OSC obtained a favorable decision in a case against a U.S. Department of Veterans Affairs employee who ran for governor, violating the Hatch Act's prohibitions against being a candidate for partisan political office and soliciting political contributions. In

27

December 2023, the administrative law judge (ALJ) ordered the employee removed from her employment and debarred from returning to federal employment for two years, as disciplinary action for her violations. The employee appealed, and in November 2024, the Merit Systems Protection Board (MSPB) affirmed the ALJ's decision.

**Corrective Action Obtained through Negotiation**

In FY 2025, the Hatch Act Unit successfully resolved 24 cases through negotiated corrective action, which required employees to cease the prohibited activity and/or complete Hatch Act training to prevent future violations.

## USERRA Unit

OSC protects the civilian employment rights of federal workers who are veterans or serve in the National Guard and Reserves by enforcing USERRA. OSC's USERRA Unit provides prompt reemployment of service members in their civilian jobs after they return from military duty. OSC also continues to assist reservists and National Guard members who face obstacles in their federal civilian jobs due to their military service. Approximately 170,000 (20 percent) Guard and Reserve members are federal civilian employees, and Congress intends for the federal government to be a "model employer" under USERRA.

OSC receives referrals of USERRA cases for prosecution from the Department of Labor, which investigates these cases. OSC received 19 new cases in FY 2025 and closed 19 cases.

Under USERRA, a claimant alleging a violation by a federal executive agency may either file an appeal with the MSPB or file a complaint with the Department of Labor, Veterans' Employment and Training Service (VETS). If the claimant chooses to file a complaint with VETS, VETS must investigate and attempt to resolve the complaint. If it cannot resolve the matter, the claimant may direct VETS to refer the complaint to OSC for possible representation before the MSPB. If, after reviewing the complaint and investigative file and conducting any necessary follow-up investigation, OSC is reasonably satisfied that the claimant is entitled to relief under USERRA, it may act as the claimant's attorney and initiate an action before the MSPB. OSC may also provide representation, when warranted, before the U.S. Court of Appeals for the Federal Circuit.

In addition to resolving individual USERRA cases, OSC also provides outreach and technical assistance to help federal agencies better comply with USERRA, often in conjunction with DOL. Most recently, OSC has provided USERRA training to the Army Intelligence & Security Command, the U.S. Office of Personnel Management (OPM), and Occupational Safety & Health Administration. OSC also maintains telephone and email hotlines to answer USERRA questions from service members and employers nationwide. Lastly, OSC reports its compliance with timeliness requirements for processing USERRA cases to Congress, and the U.S. Departments of Labor, Defense, and Justice on a quarterly basis.

28

**Resource Estimates**

During FY 2027, the USERRA Unit will have 1 FTE at a cost of approximately $256,632. During FY 2026, we expect the unit will have 1 FTE at a cost of $265,715.

| TABLE 10 - Summary of USERRA Referral and Litigation Activity | | | | | |
|---|---|---|---|---|---|
| | **FY 2021** | **FY 2022** | **FY 2023** | **FY 2024** | **FY 2025** |
| **Pending referrals carried over from prior fiscal year** | 3 | 5 | 9 | 5 | 7 |
| **New referrals received from VETS during fiscal year** | 19 | 19 | 10 | 19 | 19 |
| **Referrals closed** | 17 | 15 | 14 | 17 | 19 |
| **Referrals closed with corrective action** | 0 | 3 | 1 | 1 | 3 |
| **Referrals closed with no corrective action** | 17 | 12 | 13 | 16 | 16 |
| **Referrals pending at end of fiscal year** | 5 | 9 | 5 | 7 | 7 |
| **Litigation cases carried over from prior fiscal year** | 1 | 1 | 1 | 1 | 0 |
| **Litigation cases closed** | 0 | 0 | 0 | 1 | 0 |
| **Litigation closed with corrective action** | 0 | 0 | 0 | 1 | 0 |
| **Litigation closed with no corrective action** | 0 | 0 | 0 | 0 | 0 |
| **Litigation pending at end of fiscal year** | 1 | 1 | 1 | 0 | 0 |

**USERRA Unit – Goals and Results**

USERRA requires that OSC receives and reviews cases referred from the DOL at the claimant's request, following DOL's investigation and attempted resolution. After reviewing the investigative file and applicable law, OSC must make its determination whether to offer legal representation before the MSPB within 60 days, unless the claimant grants an extension. OSC may also seek to informally resolve the case via settlement or mediation; obtain further evidence from the agency, claimant, or witnesses; or conduct additional legal research and analysis to make its determination.

OSC's Strategic Goal 1 is to protect and promote the integrity and fairness of the federal

29

workplace, including through resolution and prosecution of USERRA cases (See Appendix II for the FY 2026 Agency Performance Plan).

**USERRA Successes**

OSC protects the civilian employment rights of federal workers who are veterans or serve in the National Guard and Reserves by enforcing USERRA, as illustrated in the case examples below.

- Upon returning to his civilian Army job after two long-term deployments, a National Guard member discovered that he had not received the same bonuses and pay raises as his peers while he was gone. (Under USERRA, service members are entitled to the same employment benefits they would have received, with "reasonable certainty", had they not been absent for military duty). At OSC's request, the Army agreed to retroactively award him bonuses and pay raises consistent with his outstanding performance history, resulting in over $20,000 in compensation and a higher salary.

- A Letter Carrier for the U.S. Postal Service (USPS) in Auburn, Maine, was called to active duty with the Maine Air National Guard following the September 11, 2001, terrorist attacks, and served almost continuously supporting the Global War on Terrorism until his honorable discharge in December 2015. During that time, he regularly provided copies of his orders to USPS, maintained his employment benefits (including making retirement contributions and paying his union dues), and repeatedly expressed his desire to return to his postal job once his service ended. USPS gave him no indication that it would not reemploy him and even sent him letters thanking him for his service and a debit card to purchase his postal uniform. However, when he notified USPS that he wished to return to his Letter Carrier position, USPS wrongfully alleged he had "abandoned" his civilian employment and refused to reinstate him. After OSC concluded that USPS violated USERRA, it represented him in an appeal to the MSPB. Ultimately, the MSPB ordered USPS to reinstate him, with full back pay, seniority, and benefits, retroactive to January 2016.

- A Foreign Affairs Officer with the State Department alleged that two of his performance ratings were downgraded and contained negative comments due to his absences for active duty in the U.S. Navy Reserve. OSC contacted the agency, which agreed to upgrade his ratings and remove the objectionable comments regarding the time periods in question.

- After returning from long-term active duty with the U.S. Navy, a USPS worker alleged that the USPS failed to properly credit his seniority upon his return, preventing him from successfully bidding on regular full-time routes and being promoted to a higher pay rate. At OSC's request, USPS agreed to a retroactive conversion to a regular full-time carrier position two years earlier along with back pay (plus interest) and additional paid leave.

## Outreach, Training, and Compliance (OTC) Unit

A key objective of OSC is to ensure that federal agencies receive high-quality training to help them understand and prevent actions that may result in violations. In FY 2025, despite agencies redirecting resources to meet new administration priorities, OSC successfully delivered 273

30

training sessions, surpassing its annual training goals. These sessions addressed critical topics such as retaliation against whistleblowers and prohibited political activity under the Hatch Act.

OSC's Strategic Goal 1, under its Strategic Plan is to protect and promote the integrity and fairness of the federal workplace, further defined by Objective #5 to expand training and outreach efforts nationwide. OSC provided training to a wide range of federal agencies, including those responsible for safeguarding public transportation, securing national borders, and providing care to veterans – demonstrating OSC's broad reach and continued relevance across the government.

OSC strengthened its support for supervisors by offering targeted training on responding constructively to employee disclosures of government wrongdoing. These sessions highlighted the importance of cultivating a workplace culture where employees feel safe without the fear of retaliation.

