**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DR. SHANNON "SJ" JOSLIN, | Case No. 1:26-cv-02029 JLT FJS |
| Plaintiff, | ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION AND GRANTING MOTION TO DISMISS |
| v. | |
| U.S. DEPARTMENT OF THE INTERIOR, et al., | (Docs. 29, 34) |
| Defendants. | |

Dr. Shannon "SJ" Joslin is a wildlife biologist who worked for the National Park Service in Yosemite National Park. Joslin is nonbinary and uses gender-neutral pronouns, such as "they" and "them." In May 2025, on their day off work, they were part of a group that flew a large trans pride flag on the face of El Capitan, one of the most iconic places in the park. Soon afterward, the park began an investigation that eventually led to Joslin's termination. A Park Service spokesperson also raised the possibility of a criminal investigation in statements to the media.

As far as Joslin knows, no one had been fired or disciplined for flying a flag on El Capitan before. Joslin asserts that the Park Service enforced its rules selectively based on the message that the pride flag sends. Joslin claims in this lawsuit that the termination was vindictive, retaliatory, intended to communicate disapproval of a particular point of view. (*See* Doc. 28 at 8–18.) They ask to be reinstated, and they ask the Court to order the government not to pursue a

1

criminal investigation or prosecution against them. (*See* Doc. 34.)

The government claims for its part that Joslin was fired for reasons that had "nothing to do" with "speech." (Doc. 35 at 12.) But the government has another more fundamental and more persuasive point: under the laws that Congress has passed, and under the legal precedent that a federal trial court must follow, this Court does not have authority to decide whether Joslin was fired for unconstitutional or illegal reasons, nor to block a hypothetical criminal case against them. The government's motion to dismiss (Doc. 34) is **GRANTED**, and Joslin's motion for a preliminary injunction (Doc. 29) is **DENIED**.

## BACKGROUND

There is not much more to explain beyond the brief introduction above. Joslin has a Ph.D. in genetics and an expertise in endangered wildlife. (*See* Doc. 29-4 at 1–2.) They helped study and protect bats, owls, and foxes in Yosemite, for example. (*Id.* at 2–3.)

Joslin came up with the idea to hang a large trans pride flag from El Capitan in early 2025, and together with several other people, they brought their plan to fruition in May. (*Id.* at 4–8.) About a week later, Joslin got a message from a Park Service law enforcement officer who wanted to talk about the flag. (*Id.* at 8.) At an interview, the officer confirmed that Joslin was "under criminal investigation," so Joslin refused to say anything more without an attorney. (*Id.*) Later, after another interview, this time with an attorney, the park's acting deputy superintendent asked to meet again. (*Id.* at 9.) Though Joslin was "petrified," the meeting was very brief. The acting deputy superintendent shook Joslin's hand, introduced herself, and handed over a notice of termination. (*Id.*)

The notice begins by explaining that Joslin was just a few weeks shy of completing their two-year "trial period" on an excepted service appointment. (Doc. 29-5 at 7.) It then stated that Joslin had "failed to demonstrate acceptable conduct" during the trial period: "on or about May 20, 2025, you participated in a small group demonstration in an area outside the designated protest and demonstration area without a permit as required by 36 C.F.R. 2.51 and thus circumvented rules applicable to all park visitors." (*Id.*) Later, Joslin received a form, which cited a presidential executive order and unspecified "unacceptable conduct." (*Id.* at 10 (citing

2

Exec. Order No. 14284, 90 Fed. Reg. 17729 (Apr. 24, 2025)).)

Joslin made an Instagram post about their termination, and several news outlets picked up the story, including the Associated Press, ABC, NBC, and Newsweek. (*See* Doc. 29-3 at 196–220.) Several of them published a statement by a National Park Service spokesperson, who said that the Park Service and the Department of Justice were "pursuing administrative action against several Yosemite National Park employees and possible criminal charges against several park visitors who are alleged to have violated federal laws and regulations related to demonstrations." (*E.g.*, *id.* at 211.)

Joslin filed a complaint with the Office of Special Counsel (OSC) and asked the OSC to put their termination on hold while it investigated whether the Park Service had violated the law. (Doc. 29-4 at 12.) The OSC denied the request. (*Id.*) Joslin also filed a complaint and a motion for a preliminary injunction in the United States District Court for the District of Columbia. (Doc. 1.) The D.C. District Court transferred the case to this Court on the government's motion. (Docs. 11, 12.)