Finally, OSC strengthened its Section 2302(c) Certification Program through several key enhancements. In FY 2025, OSC certified 31 additional agencies and registered seven more agencies for certification. The program requires agencies to take concrete steps to educate supervisors and inform employees about PPPs and whistleblower protections, reinforcing OSC's commitment to proactive compliance and accountability across the federal workforce. To further support participating agencies, OSC launched a dedicated listserv to share timely updates and resources, including new fact sheets on the 14 PPPs that provide legal overviews, illustrative examples, and practical recommendations for preventing violations.

**Resource Estimates**
In FY 2027, the OTC Unit is projected to operate with approximately two FTEs at an estimated cost of $410,611, compared to FY 2026, when the unit is expected to have two FTEs at a cost of $402,135.

31

## PART 5 – ENHANCEMENT OF OPERATIONS

### Strategic Management of Human Capital

OSC's human capital strategy aligns with its mission, goals, and organizational objectives. It is fully integrated into the agency's budget and strategic plan and adheres to human capital guidance from OPM and the Office of Management and Budget (OMB). OSC maintains internal accountability systems to ensure effective, merit-based human capital management, as described below.

The agency is implementing a range of enhancements, not only within its Human Capital Office but across program areas, using multiple strategies.

*Workforce Management: Promoting the Federal Merit System*
OSC is committed to attracting, developing, and retaining top talent to drive the agency's strategic goals and the completion of our statutorily mandated programs. To further efficiency and effectiveness, OSC continues to:

- Maintain and enhance OSC's merit hiring practices while driving operational efficiencies to build high-performing, accountable programs within established budgetary constraints.
- Align human capital strategies with the Administration priorities to ensure they are equitable, merit-driven, and strategically focused on mission needs.
- Standardize recruitment and selection processes across the agency, reinforcing hiring manager accountability using structured assessment tools, and ensuring strict adherence to merit system principles.

Key initiatives to promote the Federal merit system include:

- Updating OSC's Merit Promotion Plan.
- Standardizing position descriptions, deployment of validated assessments, and improved vacancy announcement templates.
- Expanding use of subject matter expert (SME) panels to ensure selections are based solely on job-related competencies.
- Introducing enhanced oversight mechanisms to reduce time-to-hire.

Additionally, following the FY 2024 implementation of USA Staffing, OPM's talent acquisition system, OSC has already improved hiring timelines and applicant quality. The agency will also leverage the system's reporting capabilities to analyze hiring trends and outcomes, further advancing operational efficiency. Further, OSC will attract early career talent for mission-critical positions and continue offering internship and fellowship programs that provide mentorship and meaningful work experiences.

32

**U.S. Office of Special Counsel FY 2027 Congressional Budget Justification**

To further institutionalize accountability for employee performance, OSC is requesting funding to continue implementing OPM's USA Performance System in FY 2027. Transitioning from a manual evaluation process to a modern, government-wide performance management platform will enable OSC to set clear expectations, deliver timely feedback and directly link individual performance to organizational outcomes. In addition, the system will strengthen OSC's ability to meet Administration priorities on supervisor accountability and ensure meaningful performance differentiation.

OSC's FY 2027 budget request is strategically aligned with these priorities. The requested resources focus on expanding federal hiring pipelines for early career talent, veterans, and military spouses; investing in technology and process improvements to enhance HR efficiency and responsiveness; and funding the agency-wide deployment of the USA Performance system to strengthen accountability and effective leadership.

## Financial Performance

OSC received an unqualified opinion on its most recent audit for FY 2025, indicating the agency's financials were presented fairly and in accordance with applicable accounting standards. An independent accounting firm issued this opinion after evaluating OSC's financial statements.

OSC contracts certain finance-related work to Department of Interior's Interior Business Center (IBC) under an interagency agreement, enabling access to specialized expertise at a lower cost than maintaining the expertise in-house. OSC helped design its accounting processes and customized reports to support effective funds management. IBC provides routine financial reports, quarterly reviews, and real-time information on payroll, procurement, and travel as needed.

As a small agency, OSC relies on audits and reviews of IBC operations conducted by IBC's OIG and the Office of the Chief Financial Officer, as well as information provided directly by IBC, to identify any significant issues relating to the services provided. IBC maintains a formal management, control, and compliance program that includes OMB Circular A-123 audits, accounting transaction testing, SAS 70 Type II audits, and financial statements audits. It also conducts IT audits, including reviews under the Federal Information Security Management Act (FISMA) and internal controls assessments.

OSC continues to comply with the DATA Act by submitting timely reports in coordination with IBC and other partners.

## Competitive Sourcing

OSC is a small agency with a specialized mission, and with jurisdiction over two million federal employees. Ninety-two percent of OSC's FTEs perform inherently governmental work, while the

remaining eight percent support commercial functions across multiple activities. Under OMB Circular A-76 and related guidance, agencies may perform commercial functions when, as at OSC, they involve 10 or fewer FTEs in any single activity.

## Maximizing Efficiencies through Shared Service Providers

As a small agency with limited resources, OSC maximizes efficiency by minimizing administrative staff and leveraging third-party shared service providers for technical functions such as accounting and contracting. This approach avoids the need for higher-level hires and aligns with government-wide initiatives encouraging shared services to reduce costs and improve operations.

OSC utilizes shared service providers to streamline operations, including payroll and personnel processing through USDA's National Finance Center and budget, accounting, travel, procurement, and personnel security services through IBC. OSC also partners with GSA for procurement and HHS's Program Support Center for transit services. The agency will continue exploring opportunities to shift functions to shared services when cost-effective.

To uphold best practices in procurement, OSC limits the number of purchase cardholders authorized to make micro-purchases, provides regular training for said cardholders, and conducts periodic audits of transactions and logs for compliance with agency policy. For larger purchases, OSC uses GSA schedules, vendor quotes, and Requests for Information (RFIs) to conduct market research, exploring both government and private sources. When a federal agency offers lower costs for goods and services, OSC enters an interagency agreement with the government supplier. If the private sector provides a more competitive opportunity, OSC works with its assisted acquisition provider to create a Request for Proposal (RFP) for competitive bidding. This approach delivers significant cost savings.

OSC will continue evaluating opportunities to reduce costs through shared service providers across administrative, HR, and other operational areas. For instance, the agency will likely renew its interagency agreement with the Department of the Interior for FISMA audits and will keep working with contracting service providers to leverage government-wide contracts and vehicles for greater savings and efficiency. OSC's request also includes funds to support the transition to OPM's consolidated Core Human Capital Management (Core HCM) system, which will consolidate outdated and inefficient human resources systems into a single, modern Core HCM platform. This single, modern platform will encompass personnel action processing, employee system of record, position management, and workforce analytics, among other human resource functions. This amount includes estimated licensing fees for the new system, data migration, and warehousing of legacy data.

34

## IT Modernization Initiatives

OSC is committed to using technology to streamline operations and enhance IT program effectiveness. The agency has made significant progress in modernizing and securing its systems and will continue investing in improvements for case management, electronic filing, records management, cybersecurity, end-user support, and internal processes.

Modernizing Records Management and OSC.gov
- OSC continues to enhance eCMS, built on FedRAMP-approved cloud technology, enabling a fully electronic process for complaint filing, case management, and records retention. Recent updates include a streamlined login for the online filing portal and a chatbot that guides users to the correct complaint type, improving efficiency and user experience.

- OSC has initiated an interagency agreement with GSA to migrate OSC.gov from its current platform, which will lose vendor support in July 2026, to Cloud.gov/Pages. This transition will simplify maintenance, integrate U.S. Web Design System (USWDS) design standards, and improve Section 508 compliance. Test environments are set up, with full implementation expected in Q1 FY2026.

Prioritizing IT Cybersecurity, Modernization, and eCMS
OSC has strengthened cybersecurity monitoring and incident detection by implementing multiple new features. This year, the agency conducted several phishing simulations with strong performance, provided targeted training where needed, and achieved 100 percent compliance with annual Cybersecurity Awareness training.