After the transfer, Joslin amended their complaint. (Docs. 28.) They now assert four claims: (1) a claim for equitable relief based on their right to free speech under the First Amendment; (2) a similar claim for equitable relief based on the Fifth Amendment, (3) a claim for damages and equitable relief under the federal Privacy Act, citing 5 U.S.C. § 552a(e)(7), and (4) a claim for declaratory relief. Joslin also renewed their motion for a preliminary injunction. (Doc. 29.) They ask the Court to reinstate them and to enjoin the defendants[1] "from criminal enforcement against or investigation of Dr. Joslin for both the May 20, 2025 flag display and similar future speech at Yosemite supporting LGBTQ+ rights." (Doc. 29-6.) The government opposes that motion and moves to dismiss the amended complaint. (Doc. 34.) The parties have now briefed both motions, and the Court determined oral arguments were not necessary. (*See* Docs. 35, 38, 40–43.)

---

[1] The defendants are the Department of the Interior, the National Park Service, the Department of Justice, the U.S. Attorney's Office for the Eastern District of California, the Secretary of the Interior, the Acting Director of the National Park Service, the Acting Attorney General of the United States, and the United States Attorney for the Eastern District of California.

3

**JURISDICTION**

The Court must ensure it has subject matter jurisdiction before addressing any other issue. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). The government relies on two jurisdictional arguments. First, it argues the Civil Service Reform Act (CSRA) precludes the portion of this case that is related to Joslin's employment. Second, for the portion of the case that is directed at a potential future criminal case against Joslin, the government argues there is no case or controversy in terms of Article III of the Constitution. The Court begins with the CSRA.

**I.      Employment Issues and the CSRA**

The CSRA "comprehensively overhauled" the civil service system that came before it. *United States v. Fausto*, 484 U.S. 439, 443 (1988) (quoting *Lindahl v. OPM*, 470 U.S. 768, 773 (1985)). Because the CSRA is so detailed and comprehensive, the Supreme Court has decided that Congress intended the CSRA's administrative process to be the only process for addressing the prohibited practices it covers, to the exclusion of any other litigation. *See id.* at 452–55; *see also Elgin v. Dep't of Treasury*, 567 U.S. 1, 10–13 (2012). So if the CSRA creates a procedure for a particular type of claim by a particular type of claimant, then that process is both "exclusive and preclusive." *Mangano v. United States*, 529 F.3d 1243, 1246 (2008). The CSRA is also exclusive in the sense that it can preempt employee lawsuits when no other remedy is available. *Id.*

As summarized above, Joslin's complaint focuses on an employment decision: their termination. The CSRA ordinarily allows federal employees to appeal terminations to the Merit Systems Protection Board (MSPB). *See* 5 U.S.C. §§ 7511(a)(1)(A), 7512, 7513(d); *see also Elgin*, 567 U.S. at 6. Employees can also ask the Federal Circuit to review the MSPB's final decisions. *See* 5 U.S.C. § 7703(c); 28 U.S.C. § 1295(a)(9). But the CSRA does not give Joslin and other employees on probationary or trial periods the same option. *See* 5 U.S.C. § 7511(a)(1)(A). Probationary and trial-period employees must instead rely on the OSC. *See* 5 U.S.C. § 1214(a)(1)(A), (a)(3). A few details about the OSC and its complaint process are a necessary background to the government's jurisdictional arguments and Joslin's response.

The OSC has a statutory obligation to "protect employees, former employees, and

applicants for employment from prohibited personnel practices." 5 U.S.C. § 1212(a)(1). Prohibited personnel practices run a wide gamut, from retaliation against whistleblowers to violations of constitutional rights. *See, e.g.*, *id.* §§ 2301(b)(2), 2302(b)(9), 2302(b)(12). The OSC must "investigate allegations of prohibited personnel practices" in response to employees' complaints and seek corrective action. *Id.* § 1212(a)(2); *see also id.* § 1214(a)(1)(A). It normally has 240 days to decide whether "there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken." *Id.* § 1214(b)(2)(A)(i). If there are, then the OSC must report that determination to the MSPB, to "the agency involved," and to the Office of Personnel Management, along with any "recommendations for corrective action to be taken." *Id.* § 1214(b)(2)(B). The OSC can also ask the MSPB to stay a prohibited practice in the interim. *See id.* §§ 1212(a)(2)(A), 1214(b)(1)(A)(i).