Regarding cybersecurity, OSC has also:

- Transitioned authentication from legacy Active Directory Federation Services (ADFS) to Microsoft Entra ID, enhancing security, reducing infrastructure overhead, and improving user experience.
- Upgraded network infrastructure with new firewalls and switches to strengthen protection against evolving threats and support IPv6.
- Achieved a FISMA security rating of "optimized," with no findings identified by auditors.
- Continued to monitor and enhance security to maintain stakeholder trust.

OSC's continues to prioritize IT modernization with Continuous Diagnostics and Migration (CDM) by:

- Deploying CDM's Mobile Threat Defense (MTD) solution within OSC's Microsoft Defender for Endpoint to expand coverage and integrate mobile vulnerability data into OSC's agency dashboard.

35

- Leveraging CDM to strengthen cloud identity and access management, enhance data protection, and improve network security management.

Given the significant increase in the number of cases OSC has experienced, the agency continues to invest in improving its eCMS by having:

- Implemented an eDiscovery solution to quickly search, identify, and store critical electronic information from outside agencies and complainants in eCMS.
- Enabled accredited users to process, review, analyze, and produce Electronically Stored Information (ESI) efficiently and in compliance with legal obligations.
- Increased utilization by 50% by having IT staff upload data for all new cases, simplifying the process and expanding eDiscovery use.

## IT Goals for FY 2026 and 2027

OSC strives to provide high-quality IT services that leverage innovative technology across the agency. New and enhanced IT initiatives and operational strategies will advance OSC's ability to deliver better services by leveraging industry standards and commercial-off-the-shelf products and cloud-based services. The entire range of services forms a basis for sound enterprise technology architecture that connects OSC to its customers and improves the agency's response to customer needs and ITO's customer experience. To deliver on its goals, OSC IT plans to:

- Transition OSC.gov to Cloud.gov/Pages via an interagency agreement with GSA, reducing server management needs and improving USWDS and Section 508 compliance.
- Accelerate AI adoption by piloting Office365 Copilot and evaluating existing agency workflows for AI-driven efficiency improvements.
- Enhance ransomware protection through penetration testing, safeguarding sensitive data, and implementing advanced cybersecurity capabilities.
- Develop and retain the IT workforce by expanding opportunities to strengthen and diversify skill sets, creating a highly skilled and adaptable team while also monitoring staffing needs to ensure the agency has the expertise to meet its mission objectives.
- Deploy a new Freedom of Information Act (FOIA) system to improve the timely processing of requests received by OSC.
- Modernize IT capabilities by expanding cloud-based services to support case management and overall IT modernization.
- Complete migration to FedRAMP-approved cloud services for directory and systems management, reducing costs and improving performance.
- Implement IPv6 across all OSC IT systems by FY26 in compliance with OMB Memorandum 21-07.
- Reduce uncategorized data and implement data labeling across repositories to meet M-22-09 and Federal Data Strategy requirements.

36

## Continuity of Operations

To comply with Presidential Decision Directive 67, OSC must be able to perform essential functions within 12 hours of a "catastrophic emergency" disruption. To meet this requirement, OSC safeguards vital records and validates readiness through testing, training, and exercises. Following government-wide guidance, OSC adopted a cloud-based approach— having migrated its case management system and SharePoint environment in FY 2019. This architecture provides redundancy, automatic failover, and improved performance, ensuring faster recovery and enhanced protection of agency functions and records.

## Management – Risk Management and Program Evaluation

Under the *Program Management Improvement and Accountability Act of 2015*, OSC is working to increase efficiency, reduce costs, and address high-risk areas through Enterprise Risk Management (ERM). OSC implemented a structured program review process to achieve mission goals, save taxpayer dollars, and improve service delivery.

Program evaluations will progress from smaller agency functions to larger, more complex programs. Additionally, OSC established an ERM Charter and launched an ERM Profile through an ERM Working Group, which meets quarterly to assess agency risks.
The goal is to identify weaknesses, develop mitigation strategies, and drive organizational improvement. The ERM council, composed of senior leadership, will continue to monitor and mitigate risks in the years ahead.

## APPENDICES

## Appendix I – Organizational Structure

**OSC's Organizational Structure**
OSC's principal place of business is Washington, D.C. The agency also has a staffing presence in Dallas, Detroit, and Oakland.

### A.  Immediate Office of Special Counsel
The Special Counsel and the Immediate Office of Special Counsel (IOSC) are responsible for policymaking and overall management of OSC. This responsibility encompasses the supervision of the agency's congressional liaison and public affairs activities.

### B.  Case Review Division / Clerk's Office
The Case Review Division (CRD) serves as the initial intake point for all complaints of prohibited personnel practices (PPPs) and whistleblower disclosures of government wrongdoing. CRD screens all new allegations to ensure they are directed to the appropriate OSC component. CRD also closes allegations that are duplicative, already filed with MSPB, outside OSC's jurisdiction, or untimely. Additionally, CRD now encompasses the functions previously managed by the Clerk's Office, including responsibilities related to the Freedom of Information Act (FOIA), the Privacy Act, Controlled Unclassified Information, and records management.

### C.  Investigation and Prosecution Division
The Investigation and Prosecution Division (IPD) is primarily responsible for investigating, prosecuting, and otherwise resolving PPPs. IPD determines whether the evidence is sufficient to establish that a violation has occurred and, if so, whether the matter warrants corrective action, disciplinary action, or both. If a meritorious case cannot be resolved informally between the agency and complainant, IPD may bring an enforcement action before the MSPB.

### D.  Disclosure Unit
The Disclosure Unit reviews whistleblower disclosures of government wrongdoing. DU may refer a whistleblower disclosure to the agency to investigate and report its findings to OSC. For referred whistleblower disclosures, DU reviews each agency report for sufficiency and reasonableness. Ultimately, OSC sends its determination, the agency report, and any comments by the whistleblower to the President and the responsible congressional oversight committees.

### E.  Retaliation and Disclosure Unit
The Retaliation and Disclosure Unit (RDU) handles hybrid cases where a complainant alleges both whistleblower disclosures and retaliation. In these cases, RDU performs the full range of IPD and DU actions, including, where appropriate, referring whistleblower disclosures to agencies and investigating and prosecuting related retaliation claims.

### F.  Hatch Act Unit

The Hatch Act Unit (HAU) investigates and resolves complaints of unlawful political activity under the Hatch Act and may seek corrective and disciplinary action informally or before the MSPB. HAU also provides advisory opinions under the Hatch Act.

### G.  USERRA Unit

The USERRA Unit reviews and resolves USERRA complaints by federal employees referred to OSC by the Department of Labor. The unit may represent military service members in USERRA appeals before the MSPB.

### H.  Alternative Dispute Resolution Unit

The Alternative Dispute Resolution Unit (ADR) provides mediation and other forms of ADR services to resolve select PPP and USERRA cases. Where the parties agree to mediation, ADR conducts mediation sessions seeking creative, efficient, and effective resolutions.

### I.  Outreach, Training, and Compliance Unit

The Outreach, Training, and Compliance (OTC) Unit manages OSC's 2302(c) certification program, including assisting agencies in meeting the statutory mandate of 5 U.S.C. § 2302(c). The unit also provides external education and outreach sessions regarding the laws that OSC enforces. Additionally, the Chief of this unit serves as the Equal Employment Opportunity (EEO) Director, who reports directly to the Special Counsel on the efficacy of OSC's EEO program. The unit answers questions, handles complaints, and ensures access to EEO and anti-harassment policies and materials.

### J.  Office of General Counsel

The Office of General Counsel provides legal advice regarding management, policy, and administrative matters, including federal ethics requirements. The office also defends OSC's interest in litigation filed against the agency.