After the OSC makes its report, the CSRA gives the agency "a reasonable period of time" to "correct the prohibited personnel practice." *Id.* § 1214(b)(2)(C), (D). If it does not, then the OSC can file a petition with the MSPB, which must receive any "oral or written comments by the Special Counsel, the agency involved, and the Office of Personnel Management" and any "written comments by any individual who alleges to the subject of the prohibited personnel practice." *Id.* § 1214(b)(E)(3). The MSPB can order the agency to take corrective action if it finds that there has been a prohibited personnel practice. *See id.* § 1214(b)(2)(D), (b)(3), (g). If, on the other hand, the MSPB decides there was no prohibited practice, the employee can seek judicial review, normally in the Federal Circuit. *See id.* §§ 1214(c)(1); 7703(b)(1)(A).

By contrast, if the OSC's investigation leads it to conclude that there has not been a prohibited practice, then the case takes a different course, and the employee has more limited options. The OSC can terminate an investigation, but in general, it must send "proposed findings of fact and legal conclusions" to the employee beforehand, and the employee can send "written comments" back to the OSC. *Id.* § 1214(a)(1)(D); *but see id.* § 1214(a)(6). After the OSC terminates an investigation, it must normally give notice that it has done so, summarize the "relevant facts," explain "the reasons for terminating the investigation," and respond to any written comments from the employee. *Id.* § 1214(a)(2). In some limited circumstances—such as

in cases of alleged retaliation against whistleblowers or against employees who have refused to follow illegal orders—the employee may then "seek corrective action" from the MSPB directly, and then from a court, again usually in the Federal Circuit. *See id.* § 1214(a)(3) (citing *id.* § 2302(b)(8), (b)(9)(A)(i), and (b)(9)(B)–(D)). But in most circumstances, the end of the investigation is the end of the process as a whole. In this way, the OSC's discretionary decision could be thought of as a filter or a gate through which an employee's claims must pass before a judge or a court can hear them.

The government argues this process is the only process that a probationary or trial-period employee like Joslin can follow to challenge a termination. Joslin does not dispute that the CSRA covers their claims about their termination and offers a process to contest it. They filed a complaint with the OSC in December 2025. (*See* Doc. 28 at 4.) The OSC has not requested a stay on Joslin's behalf, and its 240-day deadline to make a determination under § 1214 will expire in August 2026. Joslin argues that despite the CSRA's preclusive effect, this Court has jurisdiction because their claims are equitable claims for violations of constitutional rights. (*See, e.g.*, Doc. 40 at 18–22.)

Federal courts have indeed been reluctant to interpret statutes as completely barring judges from hearing constitutional claims, both before and after the CSRA was passed. *See Webster v. Doe*, 486 U.S. 592, 603 (1988) (citing *Johnson v. Robison*, 415 U.S. 361, 373–74 (1974)). The Supreme Court has held that if "Congress intents to preclude judicial review of constitutional claims," then "its intent to do so must be clear." *Id.* This clarity requirement avoids, among other things, "the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* (quoting *Bowen v. Mich. Academy of Family Physicians*, 476 U.S. 667, 681 n.12 (1986)). And so, when the government argues that Congress has deprived federal courts of jurisdiction over a colorable constitutional claims against it, the court checks whether that was clearly Congress's intent. *See Elgin*, 567 U.S. at 9; *Am. Fed. Gov't Emps. v. Stone*, 502 F.3d 1027, 1035 (9th Cir. 2007). If it was not, then the court interprets the statute more narrowly, as permitting it to adjudicate the constitutional claim. *See Webster*, 486 U.S. at 603–04; *Am. Fed. Gov't Emps.*, 502

F.3d at 1035–36.