### K.  Operations Division

The Operations Division manages OSC's budget and financial operations and meets the technical, analytical, records, and administrative needs of the agency. Component units include the Budget and Finance Office, the Human Capital Office, the Administrative Services Office, and the Information Technology Office (ITO).

Procurement operations and travel are included under the Budget and Finance Office. ITO maintains the electronic case management system (eCMS) used to process OSC cases, store case-related documents, and generate reporting metrics. In addition, ITO is responsible for maintaining all modern technology platforms used by the agency and ensuring their compliance with federal requirements.

**Appendix II: FY 2026 Agency Performance Plan**

**Strategic Goal 1, Tables 1-5 – Protect and promote the integrity and fairness of the federal workplace.**

Strategic Goal 1 has six objectives:
  Objective 1: Fairly and promptly investigate and prosecute cases.
  Objective 2: Obtain timely and effective relief in cases.
  Objective 3: Enhance strategic use of enforcement authority.
  Objective 4: Provide timely and high-quality Hatch Act advisory opinions and guidance.
  Objective 5: Expand training and outreach efforts nationwide.
  Objective 6: Effectively and innovatively communicate with stakeholders and the public.

**Goal Tables 1A, 1B, and 1C** relate to the first two objectives regarding OSC's investigations of alleged PPPs, Hatch Act violations, and USERRA complaints, respectively.

- **Goal Table 1A** details the data points and performance metrics for OSC's work investigating, litigating, and resolving PPP complaints.

| Goal Table 1A: Goals 1-10 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Goal 1 - Protect and promote the integrity and fairness of the federal workplace | | | | | | | |
| Objective 1: Fairly and promptly investigate and prosecute cases | | | | | | | |
| Objective 2: Obtain timely and effective relief in cases | | | | | | | |
| Target # | Description | FY 2024 Target | FY 2024 Result | FY 2025 Target | FY 2025 Result | FY 2026 Target | FY 2026 Result |
| 1 | Percent of complaints closed within 240 days. | Baseline/ datapoint | 87% | Baseline/ datapoint | 89% | Baseline/ datapoint | |
| 2 | Number of complaints mediated. | 30 | 33 | 30 | 27 | 30 | |
| 3 | Number of complaints mediated resulting in settlement. | 20 | 25 | 20 | 19 | 20 | |
| 4 | Number of formal stays obtained. | 5 | 1 | 5 | 8 | 5 | |
| 5 | Number of informal stays obtained. | 30 | 45 | 30 | 44 | 30 | |
| 6 | Number of individual corrective actions obtained. | 225 | 247 | 225 | 230 | 225 | |
| 7 | Number of systemic corrective actions obtained. | 55 | 124 | 60 | 68 | 60 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 8 | Number of disciplinary actions obtained. | 20 | 32 | 20 | 46 | 20 | |
| 9 | Number of cases filed with MSPB | 1 | 0 | 1 | 1 | 1 | |
| 10 | Number of total favorable actions obtained (i.e., formal stay, informal stay, individual corrective action, systemic corrective action, and disciplinary action). | 300 | 450 | 305 | 397 | 305 | |

- **Goal Table 1B** details the data points and performance metrics for OSC's work investigating, litigating, and resolving Hatch Act complaints.

| Goal Table 1B: Goals 11-17 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Goal 1: Protect and promote the integrity and fairness of the federal workplace | | | | | | | |
| Objective 1: Fairly and promptly investigate and prosecute cases | | | | | | | |
| Objective 2: Obtain timely and effective relief in cases | | | | | | | |
| Target # | Description | FY 2024 Target | FY 2024 Result | FY 2025 Target | FY 2025 Result | FY 2026 Target | FY 2026 Result |
| 11 | Percent of cases closed within 240 days. | 65% | 86% | 70% | 88% | 70% | |
| 12 | Number of cases filed with MSPB. | 3 | 1[12] | 3 | 4 | 3 | |
| 13 | Percent of successful prosecutions before MSPB | 100% | 100% | 100% | 100% | 100% | |
| 14 | Number of warning letters issued. | 50 | 81 | 50 | 94 | 60 | |
| 15 | Number of corrective actions obtained. | 15 | 49 | 20 | 24 | 25 | |
| 16 | Number of disciplinary actions obtained. | 5 | 7 | 5 | 17 | 5 | |
| 17 | Number of total favorable actions obtained (i.e., corrective action and disciplinary action). | 20 | 56 | 25 | 41 | 30 | |

*GOAL Table 1B explanatory notes:*

[12]: The Hatch Act Unit sent two reports to the President concerning Hatch Act violations by presidential appointees with Senate (PAS) confirmation in FY 2023, and one such report in FY 2024. For PAS, pursuant to 5 U.S.C. 1215(b), the Hatch Act Unit's only mechanism for pursuing disciplinary action against PAS is to send such a report. The MSPB does not have jurisdiction over them, thus explaining why this result fell slightly short of the target.

**U.S. Office of Special Counsel FY 2027 Congressional Budget Justification**

- **Goal Table 1C** details the data points and performance metrics for OSC's work investigating, litigating, and resolving USERRA complaints.

| Goal Table 1C: Goals 18-19 | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Goal 1: Protect and promote the integrity and fairness of the federal workplace* | | | | | | | |
| *Objective 1: Fairly and promptly investigate and prosecute cases* | | | | | | | |
| *Objective 2: Obtain timely and effective relief in cases* | | | | | | | |
| Target # | Description | FY 2024 Target | FY 2024 Result | FY 2025 Target | FY 2025 Result | FY 2026 Target | FY 2026 Result |
| 18 | Percent of referrals closed within 60 days. | 80% | 82% | 80% | 84% | 80% | |
| 19 | Number of corrective actions obtained (formally and informally). | 3 | 2 | 3 | 3 | 2 | |

- **Goal Table 2** details OSC's efforts to enhance its strategic enforcement authority, as it relates to the third objective under Strategic Goal 1.

| Goal Table 2: Goals 20-21 | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Goal 1: Protect and promote the integrity and fairness of the federal workplace* | | | | | | | |
| *Objective 3: Enhance strategic use of enforcement authority* | | | | | | | |
| Target # | Description | FY 2024 Target | FY 2024 Result | FY 2025 Target | FY 2025 Result | FY 2026 Target | FY 2026 Result |
| 20 | Number of PPP reports published on website. | 2 | 1 | 2 | 0 | 2 | |
| 21 | Number of amicus curiae briefs and interventions filed. | 2 | 4 | 2 | 1 | 2 | |

42

**U.S. Office of Special Counsel FY 2027 Congressional Budget Justification**

- **Goal Table 3** details the Hatch Act advisory opinions provided by OSC, pursuant to OSC's fourth objective under Strategic Goal 1.

| Goal Table 3: Goals 22-24 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Goal 1: Protect and promote the integrity and fairness of the federal workplace | | | | | | | |
| Objective 4: Provide timely and quality Hatch Act advisory opinions and guidance | | | | | | | |
| Target # | Description | FY 2024 Target | FY 2024 Result | FY 2025 Target | FY 2025 Result | FY 2026 Target | FY 2026 Result |
| 22 | Percent of informal telephonic advisory opinions issued within 3 days of inquiry. | 98% | 99% | 98% | 100% | 98% | |
| 23 | Percent of informal email advisory opinions issued within 5 days of inquiry. | 95% | 99% | 95% | 99% | 98% | |
| 24 | Percent of formal written advisory opinions issued within 60 days of inquiry. | 75% | 70% | 75% | 86% | 75% | |

- **Goal Table 4** details OSC's training and outreach efforts pursuant to OSC's fifth objective under Strategic Goal 1.

| Goal Table 4: Goals 25-26 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Goal 1: Protect and promote the integrity and fairness of the federal workplace | | | | | | | |
| Objective 5: Expand training and outreach efforts nationwide | | | | | | | |
| Target # | Description | FY 2024 Target | FY 2024 Result | FY 2025 Target | FY 2025 Result | FY 2026 Target | FY 2026 Result |
| 25 | Number of agencies/components certified and recertified for the 2302(c) Certification Program. | 12 | 28 | 15 | 31 | 18 | |
| 26 | Number of trainings conducted.[26] | 125 | 487 | 200 | 305 | 250 | |

**Goal Table 4 explanatory notes:**

26: Number of trainings will increase and decrease in each fiscal year based on several factors, including, for instance, (1) the increase in Hatch Act trainings we have observed during election years; and (2) the increase and/or decrease in Section 2302(c) trainings depending upon when agencies are due for recertification at the end of the three-year training cycle, creating a "lumpy forecast." In addition, certain presentations include more than one training, such as PPP training and Annual Supervisory training.