In many situations, a statute does not actually "deny any judicial forum" to those with colorable constitutional claims, but rather "channels judicial review" of those claims through a particular court. *Elgin*, 567 U.S. at 9–10. The "heightened" clarity standard does not come into play in that situation. *See id.* If a judicial venue is open, then the court checks "only whether Congress's intent to preclude district court jurisdiction was 'fairly discernible in the statutory scheme.'" *Id.* (quoting *Thunder Basin Coal Co v. Reich*, 510 U.S. 200, 207 (1994)). But even then, federal courts do not "presume" that Congress has limited their jurisdiction in a way that "could foreclose all meaningful judicial review." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 212–13).

The Supreme Court and several lower courts have applied these rules to the CSRA in many previous cases. In *Elgin*, for example, the Supreme Court held that the CSRA does not deny a judicial forum to federal employees with colorable constitutional claims, and it held that the CSRA does not foreclose all meaningful judicial review, either. *See* 567 U.S. at 10–23. As summarized above, employees can pursue claims in the Federal Circuit if the MSPB does not grant them the relief they seek. *See id.* at 10. The Supreme Court was also confident that the Federal Circuit was "fully capable of providing meaningful review" of any constitutional claims that an employee might bring. *Id.* at 10; *see also id.* at 16–21. The CSRA was therefore preclusive of the claims that the plaintiff employees had asserted by other avenues. *See id.*

The Supreme Court has not decided expressly whether the CSRA denies a judicial forum to employees on a trial period, like Joslin. The Court did not reach this question in *Elgin* because the plaintiff employee could have appealed directly to the MSPB. *See Elgin*, 567 U.S. at 9–11. The Court did not reach this question in *United States v. Fausto*, cited above, because that case involved no constitutional claims. *See id.* at 9–11 & n.4 (citing *Fausto*, 484 U.S. at 440–41, 448).

As Joslin points out, at least one district court has held that the CSRA does not offer "meaningful judicial review" to federal employees who, like Joslin, must bring complaints to the OSC rather than the MSPB. *See Bridges v. Colvin*, 136 F. Supp. 3d 620, 646–48 (E.D. Pa. 2015). That court had reservations about this holding, however, most prominently because its

7

conclusions were difficult to reconcile with the Supreme Court's reasoning in *Elgin*, if they could be reconciled at all. *See id.* at 647–48. The district court also made clear in *Bridges* that it would probably have reached a different conclusion if it had not been bound to follow the Third Circuit's precedent. *See id.* at 643–44 (citing *Semper v. Gomez*, 747 F.3d 229 (3d Cir. 2014) and *Mitchum v. Hurt*, 73 F.3d 30 (3d Cir. 1995)). Although the Third Circuit ultimately affirmed the district court's decision, its opinion is unpublished, so it is not binding even within that circuit. *See* 672 F. App'x 162 (3d Cir. 2016); *see also* U.S. Court of Appeals for the Third Circuit, Internal Operating Procedures 5.1, 5.3, and 5.7. The Third Circuit did not address the district court's concerns or the preemption issue, either. *See* 672 F. App'x 162 (3d Cir. 2016).

These circumstances deprive the district court's order in *Bridges* of a great deal of its possible persuasive value. But more importantly, the district court's holding in *Bridges* is at odds with the Ninth Circuit's opinion in *Saul v. United States*, 928 F.2d 829 (9th Cir. 1991), which this Court is bound to follow.

Many portions of the Circuit's opinion in *Saul* are unenlightening in this case, at least for the moment, because the plaintiff's claims in *Saul* were for damages, not injunctive relief. *See id.* at 835–40. At the end of the Circuit's opinion, however, it affirmed the district court's decision to dismiss the case without permitting the plaintiff to seek injunctive relief, *see id.* at 843, and this portion of the Circuit's opinion is essentially controlling. The Circuit held that a constitutional claim for injunctive relief would be "futile" because the CSRA "provides its own form of injunctive relief, by permitting the OSC to seek a stay of a prohibited personnel practice," citing the statutory provisions summarized above. *Id.* at 843 & n.26. The clear implication of this holding is that the OSC review process is meaningful and thus that the CSRA precludes constitutional claims by probationary employees. And although *Saul* was decided many years ago, the parties have cited no intervening Supreme Court or circuit authority that might show it is no longer binding, and the Court has found none. To the contrary, when the Ninth Circuit has revisited the CSRA and its preemptive effect, it has effectively confirmed that *Saul* is still binding.