- **Goal Table 5** details OSC's communications with stakeholders and the public, consistent with the sixth objective under Strategic Goal 1.

| Goal Table 5: Goals 27-29 | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Goal 1: Protect and promote the integrity and fairness of the federal workplace* | | | | | | | |
| *Objective 6: Effectively and innovatively communicate with stakeholders and the public* | | | | | | | |
| Target # | Description | FY 2024 Target | FY 2024 Result | FY 2025 Target | FY 2025 Result | FY 2026 Target | FY 2026 Result |
| 27 | Number of press releases issued. | 25 | 34 | 20 | 35 | 25 | |
| 28 | Types and frequency of digital platforms used to share information. | 275 | 1061 | 275 | Total:  68<br><br>X Posts: 46; LinkedIn Posts: 14[28]; Hatch Act (HA) Listserv: 8 messages | 500 | |
| 29 | Types and frequency of website views and activity on digital platforms. | Baseline | 1,381,676 (X engagements: 1,596, and Unique website views: 1,380,080) | Baseline | Total: 381,501[29]<br><br>X Post Engagement: 1,100 LinkedIn Post Engagement: 862 Unique website views: 379,089 | Baseline | |

28: LinkedIn posts covering 12/5/24 – 9/30/25; Analytics from Oct-Nov '24 unavailable due to LinkedIn account transition. Data reporting in this section prior to FY 2025 including 'trainings'. However, trainings are no longer being captured in this datapoint, so the FY25 result data appears lower than prior years.

29: OSC launched an online version of its complaint filing form in April 2023, which significantly increased the number of unique website views in FY24. The FY25 data represents a return to a more typical number of views than in previous years. LinkedIn engagement is the sum of actions users take (i.e. on likes, comments, shares, and clicks). LinkedIn data are from 12/5/24-9/30/25. Prior analytical data for Oct-Nov '24 unavailable due to LinkedIn account transition.

**Strategic Goal 2, Goal Tables 6-7 – Ensure government accountability.**

Strategic Goal 2 has two objectives, which relate to OSC's investigations of whistleblower disclosures:

**U.S. Office of Special Counsel FY 2027 Congressional Budget Justification**

Objective 1:  Provide employees with an effective, efficient, and safe channel to report government wrongdoing.
Objective 2: Ensure agencies provide timely and appropriate outcomes for referred whistleblower disclosures.

- **Goal Table 6** relates to the first objective under Strategic Goal 2 and details OSC's efforts to ensure government accountability by providing a safe, confidential and secure reporting channel for stakeholders and the public.

| Goal Table 6: Goals 30-31 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Goal 2: Ensure government accountability | | | | | | | |
| Objective 1: Provide employees with an effective and efficient safe channel to report government wrongdoing | | | | | | | |
| Target # | Description | FY 2024 Target | FY 2024 Result | FY 2025 Target | FY 2025 Result | FY 2026 Target | FY 2026 Result |
| 30 | Number of referrals of whistleblower disclosures to agencies for investigation. | 60 | 28 | 25 | 27 | 20 | |
| 31 | Percent of referrals of whistleblower disclosures to agencies for investigation made within 45 days. | 90% | 99% | 90% | 98% | 90% | |

**U.S. Office of Special Counsel FY 2027 Congressional Budget Justification**

- **Goal Table 7** relates to the second objective under Strategic Goal 2 and details OSC's efforts to ensure government accountability by providing timely and appropriate outcomes for referred whistleblower disclosures.

| Goal Table 7: Goals 32-33 | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Goal 2: Ensure government accountability* | | | | | | | |
| *Objective 2: Ensure agencies provide timely and appropriate outcomes for referred whistleblower disclosures* | | | | | | | |
| **Target #** | **Description** | **FY 2024 Target** | **FY 2024 Result** | **FY 2025 Target** | **FY 2025 Result** | **FY 2026 Target** | **FY 2026 Result** |
| 32 | Number of favorable outcomes—both corrective and disciplinary actions—achieved through referrals of whistleblower disclosures. | 50 corrective actions and 5 disciplinary actions | 84 corrective actions and 8 disciplinary actions | 50 corrective actions and 5 disciplinary actions | 44 corrective actions and 13 disciplinary actions | 50 corrective actions and 5 disciplinary actions | |
| 33 | Number of days between the date a case can be closed, and the date of transmission to the President and Congress.[33] | 120 days | 85 days | 120 days | 97 days | 120 days | |

[33]: The description of this goal has been updated. Data points used to determine when a case can be closed include receipt of whistleblower comments; whistleblower consent or declination to include comments on the agency report and or any supplemental report in OSC's public file; receipt of redacted agency reports; and receipt of agency updates.

**Strategic Goal 3 has three objectives, which relate to the OSC's continual goal of achieving organizational excellence:**

Objective 1:  Recruit, develop, and retain a highly talented, and engaged workforce.
Objective 2:  Improve the use of existing technology and deploy new Information Technology (IT) systems to enhance organizational operations.
Objective 3:  Monitor, evaluate, and improve the efficiency and effectiveness of programs and processes.

- **Goal Table 8** covers the first objective under Strategic Goal 3 and details OSC's efforts to achieve organizational excellence by recruiting, developing, and retaining a highly talented and engaged workforce.

| Goal Table 8: Goal 34 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Goal 3: Achieve Organizational Excellence | | | | | | | |
| Objective 1:  Recruit, develop, and retain a highly talented and engaged workforce. | | | | | | | |
| Target # | Description | FY 2024 Target | FY 2024 Result | FY 2025 Target | FY 2025 Result | FY 2026 Target | FY 2026 Result |
| 34 | Ensure Human Capital Plan aligns with Administration priorities<br><br>*(previous description of Develop and maintain up-to-date Human Capital Plan and reassess regularly)* | Met | Met | Met | Met | Met | |

- **Goal Table 9** relates to the second objective under Strategic Goal 3 and details OSC's efforts to improve the use of existing technology and deploy new IT systems to enhance organizational operations.

| Goal Table 9: Goal 35 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Goal 3: Achieve organizational excellence | | | | | | | |
| Objective 2: Improve the use of existing technology and deploy new Information Technology (IT) systems to enhance organizational operations. | | | | | | | |
| Target # | Description | FY 2024 Target | FY 2024 Result | FY 2025 Target | FY 2025 Result | FY 2026 Target | FY 2026 Result |
| 35 | Deploy enhancements and reporting capabilities of the current electronic case management system, annually. | Met | Met | Met | Met | Met | |

- **Goal Table 10**, consistent with the third objective under Strategic Goal 3, details OSC's efforts to monitor, evaluate, and improve efficiency and effectiveness of programs and processes.

| Goal Table 10: Goals 36-37 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Goal 3: Achieve organizational excellence | | | | | | | |
| Objective 3: Monitor, evaluate, and improve the efficiency and effectiveness of programs and processes. | | | | | | | |
| Target # | Description | FY 2024 Target | FY 2024 Result | FY 2025 Target | FY 2025 Result | FY 2026 Target | FY 2026 Result |
| 36 | Hold monthly or regular meetings to evaluate programs and processes and implement any learned best practices. | Met | Met | Met | Met | Met | |
| 37 | Continue to issue and review results of annual survey regarding customer satisfaction with programs and processes and assess potential changes to programs and processes based on customer feedback. | Met | Met | Met | Not Met[37] | Met | |

37: The annual survey was not administered during the reporting period due to the expiration of OMB/OIRA approval for the data collection. OSC is actively pursuing reapproval.