For example, Joslin and the government both cite the Ninth Circuit's opinion in *American*

*Federation of Government Employees Local 1 v. Stone*, 502 F.3d 1027 (9th Cir. 2007). That was an unusual case, among other reasons because the government actually agreed with the plaintiff, a former federal employee, that there was "no administrative scheme" and no "administrative forum" in which the former employee could challenge his termination. *Id.* at 1034. The government also conceded that this "total preclusion of an employee's equitable constitutional claims could not be sustained." *Id.* Finally, the case was not about the CSRA, but rather the Aviation and Transportation Security Act, and that law could not be "reasonably read as satisfying the heightened showing of congressional intent necessary to construe a federal statute completely to preclude judicial review of constitutional claims." *Id.* In those circumstances, the Ninth Circuit agreed with the employee and the government that *Webster v. Doe* was controlling: there was no administrative avenue for the plaintiff's constitutional claims whatsoever, and the allegedly preclusive law did not clearly bar all judicial review. *See id.* The federal courts remained open to hear the constitutional claim. *See id.*

The Ninth Circuit reconciled its decision in *Stone* with its opinion in *Saul* by explaining that the plaintiff in *Saul* had other options. *Id.* at 1037. Unlike the plaintiff in *Stone*, the plaintiff in *Saul* "could have availed himself of alternative mechanisms to pursue his constitutional claim," including "under at least two CSRA appeal procedures," i.e., an OSC complaint. *Id.* The plaintiff in *Stone*, by contrast, had "no remedies" under the CSRA or any other law. *Id.* The implication of this reasoning is plain: when an employee has alternatives to a judicial complaint, *Saul* is controlling. As expected, then, after both *Saul* and *Stone* were decided, appellate panels have affirmed district courts' decisions to dismiss claims as preempted by the CSRA, even constitutional claims. *See Munoz v. Locke*, 634 F. App'x 166, 167 (9th Cir. 2015), *aff'g* No. 10-1475, 2013 WL 11319006, at *6 (W.D. Wash. Apr. 24, 2013); *Wilborn v. Johnson*, 592 F. App'x 571, 572 (9th Cir. 2015), *aff'g* No. 11-2252, 2013 WL 1222061, at *3 (S.D. Cal. Mar. 25, 2013). District courts within the Ninth Circuit have also held that the CSRA is preclusive of probationary employees' claims, including their constitutional claims, citing the OSC complaint process. *See Bakshi v. Raimonda*, No. 22-2170, 2024 WL 5713606, at *5 (C.D. Cal. Dec. 23, 2024); *Toro v. Napolitano*, No. 12-2804, 2013 WL 4102158, at *2–3 (S.D. Cal. Aug. 13, 2013); *Munoz*, 2013

WL 11319006, at *6; *Chamat v. Paulson*, No. 07-1010, 2009 WL 764989, at *4–5 (S.D. Cal. Mar. 23, 2009), *aff'd on other grounds*, 381 F. App'x 728 (9th Cir. 2010).  Courts in another Circuit have relied on the same reasoning.  *See Gonzalez v. Manjarrez*, No. 11-29, 2013 WL 152177, at *4–6 (W.D. Tex. Jan. 4, 2013), *aff'd*, 558 F. App'x 350 (5th Cir. 2014) (per curiam). In short, the CSRA is preclusive because it "does not foreclose all avenues of relief" to Joslin and other employees in a similar position; "it merely directs [them] to seek relief by way of the OSC complaint process."  *Munoz*, 2013 WL 11319006, at *5.

There is a weakness in this logic, as Joslin points out.  It lies in the significant discretion that the CSRA vests in the OSC.  As summarized above, probationary employees like Joslin have very limited recourse when the OSC decides that there are no reasonable grounds to believe that a prohibited personnel practice has occurred.  Joslin argues the OSC's discretion thus deprives probationary employees of meaningful judicial review, at least in some cases. (*See, e.g.*, Doc. 40 at 18–19.)  This argument is plausible, but it conflicts with the Ninth Circuit's holding in *Saul* that an equitable constitutional claim would have been futile.  928 F.2d at 843 & n.26.  That holding is binding on this Court.