48

**U.S. Office of Special Counsel FY 2027 Congressional Budget Justification**

## Appendix III – Organizational Chart



**U.S. Office of Special Counsel FY 2027 Congressional Budget Justification**

# Exhibit 3

Case 1:26-cv-02029-JLT-FJS    Document 40-1    Filed 05/14/26    Page 114 of 137



**JUSTICE MANUAL**

## Title 1: Organization and Functions

# 1-7.000 - Confidentiality and Media Contacts Policy

| | |
|---|---|
| [1-7.001](#) | Purpose |
| [1-7.100](#) | General Need for Confidentiality |
| [1-7.110](#) | Unathorized Disclosures of Classified Information |
| [1-7.120](#) | Whistleblower Protections |
| [1-7.200](#) | Designation of Media Representative |
| [1-7.210](#) | Reporting Media Contacts |
| [1-7.300](#) | Department of Justice Components |
| [1-7.310](#) | United States Attorneys |
| [1-7.400](#) | Disclosure of Information Concerning Ongoing Criminal, Civil, or Administrative Investigations |
| [1-7.410](#) | Comments on Requests for Investigations |

1-7.500           Release of Information in Criminal, Civil, and Administrative Matters — Disclosable Information

1-7.510           Disclosure of Information Concerning Person's Prior Criminal Record

1-7.600           Release of Information in Criminal, Civil, and Administrative Matters — Non-Disclosure

1-7.610           Concerns of Prejudice

1-7.700           Guidance for Media Contacts

1-7.710           Assisting the News Media

1-7.800           Freedom of Information (FOIA)

1-7.900           Office of the Inspector General

## 1-7.001 - Purpose

The Department of Justice (DOJ) Confidentiality and Media Contacts Policy (the Policy) applies to all DOJ personnel, including employees, contractors, detailees, and task force partners.

The Policy governs the protection and release of information that DOJ personnel obtain in the course of their work, and it balances four primary interests: (1) an individual's right to a fair trial or adjudicative proceeding; (2) an individual's interest in privacy; (3) the government's ability to administer justice and promote public safety; and (4) the right of the public to have access to information about the Department of Justice.

The Policy provides internal guidance only and does not create any rights enforceable in law or otherwise. DOJ components may promulgate more specific policies, consistent with and subject to this Policy.

 [updated April 2018]

## 1-7.100 – General Need for Confidentiality

Much of DOJ's work involves non-public, sensitive matters. Disseminating non-public, sensitive information about DOJ matters could violate federal laws, employee non-disclosure agreements, and individual privacy rights; put a witness or law enforcement officer in danger; jeopardize an investigation or case; prejudice the rights of a defendant; or unfairly damage the reputation of a person.

DOJ personnel should presume that non-public, sensitive information obtained in connection with work is protected from disclosure, except as needed to fulfill official duties of DOJ personnel, and as allowed by court order, statutory or regulatory prescription, or case law and rules governing criminal and civil discovery. Other than as necessary to fulfill DOJ official duties, disclosure of such information to anyone, including to family members, friends, or even colleagues, is prohibited and could lead to disciplinary action. Unauthorized disclosures of sensitive personal or proprietary information could lead to criminal prosecution or administrative action.

[updated April 2018]

## 1.7.110 – Unauthorized Disclosures of Classified Information

Only DOJ personnel with the appropriate security clearance and a specific need to know should have access to classified information. Those with access must take every precaution to ensure that such information is safeguarded.

It is against the law to disclose classified information to someone not authorized to receive it. Deliberate unauthorized disclosures of classified information, which can endanger national security and undermine DOJ's law enforcement and intelligence work, will be prosecuted to the fullest extent of the law. DOJ will also pursue all available administrative remedies, including revocation of a security clearance or disciplinary action up to termination of employment.

[updated April 2018]

## 1-7.120 - Whistleblower Protections

DOJ personnel may disclose to their management or the Office of the Inspector General (OIG), among others, concerns they have with government policies or actions. If you are a non-FBI DOJ employee and believe that you have suffered a reprisal because of a protected disclosure as described below, you may submit a retaliation complaint, pursuant to 5 U.S.C. § 2302, to the U.S.

Case 1:26-cv-02029-JLT-EJS    Document 40-1    Filed 05/14/26    Page 117 of 137

Office of Special Counsel (OSC) or the OIG Hotline. If you are an FBI employee, you may submit a retaliation complaint to the OIG Hotline or the DOJ Office of Professional Responsibility, pursuant to 5 U.S.C. § 2303. It is illegal for a Department employee to take or fail to take, or to threaten to take or fail to take a personnel action against a Department employee or applicant in reprisal for making a "protected disclosure" — that is, a communication (*e.g.*, to a supervisor in the direct chain of command, the OIG, OSC, or Congress, among others) that reasonably evidences: a violation of any law, rule, or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety — or for cooperating with or disclosing information to the OIG or OSC.

Nothing in this Policy is intended to conflict with or limit whistleblower protections, such as those provided in 5 U.S.C. § 2302 (for non-FBI DOJ personnel) and 5 U.S.C. § 2303 (for FBI personnel) and applicable regulations. Rather, the provisions of this Policy "are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this [Policy] and are controlling." 5 U.S.C. § 2302(b)(13)(A).

For more information on whistleblower rights and protections, see the Whistleblower Protection page on the OIG's website at https://oig.justice.gov/hotline/whistleblower-protection.htm.

[updated October 2024]

## 1-7.200 - Designation of Media Representative

Each United States Attorney's Office and DOJ component field office shall designate at least one person to act as a point of contact on matters pertaining to the media. The DOJ Office of Public Affairs (OPA) shall designate a media point of contact for Main Justice components.

[updated April 2018]

## 1-7.210 - Reporting Media Contacts

DOJ personnel must report to their designated media representative any contact with a member of the media about a DOJ matter. DOJ components may, as they deem appropriate, exclude from this requirement the ministerial confirmation of matters of public record, such as the spelling of a charged defendant's name or the date of the next court hearing. If the contact concerns suspected classified or grand jury subject matter, DOJ personnel must immediately notify a supervisor.

[updated April 2018]

## 1-7.300 - Department of Justice Components

Public affairs officers at the headquarters level of DOJ components are responsible for coordinating news media contacts with the Director of OPA.

[updated April 2018]

## 1-7.310 - United States Attorneys

Each of the 93 United States Attorneys will exercise discretion and sound judgment, consistent with this Policy, as to matters affecting their own district, but must coordinate their news media contacts with OPA in cases that transcend their district or are of national importance. The United States Attorney has responsibility for all matters involving the local media.

[updated April 2018]

## 1-7.400 - Disclosure of Information Concerning Ongoing Criminal, Civil, or Administrative Investigations

A.  Any communication by DOJ personnel with a member of the media relating to a pending investigation or case must be approved in advance by the appropriate United States Attorney or Assistant Attorney General, or their designee, except in emergency circumstances. For administrative investigations not overseen by a United States Attorney or Assistant Attorney General, approval must be obtained from the Assistant Attorney General for Administration, or their designee. Where the investigation is being handled by the Office of the Inspector General, approval must come from the Inspector General, or their designee. Obtaining

Case 1:26-cv-02029-JLT-FJS    Document 40-1    Filed 05/14/26    Page 119 of 137

information or related to the news media as covered by the Department's news media policy, 28 C.F.R. § 50.10.