But even setting *Saul* aside, Joslin's position has a weakness of its own.  It would permit probationary employees to go to a district court of their choosing, in contrast with tenured employees, who would still have an obligation to pursue constitutional claims first before the MSPB, then in the Federal Circuit, as the Supreme Court required in *Elgin*.  Joslin's proposed interpretation would therefore give probationary employees more and different options than tenured employees, undermining one of the CSRA's primary purposes, i.e., the creation of a fairer and more unified administrative civil service system.  *See Fausto*, 484 U.S. at 449–50; *Irizarry v. United States*, 427 F.3d 76, 79–80 (1st Cir. 2005); *Weaver v. United States Info. Agency*, 87 F.3d 1429, 1433–34 (D.C. Cir. 1996).

To complicate matters further, Joslin's argument implies not only that probationary employees can file complaints in a district court.  It implies also that probationary employees can file lawsuits immediately, without waiting until the OSC completes its investigation and makes a decision. (*See* Doc. 40 at 18 & n.11.)  Joslin's position therefore also conflicts with the more

10

general principle "that an aggrieved federal employee must exhaust their claims before filing a federal lawsuit." *Munoz*, 2013 WL 11319006, at *6. An employee's failure to exhaust a claim by pursuing it through to a final resolution with the agency normally "deprives the Court of subject matter jurisdiction" to hear it. *Id.* So even if the OSC process fell short of ensuring a meaningful opportunity for judicial review of a constitutional claim, the better course would be to entertain a judicial complaint only after the OSC process had run its full course, not before. *See Irizarry*, 427 F.3d at 79–80 & n.4; *Weaver*, 87 F.3d at 1433. Joslin's claim would likely be premature if it were not precluded entirely.

Joslin's arguments about the statute of limitations and the OSC's decision not to seek a stay do not show that this Court can disregard the Circuit's opinion in *Saul*. (*See, e.g.*, Doc. 40 at 18–19.) They do not smooth over the problematic implications of Joslin's position, including parallel and premature litigation. The government summarizes the problem well in its reply brief: "Plaintiff's legal position, taken to its logical conclusion, would effectively permit every disappointed federal employee to bypass the CSRA simply by alleging that the OSC did not pursue the claim aggressively enough[.]" Doc. 43 at 7.

The Court lacks jurisdiction to review Joslin's termination or to offer any related relief, including a reinstatement.

## II.   Criminal Prosecution

Joslin also asks the Court to enjoin any criminal enforcement of park regulations, to enjoin any pending investigation or prosecution, and to issue a similar judicial declaration. (Doc. 28 at 21.) The government argues the Court does not have jurisdiction over these issues under Article III. (Doc. 34-1 at 18.)

As the Supreme Court has interpreted it, "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. Const., Art. III, § 2). This language imposes two related jurisdictional requirements. First, under the doctrine of constitutional standing, plaintiffs must identify an "injury in fact" that the defendants caused, one that will be redressed by a decision in their favor. *Id.* (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992)). A "future injury"

11

can be an "injury in fact," but only if it is "certainly impending" or at least presents a "substantial risk" of harm. *Id.* (quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 n.5 (2013)).  Second, the constitutional "ripeness" doctrine prevents federal courts "from entangling themselves in abstract disagreements" or issuing purely advisory opinions about conflicts that might arise in the future. *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).  The inquiry under these doctrines is often "largely the same." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (quoting *Thomas*, 220 F.3d at 1139).  That is true in this case:  Are the issues "definite and concrete"?  Or merely "hypothetical" and "abstract"? *Id.* (quoting *Thomas*, 220 F.3d at 1139).

Courts must often decide whether a plaintiff's allegations about a potential future prosecution meet this standard.  It is a "recurring issue." *Driehaus*, 573 U.S. at 158.  The Supreme Court has not forced plaintiffs to wait until they are arrested or prosecuted before they file a lawsuit, especially when their First Amendment rights are at stake. *Id.*  It has "permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Id.* at 159.  A case can move forward if the plaintiff has an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute," provided that there is also a "credible threat of prosecution" under that law. *Id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

To decide whether a "threat" of prosecution is "genuine" or "credible," courts within the Ninth Circuit have often considered whether the plaintiff has a concrete plan to violate the law, whether authorities have "communicated a specific warning or threat" to enforce it, and whether there is any "history of past prosecution or enforcement." *Thomas*, 220 F.3d at 1139.  This analysis is essentially the same as the three-part *Driehaus* standard, and the Circuit has "toggled" between both. *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024).  But it has tended to rely on the *Driehaus* test in its more recent opinions. *See, e.g.*, *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 836 (9th Cir. 2024); *Peace Ranch*, 93 F.4th at 487.  This Court will do the same.