B.  DOJ generally will not confirm the existence of or otherwise comment about ongoing investigations. Except as provided in subparagraph C of this section, DOJ personnel shall not respond to questions about the existence of an ongoing investigation or comment on its nature or progress before charges are publicly filed.

C.  When the community needs to be reassured that the appropriate law enforcement agency is investigating a matter, or where release of information is necessary to protect the public safety, comments about or confirmation of an ongoing investigation may be permissible, subject to the approval requirement in subparagraph A.

D.  An investigating agency may not disclose to a member of the news media or general public its recommended charging decision in a criminal case without the approval of the appropriate United States Attorney or Assistant Attorney General overseeing the prosecution of the case, or their designee.

[updated February 2024]

## 1-7.410 - Comments on Requests for Investigations

Individuals, groups, and organizations occasionally send letters requesting that a person or entity be investigated for violations of law. Sometimes, the requestor then publicizes the request.

Receipt of a request to open an investigation may be publicly acknowledged, but care should be taken to avoid implying that the referral will lead to an investigation. There is a distinction between reviewing a request and opening an investigation.

Any acknowledgment, which must be approved by the appropriate United States Attorney or Assistant Attorney General, should state that such requests are referred to the proper investigative agency for review, that all allegations are reviewed in light of the Principles of Federal Prosecution (see JM 9-27.000), and that DOJ ordinarily does not confirm or deny the existence of an investigation.

The same considerations apply if there is an investigation already underway.

[updated April 2018]

# 1-7.500 - Release of Information in Criminal, Civil, and Administrative Matters —Disclosable Information

Subject to limitations imposed by law or court rule or order, and consistent with the provisions of this Policy, DOJ personnel may make public the following information in any criminal case in which charges have been brought:

A.  The defendant's name, age, residence, employment, marital status, and similar background information;

B.  The substance of the charge, as contained in the complaint, indictment, information, or other public documents;

C.  The identity of the investigating or arresting agency and the length and scope of the investigation; and

D.  The circumstances immediately surrounding an arrest, including the time and place of arrest, resistance, pursuit, possession and use of weapons, and a description of physical items seized during the arrest.

    A news release issued before a finding of guilt should state that the charge is merely an accusation, and the defendant is presumed innocent until proven guilty.

    In civil and administrative cases, subject to limitations imposed by law or court rule or order, and consistent with the provisions of this Policy, DOJ personnel may release similar identification material regarding parties and the concerned government agency or program, along with a summary of the claim and an explanation of the government's interest.

    The public policy significance of a case may be discussed by the appropriate United States Attorney or Assistant Attorney General when doing so would further law enforcement goals.

[updated April 2018]

## 1-7.510 - Disclosure of Information Concerning Person's Prior Criminal Record

During an investigation or before trial, DOJ personnel generally may not provide to the media any information concerning a person's prior criminal record. When a prior conviction is an element of the current charge, such as in the case of a felon in possession of a firearm, DOJ personnel may confirm the identity of the defendant and the general nature of the prior charge if such information is part of the public record in the case.

[updated April 2018]

## 1-7.600 - Release of Information in Criminal,Civil, and Administrative Matters — Non-Disclosure

DOJ personnel shall not make any statement or disclose any information that reasonably could have a substantial likelihood of materially prejudicing an adjudicative proceeding.

[updated April 2018]

## 1-7.610 - Concerns of Prejudice

Because the release of certain types of information could prejudice an adjudicative proceeding, DOJ personnel should refrain from disclosing the following, except as appropriate in the proceeding or in an announcement after a finding of guilt:

A.  Observations about a defendant's or party's character;

B.  Statements, admissions, confessions, or alibis attributable to a defendant or party, or the refusal or failure of the accused to make a statement;

C.  Reference to investigative procedures, such as fingerprints, polygraph examinations, ballistic tests, or forensic services, including DNA testing, or to the refusal by the defendant to submit to such tests or examinations;

D.  Statements concerning the identity, testimony, or credibility of prospective witnesses;

E.  Statements concerning anticipated evidence or argument in the case; and

F.  Any opinion as to the defendant's guilt, or the possibility of a plea of guilty to the offense charged, or the possibility of a plea to a lesser offense.

    DOJ personnel should not encourage or assist news media in photographing or televising a person held in custody. DOJ personnel should not voluntarily disclose a photograph of a defendant unless it serves a law enforcement function or unless the photograph is already part of the public record in the case.

[updated April 2018]

## 1-7.700 - Guidance for Media Contacts

A.  Press conferences should be held only for significant newsworthy actions, or if an important law enforcement purpose would be served. Before holding a press conference or making comments on a pending investigation regarding another DOJ component, the U.S. Attorney or Assistant Attorney General shall coordinate any comments, including written statements, with the affected component.

B.  There are circumstances when media contact may be appropriate after indictment or other formal charge, but before conviction. In such cases, communications with the media should be limited to the information contained in publicly available material, such as an indictment or other public pleadings.

C.  DOJ personnel must avoid making public statements that violate DOJ guidelines, regulations, or legal requirements, including those imposed by case law, applicable bar policies, and local court rules.

D.  In juvenile proceedings, special rules apply and should be followed to ensure that the identity of a minor is not revealed. See JM 9-8.000, et al.

E.  In cases where the IRS has provided information to DOJ, care should be taken to comply with applicable statutory disclosure provisions, including 26 U.S.C. § 6103. When communicating with the media, DOJ personnel should attribute the immediate sourcing of information to the public record of the judicial proceeding. No information should be provided from IRS materials, even if those materials are located in DOJ files.

F.  In clemency matters, DOJ acts both as prosecutor and as advisor to the President. Any communications concerning clemency should be approved by OPA and the Deputy Attorney General to ensure that there is no infringement upon the President's prerogative in exercising his clemency powers.

[updated April 2018]

## 1-7.710 - Assisting the News Media

A. DOJ personnel shall not prevent law enforcements by the news media to record or report about a matter, unless by reason of a court order. DOJ personnel may enforce access restrictions that apply to all persons, such as a crime scene perimeter.

B. In order to promote the aims of law enforcement, including the deterrence of criminal conduct and the enhancement of public confidence, DOJ personnel, with the prior approval of the appropriate United States Attorney or Assistant Attorney General, may assist the news media in recording or reporting on a law enforcement activity. The United States Attorney or Assistant Attorney General shall consider, among other things, whether such assistance would:

   1. Unreasonably endanger any individual;

   2. Prejudice the rights of any person; or

   3. Be otherwise proscribed by law.

C. In cases where a search warrant or arrest warrant is to be executed, no advance information will be provided to the news media without the express approval of the appropriate United States Attorney or Assistant Attorney General. This requirement also applies to operations in preparation for the execution of a warrant.

[updated April 2018]

## 1-7.800 - Freedom of Information (FOIA)

Nothing contained in this Policy is intended to control access to DOJ records under the Freedom of Information Act (FOIA).

[updated April 2018]

## 1-7.900 - Office of the Inspector General

A. Consistent with the independence of its operations under the Inspector General Act of 1978, OIG is exempt from the requirements of this Chapter regarding media contacts and approvals. OIG should, however, timely inform the Attorney General, or the Deputy Attorney General upon delegation, about any significant media issues in matters handled by OIG.

[updated April 2018]

1-6.000 - DOJ Personnel As Witnesses

1-8.000 - Congressional and White House Relations

**U.S. Department of Justice**

950 Pennsylvania Avenue NW

Washington DC 20530

Contact the Department

Phone: 202-514-2000

TTY: 711 | TRS Info

# Exhibit 4



Advertisement

≡  **CNN** Business    Markets    Tech    Media    Calculators    Videos    ● Watch    🎧 Listen    🔍    **Subscribe**    **Sign in**

| Markets → | | | |
|---|---|---|---|
| DOW | 49,693.20 | 0.14% ▼ | |
| S&P 500 | 7,444.25 | 0.58% ▲ | |
| NASDAQ | 26,402.34 | 1.20% ▲ | |

**Fear & Greed Index →**

**Greed**
is driving the US market

66

**Latest Market News →**

Kevin Warsh confirmed as Fed chair, succeeding Jerome Powell

America is in for yet another long spell of price pain

Seeking free money advice from AI? Don't be so quick to upload any financial sta...