Joslin has already engaged in conduct "affected" with a constitutional interest by helping

to display a large trans rights flag on El Capitan.  At that time, it might have been unclear whether park regulations permitted Joslin and others to do as they did, but the defendants have since made clear that they believe Joslin violated park regulations.  (*See, e.g.*, 34-1 at 9.)  Joslin does not describe any concrete plans to fly another flag in a similar place now that the government's position is clear.  They do allege that they are worried about "speaking out" more generally.  (*See* Doc. 29-4 at 10–11.)  But that worry stems from their concern that the government will prosecute them for the events in May 2025, not for the later "speaking out," whatever form it might take.  To put it differently, Joslin does not allege that they have plans to hang another flag from El Capitan again soon.  For these reasons, the only dispute is whether there is any "credible" or "genuine" threat of a prosecution based on the events in May 2025. There is not.

First, the government has now stated that prosecutors are pursuing neither a criminal investigation nor an indictment.  It writes unambiguously in its legal memorandum that it would be "contrary to fact" to assume that Joslin is "the target of an ongoing criminal investigation." (Doc. 34-1 at 18.)  The government also dismisses Joslin's allegations about a potential future prosecution as unfounded and baseless "speculation."  (*Id.* at 17.)  The government's willingness to disavow a prosecution supports its assertion that there is no credible threat.  *See, e.g.*, *Peace Ranch*, 93 F.4th at 490 ("[The threat factor] often rises or falls with the enforcing authority's willingness to disavow enforcement.").

Second, the parties appear to agree that no one has ever been prosecuted for flying a flag on El Capitan, neither before May 2025 nor afterward.  Joslin argues, in fact, that they are the first and only person who has ever faced any adverse consequence at all.  (*See* Doc. 29-1 at 9.) The absence of any other enforcement supports the government's argument that there is no credible threat.  *See Driehaus*, 573 U.S. at 164; *Thomas*, 220 F.3d at 1140–41.

Third, although Joslin alleges that park officials and a spokesperson left open the possibility of a criminal investigation of some kind against someone in statements to reporters, Joslin does not allege that anyone has threatened them with a prosecution.  As summarized above, news outlets published a statement by a spokesperson (not a prosecutor, not a law enforcement officer) that a criminal investigation (not a prosecution) against unidentified employees or visitors

(not Joslin in particular) was merely "possible." (*E.g.*, Doc. 29-3 at 211.)  Although an officer told Joslin at one point that an investigation was underway, prompting them to secure representation by an attorney, Joslin does not allege that any officers have said anything about a criminal investigation since then.  Nor does Joslin allege that any official with prosecutorial authority has made any other statements or taken any other actions that imply a prosecution or investigation is in the works.  The absence of any such threat offers further support to the conclusion that Court lacks jurisdiction.  This is not a case, like *Planned Parenthood*, for example, in which a government official with prosecutorial authority has communicated a clear written warning about a specific criminal prohibition.  *See* 122 F.4th at 839.

For these reasons, there is not a credible threat of prosecution.  The Court lacks jurisdiction to hear Joslin's claims about a criminal investigation or prosecution.