BUSINESS • 5 MIN READ

# Jeanine Pirro drops criminal probe of Jerome Powell

UPDATED APR 24, 2026 ⌄

By Lucy Bayly,   David Goldman



Federal Reserve Chair Jerome Powell in Washington, DC, on Thursday, March 19, 2026. Al ...

💬 189    ⬆️

The Trump administration's extraordinary criminal investigation of Federal Reserve Chair Jerome Powell is over, removing significant uncertainty that had been clouding the future of the world's most important central bank.

Jeanine Pirro, the US Attorney for the District of Columbia, announced on X Friday that she **is closing the probe**. In the investigation's place, the Fed's inspector general has agreed to scrutinize the significant cost overruns at the central bank's ongoing multibillion-dollar renovation project at **its Washington, DC, headquarters**.

After the inspector general completes his report, Pirro said her office will review it and could restart its criminal probe if warranted.

Trump's pick to succeed Powell, to get confirmed for the role. Powell's term helming the central bank is set to expire on May 15, and Warsh appeared before the Senate Banking Committee for a confirmation hearing earlier this week.

Advertisement

One key senator on the committee had vowed to block the vote unless the DOJ dropped the investigation into Powell.

## The investigation

The Department of Justice launched a **criminal investigation** into the Fed chair in January after Trump spent months railing against Powell for not lowering interest rates faster. Trump's complaints included accusations of impropriety and incompetence in Powell's leadership of the renovation.

A federal prosecutor in Washington, DC, **told a judge last month** that his office didn't have evidence of any crimes, but Pirro continued the probe and Trump said he supported the investigation.



Construction is seen at the Marriner S. Eccles Federal Reserve Board Building on January 12, 2026, in Washington, DC. *(Heather Diehl/Getty Images)*

The investigation, which Powell in January strongly rebuked as politicized, has been fraught from the start. Pirro's subpoenas **took the White House by surprise** and cast a shadow over Warsh's nomination chances. A federal judge last month **quashed the Justice Department's subpoenas**, a decision that Pirro said she planned to appeal.

The DOJ probe stoked fears that the Trump administration was trying to chip away at the Fed's independence, which would pave the way for political interference in setting interest rates for the world's largest economy.

Advertisement

Republican Senator Thom Tillis, who sits on the banking committee that approves Fed nominees, has been blocking a vote for Warsh because of the probe, which he described as "frivolous." He said he would vote to confirm Warsh once the probe ended.

---

**RELATED ARTICLE**



How the Supreme Court will have a major impact on the economy this spring

6 MIN READ

---

Tillis did not immediately respond to CNN's request for comment on the end of the investigation.

The move to abandon the criminal probe comes **after weeks of private pleas from Senate Republicans** that grew increasingly public.

## 'Then I'll have to fire him'

The probe imperiled both Warsh's nomination and Powell's tenure at the Fed, throwing the future leadership of America's central bank into doubt.

Advertisement

Powell had said that if a replacement hadn't been named by the end of his term on May 15, **Powell would remain as Fed chair "pro tem"** in the interim.

that a new Fed chair will lower interest rates, and joked that he would sue Warsh if he didn't cut rates if confirmed to the role.



Kevin Warsh, US President Donald Trump's nominee for Chair of the Federal Reserve, is sworn in to testify during his Senate Committee on Banking, Housing, and Urban Affairs confirmation hearing on April 21, 2026 in Washington, DC. *(Andrew Harnik/Getty Images)*

Last week, Trump threatened to fire Powell if he refused to step down at the end of his term. But that threat injected more chaos into the situation. Firing Powell would have kicked off a lengthy legal faceoff that could have prolonged the tenure of Trump's unwanted Fed chair.

Dropping the probe is an abrupt left turn for an administration that appeared to be doubling down on the investigation.

On Tuesday, Trump suggested that Powell was profiting from the renovations. "I can't imagine that 'Too Late' is taking money on construction. I can't. But it's possible," he said, using his nickname for the head of the central bank. "But we have to find out."

---

**▌ RELATED ARTICLE**

 How Trump built a case against the Fed chair, explained

7 MIN READ

---

White House press secretary Karoline Leavitt on Friday noted that the criminal probe may be on hold, but said the president is satisfied that the Fed's inspector general is reviewing the renovation.

"The investigation still continues. It's just under a different authority," Leavitt said outside the White House.

Advertisement

It's not clear that the Fed inspector general's review is new: Powell instructed the IG to **give the project additional scrutiny** in July 2025.

Trump administration dropped the investigation was "to install President Trump's sock puppet Kevin Warsh as Fed chair."

"Anyone who believes Donald Trump's corrupt scheme to take over the Fed is over is fooling themselves," Warren said in a statement Friday. "The Senate should not proceed with the nomination of Kevin Warsh."

## The massive renovation

Trump **toured the renovation** with Powell last year. The project is expected to be finished by the fall of 2027, with a DC-based workforce of about 3,000 moving in through March 2028.

Advertisement

The renovation project includes buildings that "needed a lot of work," Powell told senators last year in his semiannual testimony. The Fed's main Eccles building in particular, Powell said, hadn't had a serious renovation since it opened in the 1930s. "It was not really safe, and it was not waterproof."



Original detail work along the ceiling is visible in the main two story board room as a massive renovation continues of the Marriner S. Eccles Federal Reserve Board Building and the 1951 Constitution Avenue Building on July 24, 2025 in Washington, DC. *(Andrew Harnik/Getty Images)*



The front facade of the Marriner S. Eccles Federal Reserve Board Building is visible as a massive renovation takes place on the building and the 1951 Constitution Avenue Building on July 24, 2025 in Washington, DC. *(Andrew Harnik/Pool/AFP/Getty Images)*

https://www.cnn.com/2026/04/24/business/doj-criminal-probe-of-powell



President Donald Trump, Federal Reserve Chair Jerome Powell, and Senator Tim Scott (R-SC) tour the Federal Reserve Board building on July 24, 2025. *(Kent Nishimura/Reuters)*

On its website, the **Fed has posted** video of water pouring into the building's basement in 2017. And in a **lengthy FAQ**, the Fed laid out many of the details for the cost overruns: Asbestos abatement, a higher-than-expected water table and the rising cost of some raw materials contributed to the spiraling cost, it explained.

The construction also includes blast-resistant windows and shear walls, which are big drivers of the building's cost, according to Fed staff during Trump's tour. These upgrades are meant to abide by the Department of Homeland Security's highest level of security for federal buildings.

Advertisement

https://www.cnn.com/2026/04/24/business/doj-criminal-probe-of-powell

"No one in office wants to do a major renovation of a historic building during their term," Powell told senators at the time. "You much prefer to leave that to your successors — and this is a great example why," he said, referring to the current backlash. "But we decided to take it on."

CNN's Devan Cole contributed to this report.

This story has been updated with additional content.

---

💬 189    ⬆️

## Up next

 **Takeaways from FBI Director Kash Patel's defensive Hill testimony**
4 MIN READ

 **Inside the Justice Department's shakeup of the John Brennan investigation**
9 MIN READ

 **Kevin Warsh confirmed as Fed chair, succeeding Jerome Powell**
4 MIN READ

 **How investigators say the killings of two University of South Florida students unfolded**
7 MIN READ

## Most popular

**1**    Court overturns Alex Murdaugh's murder convictions and orders new trial

---

**2**    Takeaways from FBI Director Kash Patel's defensive Hill testimony

---

**3**    China rolls out red carpet treatment as Trump arrives for high-stakes visit ⊙ **3:04**