**III.    Privacy Act**

Finally, the government interprets Joslin's claim under the Privacy Act as a subsidiary employment dispute.  (*See, e.g.*, Doc. 43 at 8–9.)  It argues the CSRA applies to that claim as well.  (*See id.*)  Joslin argues the government has misinterpreted this claim.  (Doc. 40 at 32.)  They explain that their allegations about the Privacy Act are "narrower" than the government believes and are focused on events before their termination.  (*See id.*)

The government relies primarily on the Ninth Circuit's opinion in *Houlihan v. Office of Personnel Management*, 909 F.2d 383 (9th Cir. 1990) (per curiam).  (*See, e.g.*, Doc. 43 at 7–8.)  The plaintiff in *Houlihan* was an employee who disputed her reclassification to a lower level on the General Schedule.  909 F.2d at 384.  One of the issues in the case related to a set of interview notes.  *See id.*  The notes had been destroyed, and the plaintiff contended that this was in violation of the Privacy Act.  *Id.*  The Ninth Circuit rejected the claim as precluded by the CSRA.  *See id.* at 384–85.  As it explained, the employee would ultimately have had to prove that there was some "causal connection" between the destruction of the interview notes and a specific harm that the plaintiff had suffered.  *Id.* at 384 (citation omitted).  The "harm" in question was the decision to reclassify the plaintiff to a lower GS level.  *See id.* at 385.  So to decide whether there was any "causal connection," a federal court "would have to compare [the agency's] decision to the

decision it would have made had [it] maintained its records." *Id.* The court would be reviewing the reclassification itself. *See id.* The CSRA applies to reclassifications, so the employee's Privacy Act claim threatened to open a "back door to judicial review, . . . thereby frustrating Congress's decision to assign to the OSC the task of policing alleged prohibited personnel practices." *Id.* The Privacy Act claim could not move forward in those circumstances. *See id.*

The situation in this case is different. Joslin alleges the defendants "collected and otherwise maintained records describing how Dr. Joslin exercised rights guaranteed by the First Amendment," in violation of the Privacy Act. (Doc. 28 at 20 (alterations and quotation marks omitted).) Joslin alleges the collection of these records "adversely affected" them "by chilling their constitutional rights." (*Id.*) The "harm," in other words, was not the termination or some other employment matter listed in the CSRA, *see* 5 U.S.C. § 7512, but rather the more general chilling effect of the collection itself. Joslin's allegations do not imply that resolving their Privacy Act claim will entail any investigation of a decision that this Court is bound not to second-guess under the CSRA, so the Circuit's opinion in *Houlihan* does not show that the CSRA is preclusive.

But Joslin's claim under the Privacy Act has a different jurisdictional problem, which this Court cannot overlook, even though neither party has raised it. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[C]ourts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."). As summarized in the previous section, a plaintiff cannot pursue a claim in a federal court if the complaint's allegations do not show how the defendant's actions caused a concrete and particularized harm. *See, e.g.*, *Lujan*, 504 U.S. at 560–61. Joslin alleges the collection of records "adversely affected" them "by chilling their constitutional rights." (Doc. 28 at 20.) But Joslin does not explain how or when they learned that the defendants were collecting information, nor what information the defendants collected, nor how the knowledge of this collection might have dissuaded them or someone else from doing or saying anything. For these reasons, the Court cannot infer from Joslin's current allegations that they have constitutional standing to pursue a claim under the Privacy Act.

**CONCLUSION**

For the reasons above, the motion to dismiss for lack of jurisdiction (Doc. 34) is **GRANTED**, and the motion for a preliminary injunction (Doc. 29) is **DENIED**:

(1)   The Court cannot conceive of any allegations that Joslin could assert in a future complaint that might permit them to avoid the CSRA's preclusive effects. *See Saul*, 928 F.2d at 843. The motion to dismiss Joslin's employment-related claims and requests for relief is granted without leave to amend, but also without prejudice to any future litigation in an appropriate venue. *See Hamptom v. Pac. Inv. Mgmt. Co. LLC*, 869 F.3d 844, 846 (9th Cir. 2017).

(2)   The Court cannot exclude the possibility that Joslin could make additional allegations to show that the Court has jurisdiction over their claims about a potential criminal prosecution or under the Privacy Act. The government's motion to dismiss these portions of the complaint is therefore granted with leave to amend. *See* Fed. R. Civ. P. 15(a). Any second amended complaint must be filed within thirty days.

(3)   Because the Court has dismissed the complaint, Joslin cannot show they are likely to succeed on the merits of the claims within it, nor that their claims raise serious questions on the merits. The motion for a preliminary injunction is therefore denied. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

IT IS SO ORDERED.

Dated:   **June 12, 2026**

_____
UNITED STATES DISTRICT JUDGE